THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| VICTOR STANLEY, INC. | * | |
| | * | Civil No. MJG-06-2662 |
| Plaintiff, | * | |
| v. | * | |
| CREATIVE PIPE, INC., ET AL. | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM, ORDER AND RECOMMENDATION

This Memorandum, Order and Recommendation addresses Plaintiff's Motion For Terminating And Other Sanctions Arising Out Of Defendants' Intentional Destruction Of Evidence And Other Litigation Misconduct ("Pl.'s Mot."), ECF[1] No. 341, which Plaintiff Victor Stanley, Inc. ("VSI") filed; Plaintiff's Supplemental Memorandum Relating To Possible Misconduct By Others That Contributed To Defendants' Spoliation Of Evidence, ECF No. 342; Defendants Creative Pipe, Inc. ("CPI") And Mark Pappas' Opposition To Victor Stanley, Inc.'s Motion For Sanctions ("Defs.' Opp'n"), ECF No. 350; Plaintiff's Reply to Defendants' Opposition, ECF No. 368; and Defendants' Surreply, ECF No. 372.[2]

---

[1] Court papers formerly were cited as "Paper No." or "Doc. No."  The recently-published Nineteenth Edition of *The Bluebook* provides that electronically-filed documents should be cited as "ECF No."

[2] On December 8, 2006, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302, Judge Garbis referred this case to me to resolve discovery disputes and related scheduling matters. ECF No. 21.  Ordinarily, referral of a case to a Magistrate Judge to resolve discovery matters pursuant to 28 U.S.C. § 636(b)(1)(A) and Local Rule 301.5.a contemplates that the Magistrate Judge may order any appropriate relief short of issuing an order that is dispositive of one or more of the pending claims or defenses.  Objections to such non-dispositive discovery orders must be

Through four years of discovery, during which Defendant Mark Pappas, President of Defendant CPI, had actual knowledge of his duty to preserve relevant information, Defendants delayed their electronically stored information ("ESI") production; deleted, destroyed, and otherwise failed to preserve evidence; and repeatedly misrepresented the completeness of their discovery production to opposing counsel and the Court.   Substantial amounts of the lost evidence cannot be reconstructed.   After making repeated efforts throughout discovery to try to effect preservation of ESI evidence and obtain relevant ESI evidence to support its claims, Plaintiff has identified eight discrete preservation failures, as well as other deletions that did not permanently destroy evidence, in a byzantine series of events.   These events culminated in a succession of requests by Plaintiff to obtain discovery that it consistently maintained Defendants had not provided despite numerous Court orders.   Plaintiff sought permission to file its fourth motion for sanctions, and the Court held evidentiary hearings on October 29 and December 1 and 2, 2009.   Ultimately, Plaintiff received permission and filed the above-referenced motion, which resulted in filings and exhibits exceeding the Manhattan telephone directory in girth, as well as

---

served and filed within fourteen days of the entry of that order.  Loc. R. 301.5.a.  If a District Judge contemplates that the disposition of discovery disputes by a Magistrate Judge may involve sanctions that are dispositive of pending claims or defenses, such as those provided in Fed. R. Civ. P. 37(b)(2)(A)(v) and (vi), then the District Judge would direct the Magistrate Judge to propose findings of fact and recommendations for action to be taken pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 301.5.b.   When a Magistrate Judge issues a Report and Recommendation, the parties have fourteen days to serve and file objections.  Fed. R. Civ. P. 72(b); Loc. R. 301.5.b.  Judge Garbis's Order of Referral does not state whether it is pursuant to 28 U.S.C. § 636(b)(1)(A) or (B), but to the extent that this Memorandum and Order orders non-dispositive relief, it shall be pursuant to 28 U.S.C. § 636(b)(1)(A); to the extent that it recommends dispositive relief, it shall be pursuant to 28 U.S.C. § 636(b)(1)(B).  Either way, the parties have fourteen days in which to serve and file objections to any aspect of this Memorandum, Order and Recommendation.  Loc. R. 301.5.

As discussed *infra*, both non-dispositive and dispositive relief is granted; accordingly the format is a hybrid memorandum and order and, as to the dispositive relief sought, a recommendation.  *See* 28 U.S.C. § 363(b)(1).

hearings jointly conducted before the undersigned and Judge Garbis on February 24, 2010; April 26, 2010; and June 25, 2010.   At the end of the day, Defendant did not rebut, but indeed acknowledged, that the majority of Plaintiff's allegations were accurate.   Moreover, without conceding any inappropriate motive on their part, Defendants stated their willingness to acquiesce in the entry of a default judgment on Count I (which alleges copyright infringement), the primary claim filed against them.   That Defendants Pappas and CPI would willingly accept a default judgment for failure to preserve ESI in the primary claim filed against them speaks volumes about their own expectations with respect to what the unrebutted record shows of the magnitude of their misconduct, and the state of mind that must accompany it in order to sustain sanctions of that severity.

For the reasons stated herein, Plaintiff's Motion will be GRANTED IN PART and DENIED IN PART, and it further is recommended that, in addition to the relief ordered by this Memorandum and Order, Judge Garbis enter an Order granting a default judgment against Defendants with regard to Count I of the Complaint (which alleges copyright infringement). Among the sanctions this memorandum imposes is a finding, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vii), that Pappas's pervasive and willful violation of serial Court orders to preserve and produce ESI evidence be treated as contempt of court, and that he be imprisoned for a period not to exceed two years, unless and until he pays to Plaintiff the attorney's fees and costs that will be awarded to Plaintiff as the prevailing party pursuant to Fed. R. Civ. P. 37(b)(2)(C).[3]   The

---

[3]  Imposing contempt sanctions pursuant to Rule 37(b)(2)(A)(vii), particularly including a sentence of imprisonment, is an extreme sanction, but this is an extreme case.  For reasons that are much more fully explained below, this sanction is not a form of criminal contempt, which could not be imposed without compliance with Fed. R. Crim. P. 42, but rather a form of civil contempt, inasmuch as Pappas may purge himself of his contempt, and concomitantly avoid imprisonment, by performing the affirmative act of paying Plaintiff's attorney's fees and costs incurred in connection with successfully prosecuting this motion. *Hicks v. Feiock*, 485 U.S. 624,

recommendation that a default judgment be imposed as to Count I is made pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi), based on the Defendants' spoliation of evidence, as further described herein.  As noted, Defendants themselves have agreed that such a sanction is appropriate. (Defs.' Opp'n 29.)

## I.    BACKGROUND

Regrettably, the events underlying the pending motions are convoluted and cannot be summarized succinctly.  They must be set forth in considerable detail, inasmuch as they spanned several years, involved multiple actors and a succession of defense attorneys, and are memorialized by hundreds of Court filings and affidavits, as well as countless hours of deposition and hearing testimony.  Charting them has consumed, collectively, hundreds of hours of my time and my law clerk's time.[4]  It is unfortunate that the Court lacks any effective means to order Defendants to pay a fine to the Clerk of the Court to recapture the cost to the Court of the time my staff and I spent on this motion, which prevented us from addressing deserving

631-32 (1988); *Buffington v. Baltimore Cnty., Md.*, 913 F.2d 113, 133 (4th Cir. 1990). These cases are discussed in further detail below. A magistrate judge's finding of a party in civil contempt as a discovery violation is reviewable by the district court, as is any non-dispositive discovery order, pursuant to Local Rule 301.5.a, which permits a party to file objections to a magistrate judge's discovery rulings within fourteen days. *See, e.g.*, *SonoMedica, Inc. v. Mohler*, No. 1:08-cv-230 (GBL), 2009 WL 2371507 (E.D. Va. July 28, 2009).

[4] I acknowledge with gratitude the copious-fact checking of Joshua Altman, Ashley Marucci, and Jessica Rebarber; the research assistance of Rignal Baldwin V, Matt Haven, and Ilan Weinberger; and the cite-checking of Eric Kunimoto, Marissa Lenius, and Melissa O'Toole-Loureiro, all of whom interned in my Chambers over the course of the past year.  Further, the indispensable assistance of my law clerk, Lisa Yurwit, is gratefully acknowledged.

motions in other pending cases.[5]  If such a sanction were reasonably available, however, this case would be the poster child demonstrating its appropriateness.

For ease of comprehension, after briefly describing the basis of the underlying lawsuit, the Background section of this Memorandum, Order and Recommendation chronicles Pappas's[6] dogged but unsuccessful attempts to prevent the discovery of ESI evidence against him, because it is relevant to his state of mind at the time of his myriad successful deletions.  It then chronicles Pappas's successful, permanent deletions of countless ESI.   In this regard, Plaintiff VSI is fortunate that Pappas's zeal considerably exceeded his destructive skill and his judgment in selecting confederates to assist in his efforts to destroy ESI without detection.   While Pappas succeeded in destroying a considerable amount of ESI, Plaintiff was able to document this fact and ascertain the relevance of many deleted files.   At the end of the day, this is the case of the "gang that couldn't spoliate straight."   All in all, in addition to the attempted deletions that

---

[5] I note that the Court lacks any "effective" means to order Defendants to pay a fine to the Clerk of the Court.   Such an order is regarded as a form of criminal contempt, which may not be imposed without affording Defendants the procedural protections of Fed. R. Crim. P. 42(b).   *See Buffington*, 913 F.2d at 131-34 (reversing order of district court finding defendants' attorneys in civil contempt for failing to comply with orders to produce evidence in a civil case and ordering each to pay a fine of nearly $7,000 to the Court, because such a sanction is a form of criminal contempt that cannot be imposed without compliance with Fed. R. Crim. P. 42(b)).   While it is technically accurate that a court may, after complying with those procedures, order a party to pay a fine to the Clerk of the Court as a sanction for discovery misconduct that consumed excessive court resources to resolve, it is a rare case in which a court will do so because Rule 42(b) contemplates a referral to the United States Attorney for criminal prosecution or, if that office declines to prosecute, appointment of a private prosecutor to bring the case.   I seriously considered doing so in this case, for reasons explained below, but ultimately decided against it. This case has been pending for more than four years, and to perpetuate it in another form by initiating a criminal prosecution of Pappas just to impose a fine payable to the Clerk of the Court would be unwarranted, particularly because Fed. R. Civ. P. 37(b)(2)(A)(vii) allows the imposition of appropriately severe sanctions as a form of civil contempt.

[6] For ease of reference I will refer to Pappas's actions, but because Pappas controlled CPI at all times relevant to this case, his misconduct is attributable to him individually as well as to his company, CPI.

caused delay but no loss of evidence, there were eight discrete preservation failures: (1) Pappas's failure to implement a litigation hold; (2) Pappas's deletions of ESI soon after VSI filed suit; (3) Pappas's failure to preserve his external hard drive after Plaintiff demanded preservation of ESI; (4) Pappas's failure to preserve files and emails after Plaintiff demanded their preservation; (5) Pappas's deletion of ESI after the Court issued its first preservation order; (6) Pappas's continued deletion of ESI and use of programs to permanently remove files after the Court admonished the parties of their duty to preserve evidence and issued its second preservation order; (7) Pappas's failure to preserve ESI when he replaced the CPI server; and (8) Pappas's further use of programs to permanently delete ESI after the Court issued numerous production orders.  The reader is forewarned that although organized into separate categories to facilitate comprehension of so vast a violation, many of the events described in the separate categories occurred concurrently.[7]

VSI filed a Complaint against CPI, Mark Pappas, Stephanie Pappas (Mark Pappas's wife at the time), and "John Doe a/k/a Fred Bass" on October 11, 2006, alleging, *inter alia*, violations

---

[7] As will be discussed in detail later in this memorandum, when a court is evaluating what sanctions are warranted for a failure to preserve ESI, it must evaluate a number of factors including (1) whether there is a duty to preserve; (2) whether the duty has been breached; (3) the level of culpability involved in the failure to preserve; (4) the relevance of the evidence that was not preserved; and (5) the prejudice to the party seeking discovery of the ESI that was not preserved.  There is something of a "Catch 22" in this process, however, because after evidence no longer exists, it often is difficult to evaluate its relevance and the prejudice associated with it. With regard to Pappas's many acts of misconduct, the relevance and prejudice associated with some of his spoliation can be established directly, or indirectly through logical inference.  As to others, the relevance and prejudice are less clear.  However, his conduct still is highly relevant to his state of mind and to determining the overarching level of his culpability for all of his destructive acts.  When the relevance of lost evidence cannot be proven, willful destruction of it nonetheless is relevant in evaluating the level of culpability with regard to other lost evidence that was relevant, as it tends to disprove the possibility of mistake or accident, and prove intentional misconduct.  Fed. R. Evid. 404(b).

of copyrights and patents, and unfair competition.[8]  (Compl. ¶ 2, ECF No. 1.)  Specifically, VSI claimed that someone at CPI downloaded VSI design drawings and specifications[9] extensively from VSI's website, using the pseudonym "Fred Bass," and that those drawings were used improperly in competition with VSI.  (*Id*. ¶¶ 17, 20.)  The Complaint was served on Mark Pappas on October 14, 2006.  (ECF No. 8.)  On October 23, 2006, Judge Garbis authorized immediate discovery—prior to Defendants' response to the Complaint—so that VSI could "ascertain the nature and scope of issues presented with regard to prior use of the Restricted Documents," i.e., "VSI product drawings and specifications as to which VSI claims copyright protection."  (ECF No. 9.)  VSI served limited document requests and interrogatories on Defendants on October 24, 2006.  (ECF No. 22-1.)

### 1. *Pappas Attempted to Prevent the Discovery of Evidence Against Him*

The bulk of this factual background describes Pappas's successful deletions of ESI.  To understand the gravity of these events, however, it is helpful to place them in the context of Pappas's state of mind during discovery.  For years, Pappas engaged in a cat and mouse game to

---

[8] According to a February 2, 2009 letter from Plaintiff's counsel, "Pappas became aware that Victor Stanley was contemplating a lawsuit against him and CPI" in July 2006. (Pl's Mot. Ex. 46, ECF No. 341-46.)  Defense counsel acknowledged that "[f]iles had been deleted from Mark Pappas' laptop in July 2006." (June 9, 2009 Rothschild Ltr. to Court, ECF No. 300.)

Although Stephanie Pappas, Mark Pappas's wife, is also a defendant, Plaintiff seeks no relief against Stephanie Pappas.  (Pl.'s Mot. 100 n.105.)   References to "Pappas" in this memorandum are to Mark Pappas.

[9] VSI "manufactures a broad line of high quality site furnishings used in public and commercial sites, such as litter receptacles, benches, tables and chairs, ash urns, planters, tree guards, seats and bollards made from steel, cast ductile iron, several special of wood or recycled plastic." (Compl. ¶ 10.)  The design drawings and specifications at issue were from VSI's "Product Library," which is posted on VSI's website, and which includes design drawings and specifications, as well as images, for VSI products.  (*Id*. ¶ 13, 20.)  CPI is a competitor selling similar products.  (*Id*. ¶ 1.)

hide harmful ESI from production during discovery, repeatedly trying to stall or prevent VSI from discovering evidence that he improperly accessed or used VSI's website or drawings. Ultimately, after Plaintiff demonstrated the incompleteness of Pappas's ESI production, the Court compelled Pappas to produce the ESI evidence he had not succeeded in deleting. This evidence supported Plaintiff's claims. Therefore, Pappas's actions in this regard did not result in actual prejudice to Plaintiff's ability to obtain evidence to support its claims, although it clearly resulted in considerable delay in completion of discovery and expense associated with efforts to discover the nature and extent of the spoliation. Nonetheless, I shall catalog a representative sampling of them because they are probative of the intentionality and bad faith of Pappas's successful deletions.[10]

Evidence that Pappas used the pseudonym "Fred Bass" is relevant to and would support Plaintiff's claim that Pappas's improper downloads of documents from VSI's Product Library were as "Fred Bass," and Plaintiff sought such evidence in discovery. (Pl.'s Second Request for Prod. of Docs., Pl.'s Mot. Ex. 9, ECF No. 341-9.) Pappas initially denied that he had ever accessed the VSI website (Oct. 20, 2006 Hr'g Tr. 5:8-18, Pl.'s Mot. Ex. 3, ECF No. 341-3) or used the pseudonym "Fred Bass." (Pappas Dep. 29:2-8, 31:24 – 32:2, 148:10-22, Nov. 17, 2006.) Also, during discovery, Defendants produced only two of 110 known "bass@aol.com" downloads of VSI drawings from a CPI computer. (Fifth Slaughenhoupt Aff. ¶¶ 11-12, Pl.'s Reply to Opp'n to July 13, 2007 Mot. for Sanctions Ex. 1, ECF No. 134-1.) These actions demonstrate Pappas's reluctance to produce evidence supporting Plaintiff's theory that "Fred

---

[10] I note that this case is not Pappas's maiden voyage into spoliation. He appears to have served his apprenticeship during his divorce case involving Stephanie, where the Court found that he had deleted evidence relevant to the case. (Oct. 29, 2009 24:10-14 (Pappas Test.).) The Court entered a restraining order against Pappas, prohibiting him from making any further data alterations on the CPI computers. (*Id.*) This is relevant to his state of mind in this case as well. Fed. R. Evid. 404(b).

Bass" was a CPI employee. Moreover, after VSI filed suit, Pappas asked a business contact in Argentina who had been hired to prepare CPI design drawings based on the downloaded VSI drawings, identified only as "Federico," to "destroy . . . all e-mail references" to VSI drawings, and he attempted to delete over 5,000 files that included email correspondence with Digican, Federico, and Steven Hair (CPI's business contacts that would have been involved in the production and importation of VSI products under the CPI name).[11]  (Pappas emails, Pl.'s Mot. Ex. 13; Dec. 1, 2009 Hr'g Tr. 76:2-25 (Spruill Test.), Pl.'s Mot. Ex. 26, ECF No. 341-26.) Pappas claimed to have moved the emails to a deleted items folder for "storage purposes," (Feb. 16, 2010 Pappas Aff. ¶ 7), a claim that, considering all the evidence, cannot be regarded as credible.  Indeed, it is hard to imagine that anyone would claim, with a straight face, that he deleted emails in order to "store" them in a deleted items folder.  The more credible inference to be drawn is that Pappas wanted to destroy any evidence that would belie his sworn statements. The evidence that Defendants ultimately produced after Plaintiff filed motions to compel and for sanctions, and the Court repeatedly ordered production, strongly demonstrates Pappas's use of the "Fred Bass" pseudonym, and Pappas eventually admitted that he accessed the VSI Library to look at the VSI drawings, and that he downloaded "some" of VSI's files.  (Oct. 29, 2009 Hr'g Tr. 64:2-4 (Pappas Test.).)  Also, the 5,000 files ultimately were recovered.[12]  (Dec. 1, 2009 Hr'g Tr. 81:7-9 (Spruill Test.).)  Thus, Pappas's efforts to subvert this evidence did not result in the

---

[11] Digican was CPI's connection to a Chinese supplier that manufactured CPI's products that competed with VSI's products.  The emails that were destroyed related to VSI.  (Pappas Dep. 88:19 - 91:6-21.)  Hair was CPI's shipping agent involved in CPI's import of Chinese-made products that CPI subsequently sold under a false claim that they were "Made in the USA." (Slaughenhoupt Aff. ¶ 42.)  CPI sold these products in competition with VSI's products, which are manufactured in Maryland.  (*Id.*)

[12] As discussed *infra*, in Section I.3, although Pappas's email deletion instructions to Federico were available for discovery, any emails that Federico may have destroyed per Pappas's directions have not been produced.

loss of this evidence, although his efforts to eliminate it caused considerable delay and expense to VSI.

Additionally, Pappas delayed in producing relevant ESI after Plaintiff identified it and requested it in discovery, and he lied about the completeness of Defendants' ESI production.  For example, Pappas swore on September 27, 2007 that "Defendants have produced to Plaintiff all non-privileged ESI sought by Plaintiff in its Rule 34 production requests."  (Sept. 27, 2007 Pappas Aff. 2, ECF No. 150.) Yet, Defendants had not produced 2,477 fully intact "deleted emails," 1,589 of which were between CPI and Digican, which Defendants, through their attorney at the time, Christopher Mohr,[13] had been aware of since at least May 2007. Defendants ultimately produced 1,199 of the emails, but not until August 5, 2009, nearly two years later, and only after Plaintiff identified the emails, with no help from Defendants, and repeatedly requested their production. (Feb. 9, 2009 Turner Report 2, Pl.'s Mot. Ex. 35, ECF No. 341-35; Dec. 2, 2009 Hr'g Tr. 87:1 – 88:25 (Turner Test.); Ninth Slaughenhoupt Aff. ¶¶ 27-28; Aug. 12, 2009 Ogg Ltr., ECF No. 341-36.)  Defendants concede, as they must, that the emails "should have been produced with the ESI produced to VSI in September/October 2007." (Defs.' Opp'n 19.)  Also in May 2007, Defendants, through Mohr, were aware of a deleted internet form using the name "Fred Bass" on Pappas's home computer, but the form neither came to light nor was produced until December 2009.  (Dec. 2, 2009 Hr'g Tr. 89:9-17, 93:1-13, 153:1 – 155:2 (Turner Test.).)  These instances of Defendants' delayed production, coupled with the Court's need to order repeatedly that Defendants preserve relevant ESI in its native fashion and turn it

---

[13] Counsel who currently represent Defendants, James Rothschild and Joshua Kaufman, were not counsel to Pappas or CPI during the times when the misconduct resulting in spoliation of evidence took place.

over to VSI, (Oct. 3, 2007 Hr'g Tr. 19:10 – 20:5 (Ct. order), Pl.'s Mot. Ex. 45, ECF No. 341-45), further evidence Pappas's efforts to thwart producing ESI that supported Plaintiff's case.

Moreover, at least two of Pappas's successful larger deletions of ESI occurred on the eve of scheduled discovery regarding the contents of Pappas's work computer. First, the Court scheduled a discovery hearing for February 1, 2007, and the afternoon before, Pappas deleted 9,234 files from his work computer, a password-protected laptop. (ECF No. 42; July 22, 2009 Spruill Report 3, ¶ 3.) Some, but not all, of these files reappeared in the middle of 2009, well after Plaintiff filed repeated motions to compel and the Court issued numerous orders to produce the evidence, as discussed *infra*. Second, an imaging of Pappas's work computer was scheduled for the week of February 21, 2007. Pappas deleted almost 4,000 files on February 16 and 17, 2007, and someone ran Microsoft Window's Disk Defragmenter program immediately afterward, rendering the files unrecoverable.[14] (Oct. 29, 2009 Hr'g Tr. 153:12-17, 161:8-11 (Pappas Test.); July 22, 2009 Spruill Report 4.) Despite the aforementioned motions and Court orders, these files were never produced. (July 22, 2009 Spruill Report 4.) The obvious relevance of the files deleted on January 31 and February 16 and 17, 2007 is discussed in detail, *infra,* in Sections I.6-7. The fact that Pappas undertook to delete these inculpatory files from his work computer on the eve of a discovery hearing and only days before a scheduled imaging of his

---

[14] Disk Defragmenter, Microsoft Window's disk defragmentation program, is a system utility that "consolidates fragmented files and folders on [a] computer's hard disk, so that each occupies a single, contiguous space" in the system. http://www.microsoft.com/resources/documentation /windows/xp/all/proddocs/en-us/snap_defrag.mspx?mfr=true. To consolidate fragmented files, the program moves the file fragments together by "overwriting all those places" where space in the system was occupied by deleted files. As a result, "the ability to recover deleted items virtually . . . disappears" because the same is occupied by other files. (Dec. 1, 2009 Hr'g Tr. 43:1 – 44:18 (Spruill Test.).) Cutting through all the techno-speak, it is foreseeable that the running of a disk defragmentation program, colloquially referred to as "defragging," can result in the loss of files that were recoverable before the defragmentation occurred.

work computer's contents compels the conclusion that he was knowingly engaged in efforts to destroy evidence that he regarded as harmful to Defendants and beneficial to Plaintiff.

### 2. *Pappas Failed to Implement a Litigation Hold*

Before litigation began, CPI stored all of its data on its server and backed up the data on ten backup tapes.  (DeRouen Dep. 17:9-12, June 29, 2007, ECF No. 341-17.)  Each tape would run for a day, and then someone at CPI would replace it with the next tape.  (*Id.* at 46:10-19.)  At the end of a two-week period, the process began again with the first tape, which was "amended" to incorporate any changes to the server since it last was recorded.  (*Id.*)  As to the reliability of the backup system, Evan DeRouen, Pappas's computer consultant of the past six years, testified that the system failed "[a]t least once or twice a week" when someone forgot to replace the backup tape.  (*Id.* at 45:13-17, 46:1-3.) DeRouen added that sometimes a week went by before someone replaced the tape.  (*Id.*)  Additionally, all users had the ability to alter or delete data. (*Id.* at 90:20-91:25.)  Therefore, without a litigation hold, ESI *could* be lost or modified at any time; without a change to the backup system, ESI *would* be lost or modified biweekly, under the best of circumstances.

The record is devoid of any evidence that Defendants considered, let alone implemented, a litigation hold after Plaintiff filed suit or after the Court issued preservation orders, discussed *infra*.  To the contrary, DeRouen testified that after suit was filed, nothing was done to address the system's deficiencies and to ensure the preservation of relevant ESI; Pappas did not ask him to take any steps, nor did he take any steps, to prevent users from deleting files from the server, or even to advise them not to delete files.  (*Id.*)  VSI's ESI expert, Andreas Spruill of Guidance Software, observed that "multiple users who ha[d] accounts on the server [were] adding,

deleting, creating, just carrying on business as usual." (Dec. 1, 2009 Hr'g Tr. 123:25 – 124:75.) Although Defendants retained Genevieve Turner[15] as an ESI litigation consultant between December 2006 and January 2007 and asked her to preserve some data, they did not consult her specifically about implementing an ESI preservation plan or a litigation hold. (Oct. 29, 2009 Hr'g Tr. 118:20 – 119:13 (Pappas Test.); Dec. 2, 2009 Hr'g Tr. 10:13-18, 12:1-22, 21:1-14, 101:12 – 102:3 (Turner Test.).)

DeRouen testified in 2007 that Pappas and/or Mohr, Defendants' counsel at the time, instructed him to retain the exchange server logs and not to delete anything.  (DeRouen Dep. 87:4-25.)  He stated that he therefore "removed the . . . function that allowed the [exchange server] logs to be purged once they're backed up" and ensured that "the backups are done."  (*Id.* at 88:21 – 89:4.)  However, Spruill testified in December 2009 that he had not "seen any exchange server logs that ha[d] been preserved or produced."  (Dec. 1, 2009 Hr'g Tr. 122:20 – 123:5.)  Nor had he seen any evidence that DeRouen prevented the logs from being purged, as he said he had.  (*Id.* at 123:6-24.)  Spruill stated in his affidavit that he "saw no evidence of any litigation hold having been implemented in regards to CPI's ESI as that term is commonly understood.  No reasonable measures were taken to prevent potentially relevant data stored on any of CPI's computer systems from being modified, overwritten, or deleted." (Third Spruill Aff. ¶ 31.)  Moreover, Defendants have produced only ten backup tapes, which contain only data from November 15, 2006, and January 17, 2007.  (July 22, 2009 Spruill Report 4.)  This hardly evidences an effective litigation hold.

---

[15] There is no evidence to suggest that Ms. Turner was involved in any of the misconduct described in this memorandum.  She testified credibly during the hearing and her testimony was helpful.

In evaluating the weight to be given to DeRouen's testimony, I cannot overlook his dependence on his wife's income, paid by CPI, and his qualifications as an ESI expert leave much to be desired, as he has not taken any college-level computer courses or passed any Microsoft proficiency tests.[16]   In contrast, Plaintiff's ESI expert, Spruill, has passed Microsoft tests, teaches a college-level computer forensics course, and has worked on computers professionally since 1993.   (Apr. 26, 2010 Hr'g Tr. 149:17 – 150:22 (Spruill Test.).) Accordingly, I found his testimony to be credible at the December 2009 and April 2010 hearings. Apart from the relative merits of their "expert," Defendants admit that "between October 14, 2006 and February 17, 2007 thousands of files were deleted from Pappas' laptop computer" (Defs.' Opp'n 5), an admission that would not have been necessary or possible had there been an appropriate litigation hold.  The running of the Disk Cleanup, Disk Defragmenter, Easy Cleaner, and CCleaner programs, discussed later, further demonstrate that Defendants failed to implement an effective litigation hold.  I find that Spruill's assessment that Defendants failed to take any "reasonable measures" to preserve data is accurate.  The evidence of record is abundantly clear that Defendants did not implement any system to prevent users from deleting files from the server or to stop the backup system from being overwritten. (DeRouen Dep. 91:4-10.)   The following discussion of Defendants' deletions demonstrates the prejudice caused by Defendants' failure to implement a litigation hold to prevent such deletions.

---

[16] DeRouen testified that his wife, Christie DeRouen, has worked for CPI for more than a decade as an office manager and earns about $68,000 annually, which represents approximately 75-80% of their family income. (Apr. 26, 2010 Hr'g Tr. 27:6-19.)  With regard to his expertise, DeRouen is "certified from HP to repair their printers and computers," but failed the one Microsoft examination he took. (*Id.* 67:25 – 68:7.)

3.   *Early Evidence of Pappas's Failure to Preserve ESI*

An  examination of the CPI System Registry conducted during discovery showed 353 user-initiated deletions of files from Mark Pappas's work computer, a password-protected laptop, commencing soon after VSI filed suit, i.e., between October 11, 2006, and November 17, 2006. (July 22, 2009 Spruill Report 2-3, Pl.'s Mot. Ex. 14, ECF No. 341-14; Defs.' Opp'n 5.)  In addition, on October 19, 2006, Pappas sent a series of emails instructing Federico, the Argentine contact, to destroy various emails and attachments relating to the VSI drawings that Pappas had sent to Federico for "conversion" to CPI drawings.  (Pappas emails, Pl.'s Mot. Ex. 13, ECF No. 341-13.)  Defendants have neither denied nor rebutted the evidence of these deletions and instructions to delete during the proceedings related to the pending motions. Nor have they produced the 353 files deleted from Pappas's work computer or any files or emails that Federico destroyed per Pappas's instruction.

Because Defendants had notice of the existing lawsuit at the time of the deletions, they clearly were under an obligation to preserve these potentially relevant files.  Defendants, through their current attorney, James Rothschild, claimed that the files deleted from Pappas's work computer were preserved because the computer "was synchronized to the CPI server," such that the files were copied to the server and "still exist on the server."  (Oct. 28, 2009 Rothschild Ltr., ECF No. 324.)  However, the more believable evidence is to the contrary.  As discussed in detail *infra*, CPI replaced its "Old Server" with a "New Server" in April 2007.  DeRouen stated in an affidavit that before the server exchange in April 2007, "most of the files from Mark Pappas' workstation were not mapped [i.e., copied] to the server," (DeRouen Aff. ¶ 3), and he later testified in April 2010 that his affidavit was accurate.  (Apr. 26, 2010 Hr'g Tr. 38:11-17.) DeRouen also stated that Pappas "was aware" that his files generally were not copied to the

server before April 2007.  (*Id.* at 70:17-22.)  Further, DeRouen testified that "some" of the files on Pappas's work computer "would not be found" on the Old Server because it could not accommodate all of Pappas's files. (*Id.* at 69:13 – 70:3.)  DeRouen explained that for files on Pappas's work computer to be copied to either server, Pappas would "have to put it in the folder that gets synchronized" because only "certain folders" were synchronized.  (*Id.* at 117:20 – 118:6.)   Defendants did not offer any evidence that Pappas put the deleted files into the synchronized folders so that they would be copied to the Old Server or the New Server.  And, even if the files were copied to the Old Server, by the time VSI received the Old Server, it had become corrupted and could not be searched.  (Apr. 26, 2010 Hr'g Tr. 153:16-20, 155:11-16 (Spruill Test.).)  Given that Plaintiff has shown that the ESI evidence was deleted, Defendants' claims to have preserved it are not credible.

Turner, CPI's ESI litigation consultant, made an image (i.e., copy) of CPI's New Server in July 2007, and Rothschild stated that "the image of the new server contains copies of the deleted files."  (Oct. 28, 2009 Rothschild Ltr.)   Again, the evidence does not support this assertion.   As noted above, not all of Pappas's files were copied to the New Server, and therefore, they would not appear on an image of the New Server.  Also, Turner testified that she "did not image" the New Server in its entirety; instead, she took a "targeted collection" of user files, folders, and emails, without imaging "unallocated space" where deleted files most likely would appear.   (Dec. 2, 2009 Hr'g Tr. 105:15 – 107:22; Feb. 9, 2009 Turner Report 3.) Moreover, the files in question predated the New Server, and therefore only would appear on the New Server if they had been copied to the Old Server in the first place and then successfully transferred to the New Server.[17]   Thus, Defendants have not shown that copies of any of these

---

[17] The incompleteness of the data transfer between servers is discussed in further detail below.

deleted files were produced with the image of the New Server.  Nor have they shown that any of the files later were restored and produced.  Defendants failed to meet their obligation to preserve these files.

The relevance of any files or emails that Federico deleted pursuant to Pappas's instructions is readily apparent from Pappas's emails to Federico, which were preserved.  They would have demonstrated the truth of VSI's core contention—that Pappas accessed VSI's website under a fictitious name on numerous occasions to download multiple design drawings of VSI and, in violation of the limited licensing agreement on the VSI website that had to be accepted before the drawings could be downloaded, sent them out of the country to be copied as CPI design drawings, sans any reference to their true origin, so that Pappas then could submit them as part of bid documents for the type of jobs for which CPI competed with VSI.  If this is not "smoking gun" evidence, one wonders what is.  That Defendants, despite their protests of innocent intent and conduct, produced no evidence in rebuttal, and have "acquiesced" in the entry of a default judgment with regard to Plaintiff's flagship claim, suggests that they too view this deleted ESI for what it is—critical evidence proving the guts of Plaintiff's liability claims. Equally clearly, the absence of these emails referring to the unauthorized conversion of VSI drawings to CPI files is prejudicial to Plaintiff's case.  With regard to the 353 deleted files, although their contents are unknown, the only rational conclusion that can be drawn is that VSI suffered prejudice from the loss of these files, based on Pappas's bad faith, willful misconduct and the fact that the large quantity of deletions occurred shortly after VSI filed suit.  Defendants have not offered any evidence to rebut this conclusion.  To the contrary, they acquiesced in the entry of a default judgment on the copyright claim, essentially conceding the prejudice to VSI of the loss of the deleted files.

4. *Pappas Failed to Preserve His External Hard Drive Despite Plaintiff's Demand that Defendants Preserve ESI*

Pappas was deposed on November 17, 2006, and, at the conclusion of the deposition, VSI's counsel gave notice to Defendants that VSI would be filing a request to have the CPI hard drives imaged, and explicitly demanded that no files be deleted and that no data be scrubbed. (Pappas Dep. 148:23-25 – 149:1-9.)  Pappas later admitted he was aware this request had been made.  (Oct. 29, 2009 Hr'g Tr. 89:25 (Pappas Test.), Pl.'s Mot Ex. 12, ECF No. 341-12.)

Subsequent forensic examination of Pappas's work computer revealed the existence of a SimpleTech "Simple Drive"™ external hard drive ("EHD") that last was plugged into Pappas's work computer on November 7, 2006, and last used on November 20, 2006 (just days after VSI notified Defendants to preserve ESI), when the backup feature for the EHD was run and then the software for the EHD was "uninstalled" from Pappas's work computer. (July 22, 2009 Spruill Report 2, ¶¶ 3-6.)  A subsequent examination of Pappas's work computer led Spruill, VSI's ESI expert, to conclude that the EHD must have been connected to it continuously from November 7 to November 20, 2006.  (*Id.* at 2, ¶ 5.)   Therefore, the EHD still was in Pappas's possession *after* VSI filed this lawsuit, and it also was in Pappas's possession on and after November 17, 2006, when Plaintiff informed Defendant that it would be requesting imaging of Defendants' computers.

The EHD contained 62,071 files that were transferred to it from Pappas's work computer on July 10, 2006, shortly before suit was filed.  (*Id.* at 2, ¶ 3; Defs.' Opp'n 4.)  Based on a log created on Pappas's work computer at the time of the transfer, VSI's IT director, Bryan Slaughenhoupt, concluded that the transferred files likely were relevant because the file names

corresponded with search terms contained in the Joint Search Protocol.[18]   (Ninth Slaughenhoupt Aff. ¶ 49 & Ex. E).   For example, Slaughenhoupt identified the file names "digicanCAD," "digicanchina," "nancadhistory," "bassquote," "Chicago.doc," fuvista-vs.zip,[19] mpappas@www.victorstanley[1].txt, and victorstanley[1].htm, and a folder named "CompetitorCAD" with "hundreds of files."   (*Id.* ¶¶ 49, 54.)   Importantly, as noted below, the EHD never has been produced by Defendants during discovery, despite the obvious relevance of the data it contained.   The prejudice its loss caused to Plaintiff is unquestionable.

Pappas testified that he presumed that, even though the EHD was not produced, the information on the EHD had been, because the server was produced and it contained the same information.   (Oct. 29, 2009 Hr'g Tr. 175:20 – 176:1.)   However, as discussed above, at the time that the EHD was connected to Pappas's work computer, not all of the files on that computer regularly were copied to the server.   Moreover, as noted, the Old Server was corrupted and unsearchable when VSI received it.   (Apr. 26, 2010 Hr'g Tr. 153:16-20, 155:11-16 (Spruill Test.).)   And, because Defendants did not disclose the existence of the EHD to Genevieve Turner, their ESI litigation consultant who worked with Plaintiff's ESI consultant to develop and implement the Joint Search Protocol for ESI, she did not image the EHD or search it for

---

[18] After discovery commenced, the parties' ESI consultants conferred and developed a Joint Search Protocol for ESI, dated June 28, 2007 (Pl.'s Mot. Ex. 41, ECF No. 341-41), in accordance with the Court's Order (June 14, 2007 Conf. Tr. 16:14-21, Pl.'s Mot. Ex. 40, ECF No. 341-40). The Joint Search Protocol was amended in May 2009.   (May 29, 2009 Spruill and Turner Ltr., ECF No. 299-1.)   It was intended to facilitate VSI's discovery of relevant ESI at a cost and burden proportional to what is at stake in this case.

[19] CPI named one of its product lines the "Fuvista" line.   Pappas admitted during discovery that "Fuvista" stood for "Fuck you Victor Stanley," (Pappas Dep. 22:20-24, Pl.'s Mot. Ex. 5, ECF No. 341-5), demonstrating that Pappas's wit transcended sophomoric pranks such as logging into VSI's web site as "Fred Bass" and extended to inventing insulting acronyms to name his competing products.   When disclosed, the meaning of this acronym removes any doubt about his motive and intent.   No doubt Pappas regarded this as hilarious at the time.   It is less likely that he still does.

responsive ESI.  (Dec. 2, 2009 Hr'g Tr. 55:19 - 56:5 (Turner Test.), Pl.'s Mot. Ex. 19, ECF No. 341-19).  Again, the prejudice to Plaintiff is clear.

According to Defendants, Pappas did not "intentionally" dispose of the EHD "to keep the files on it from being subject to discovery."  (Defs.' Opp'n 5.)  This argument is absurd.  Pappas purchased the EHD; attached it to his work computer immediately before suit was filed; used it for months, including after suit was filed and Plaintiff had demanded preservation of ESI; transferred 62,071 files to it, which included many files with names that render their relevance readily apparent; and kept its existence secret even from his own ESI litigation expert.  He testified that he returned the EHD in November 2006—without having someone back up its contents—to "Bob from Office Max" because he was "frustrated" by its automatic backup features that "would flash messages and interrupt [his] work."  (Oct. 29, 2009 Hr'g Tr. 18:13 – 19:11.)  Defendants failed to produce any documentation corroborating Pappas's testimony that the EHD was returned to Office Max, such as an affidavit from "Bob," a receipt from Office Max, or documents showing the crediting of the purchase price of the EHD back to CPI after it was returned.  Yet Pappas expects the Court to accept his doe-eyed explanation at face value, rather than the untruth that it manifestly is.  Even if true, this is of little moment, as Defendants concede that the EHD "should not have been disposed of since it was in existence after the lawsuit had been filed."  (Defs.' Opp'n 5.)  Moreover, the EHD and its contents never were made available for forensic examination during discovery and remain unavailable today.  It does not require Napoleonic insight to recognize with a casual glance at the names of the unavailable files that what was lost was relevant to Plaintiff's claims, and the absence of such a large quantity of clearly relevant files was prejudicial.

5.   *Pappas Also Failed to Preserve Files and Emails Immediately Following Plaintiff's Demand that Defendants Preserve ESI*

On November 17, 2006, the very same day Defendants were put on notice not to destroy evidence relevant to this lawsuit, Curtis Edmondson, a lawyer who previously had done legal work for Pappas (and who is an engineer whose training emphasized "computer architecture"), visited the CPI offices to review CPI's computer systems in regard to this litigation. (Edmondson website & invoice, Pl.'s Mot. Exs. 20-21, ECF Nos. 341-20 & 341-21.)   Pappas testified that Edmondson accessed information on Pappas's work computer.   (Oct. 29, 2009 Hr'g Tr. 121:8-9.) Thereafter, between November 18, 2006 and December 22, 2006, the CPI System Registry for that computer showed thirteen user-initiated deletions of files.   (July 22, 2009 Spruill Report 3.) Defendants' contention that the files were preserved on the server does not hold water, as discussed above.   Therefore, Defendants breached their duty by failing to preserve these files. Given that, shortly before these deletions, Pappas was put on notice to preserve relevant ESI and Edmondson visited CPI on the same day, and Pappas attempted to delete about 5,000 largely responsive emails around the same time, (Dec. 1, 2009 Hr'g Tr. 76:2-5 (Spruill Test.); July 22, 2009 Spruill Report 4), the only logical inference to draw is that these files were relevant to this lawsuit and, when viewed with all the other evidence of Pappas's willful destruction of relevant ESI, that their loss caused prejudice to Plaintiff.

6.   *The Court Issued a Preservation Order and Pappas Continued to Delete ESI*

On December 7, 2006, VSI served a second Request for Production of Documents on Pappas and CPI.[20]   (Pl.'s Second Request for Prod. of Docs., Pl.'s Mot. Ex. 9, ECF No. 341-9.) Defendants, by then having retained new counsel, moved for a two-week extension of time to file their responses and for a stay of discovery during that time.  (ECF No. 38.)  On December 22, 2006, I entered an order staying all discovery (except for an existing order that the parties meet and confer regarding discovery disputes, which had begun to multiply) until after a hearing scheduled for January 18, 2007.  (ECF No. 41.)  That order cautioned: "[B]oth parties are reminded of their substantive duty to preserve evidence, including electronic evidence, that is relevant to the case."[21]  (*Id.*)   Pappas later admitted that he received that order the following day and that he understood what it meant.  (Oct. 29, 2009 Hr'g Tr. 117:18 - 118:2 (Pappas Test.).) The Court rescheduled the discovery hearing for February 1, 2007. (ECF No. 42.)

Subsequent forensic examination of Defendants' computers showed that the CPI System Registry reflected 9,282 user-initiated deletions of files from Pappas's work computer between my December 22, 2006 order and the February 1, 2007 discovery hearing. (July 22, 2009 Spruill Report 3,  ¶  3.)    The  files,  with  names  like  "bollardcad8.doc,"  "China-6.zip," "nancadsamples.zip," "UBBENCHCAD.doc," and "victor.zip," "appear to be related to 'VSI-

---

[20]  At the parties' initial Fed. R. Civ. P. 26(f) planning meeting on January 18, 2007, VSI reiterated its request for imaging of Defendants' drives.  (Joint Rule 26 Report of the Parties 3, ECF No. 51.)

[21]  For the purpose of sanctions pursuant to Fed. R. Civ. P. 37(b)(2) for failure to obey a discovery order, it was in the December 22, 2006 Order that I first made the duty to preserve part of a Court order in this case.  However, it was not the only preservation order.  As discussed below, I issued another preservation order on February 1, 2007. Additionally, on August 1, 2007, August 30, September 21, and October 3, 2007, I ordered Defendants to produce all relevant, non-privileged ESI and a privilege log to Plaintiff. (ECF Nos. 131, 145, 149, 164, 341-45.)

like' site furnishing, sale of products made in China, Nancad (the company in Argentina with which Federico was affiliated), Digican, Victor Stanley products, Ecklund (a company that CPI used to manufacture site furnishings) and CAD drawings."   (Ninth Slaughenhoupt Aff. ¶ 33.) Almost all of the deletions occurred on January 31, 2007, the eve of the discovery hearing. (*Id.* ¶¶ 31, 44.)   Pappas knew that the discovery hearing would be held the next day and that VSI's interest in imaging his computers "was at issue."   (Oct. 29, 2009 Hr'g Tr. 123:15 & 125:8-12 (Pappas Test.).)

Pappas testified that he believed that DeRouen, CPI's computer consultant, made the January 31, 2007 deletions.  (*Id.* at 33:3-4.)  In a February 2010 affidavit, undoubtedly drafted by counsel, DeRouen stated that he deleted a folder on Pappas's work computer containing the files in question because the folder was "a copy of a copy" of a folder that still existed on the server. (DeRouen Aff. ¶ 7.)  However, previously, in a June 2007 deposition, DeRouen had denied that he had ever deleted files from any CPI computer. (DeRouen Dep. 42:17-19.)   Moreover, in rebuttal to DeRouen's February affidavit, Plaintiff's ESI consultant, Spruill, testified that the deleted files could not have been a set of copies because, if that were the case, the files would have had been created minutes or seconds apart, whereas in reality, the files were created years apart.   (April 26, 2010 Hr'g Tr. 133:16 – 134:13.)   Additionally, Spruill testified that those deletions were not done by someone who logged in remotely (Dec. 1, 2009 Hr'g Tr. 166:2 – 168:21), meaning that Pappas or someone at CPI deleted the data.   In this regard, Pappas admitted he was present at the CPI offices on January 31, 2007.  (Oct. 29, 2009 Hr'g Tr. 122:2-11 (Pappas Test.).)  And, emails were sent from Pappas's email account using that computer (not via remote access) just prior to and just after these deletions.   (Ninth Slaughenhoupt Aff. ¶¶ 31-32; Dec. 1, 2009 Hr'g Tr. 167:8-25 (Spruill Test.).)   Once again, the only rational conclusion to

be drawn is that Pappas himself deleted the nearly ten thousand files during the discovery stay. He did so with full awareness that I had issued a preservation order and that there was to be a hearing to address, *inter alia*, Plaintiff's complaints regarding the sufficiency of Defendants' compliance with their discovery obligations.  Thus, Pappas not only deleted the files, but did so intentionally and willfully.  That he was willing to do so in defiance of a Court preservation order compels the conclusion that he viewed the files as both relevant and prejudicial to his position in the litigation.  Their unavailability for Plaintiff's use is prejudicial to Plaintiff's case.

Incredulously, Defendants again contend that these deleted files were "preserved" because they had been copied to the server.  (Oct. 28, 2009 Rothschild Ltr.)  Spruill testified that "some" of the files deleted on January 31, 2007 "did reappear" in the middle of 2009, in a folder called "Mark Copy" that appeared on the New Server. (April 26, 2010 Hr'g Tr. 142:12-18.) However, according to Spruill, the "Mark Copy" folder did not contain all of the deleted files and, because someone ran the Disk Defragmenter program, as discussed below, he "was unable to recover" the files that did not reappear "in any intelligible form."  (July 22, 2009 Spruill Report 4.)  Also, as discussed, Spruill could not search the Old Server because it had become corrupted.  (Apr. 26, 2010 Hr'g Tr. 153:16-20, 155:11-16 (Spruill Test.).) Thus, I find that Pappas deleted the files, and the timing of the bulk of the deletions immediately prior to the scheduled discovery hearing suggests to me that he deleted the files to prevent their discovery. Given the file names, it is evident that the files were relevant and would have supported Plaintiff's case, and I conclude that Defendants breached their duty to preserve potentially relevant ESI.

7. *The Court Again Admonished Defendants of Their Duty to Preserve and Issued Another Preservation Order, and Pappas Deleted Files and Used Programs to Overwrite the Files*

At the February 1, 2007 discovery hearing, noting that "certain emails have been deleted," I again admonished the parties of their duty to preserve relevant ESI and instructed counsel to explain to their clients the duty to preserve "all information that may . . . be relevant to the claims and defenses." (Feb. 1, 2007 Conf. Tr. 18:18-24- 19:1-3, 23:8, 24:3-5, Pl.'s Mot. Ex. 15, ECF No. 341-15.)   I reminded counsel that the parties had a "duty to intervene and to suspend any operations as part of an electronic records management system that might need to override [sic] or cause the loss and destruction [of ESI] that might be relevant."   (*Id.* at 18:18-23, 25:19 – 26:3.)    Christopher Mohr, defense counsel at the time, stated on the record that he understood the Court's admonitions and orders given during the discovery conference.   (*Id.* at 25:11, 25:14.)   Further, Pappas admitted that Mohr spoke with him regarding my instructions. (Oct. 29, 2009 Hr'g Tr. 130:14 – 133:20 (Pappas Test.).)

Additionally, on February 1, 2007, I issued a written Preservation Order that required the parties to "meet and confer . . . to narrow the range of information sought" and stated that the parties had been admonished at the hearing of their "substantive duty to preserve evidence potentially relevant to the case, and . . . ordered to do so by the Court." (Feb. 1, 2007 Order 2, ECF No. 56.)  Pappas later acknowledged learning of that Order, and he admitted that there was nothing about the Order that he did not understand, and that the Court's statement regarding the duty to preserve "was very clear."  (Oct. 29, 2009 Hr'g Tr. 139:10 – 140:19 (Pappas Test.).)  He stated that he "understood this Order to mean that [he] had to maintain a version/copy of [his] files that were related to the case." (Feb. 16, 2010 Pappas Aff. ¶ 8.)

During a February 2, 2007 conference, Defense counsel agreed that Defendants would follow "the two tier approach" outlined in this Court's Suggested Protocol for Discovery of Electronically Stored Information (ECF No. 56-1) ("Suggested ESI Protocol"),[22] and that "accessible files should be searched and produced first."  (Feb. 2, 2007 Mohr Ltr. 3, Pl.'s Mot. Ex. 22, ECF No. 341-22.)  Defendants further agreed that the ESI would be produced in its native format, an agreement that counsel confirmed on several occasions. (Apr. 3, 2007 Mohr Ltr. 2, Pl.'s Mot. Ex. 23, ECF No. 341-23; Apr. 19, 2007 Mohr Ltr. 1, Pl.'s Mot. Ex. 24, ECF No. 341-24.) ESI in its native format would include metadata, which would assist in establishing who at CPI downloaded or altered the files at issue, and when and how they were altered.

Despite the discussion of preservation obligations during the discovery hearing and conference and in the February 1, 2007 Order, in the weeks that followed, as described in further detail below, a user logged into Pappas's work computer as Pappas, ran a Disk Cleanup program on it, deleted files, accessed the Registry Editor, and ran the system's Disk Defragmenter program on the computer.  The Disk Cleanup program empties the Recycle Bin and deletes temporary internet files, i.e., records of web sites visited.  (Dec. 1, 2009 Hr'g Tr. 52:20-25, 53:16 – 55:15, 57:1-3 (Spruill Test.).)  Once deleted, a file can be overwritten by Disk Defragmenter, such that the data is "lost."  (*Id.*)  Indeed, defragmentation is sometimes used as "a method to cover up deletions of data by eliminating all traces of deleted data."  *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 870 (N.D. Ill. 2001).  Additionally, through the Registry Editor, a user may "modify [and/or] delete . . . any of the settings within the registry . . . . to remove or obfuscate data."  (Dec. 1, 2009 Hr'g Tr. 58:1-20 (Spruill Test.).)  For this reason, Microsoft highly

---

[22] Suggested Protocol for Discovery of Electronically Stored Information ("ESI"), www.mdd.uscourts.gov/news/news/ESIProtocol.pdf.

discourages use of the Registry Editor.  (*Id*. at 57:8-10, 58:8-9.)  Thus, the net effect of accessing the Registry Editor and running the Disk Defragmenter program after deleting files and running the Disk Cleanup program was to ensure that deleted files could not be recovered.

The person who signed in as "Pappas" ran the Disk Cleanup program on Defendant Pappas's work computer on February 7, 2007; CPI had not used this program in the past.  (Dec. 1, 2009 Hr'g Tr. 52:20-25, 53:16 – 55:15, 57:1-3 (Spruill Test.).)  Between February 2, 2007 and February 23, 2007, this user deleted 4,316 user-content files from Pappas's work computer.  (July 22, 2009 Spruill Report 3-4.)  Almost all (3,969) of the deletions occurred between noon on Friday, February 16, 2007, and early morning on Saturday, February 17, 2007.  (*Id.*; Feb. 16, 2010 Pappas Aff. ¶ 9)  Additionally, on the night of February 16, 2007, the user accessed the computer's Registry Editor. (Dec. 1, 2009 Hr'g Tr. 58:1-20 (Spruill Test.).)  Thereafter, during the late morning of Saturday, February 17, 2007, this user successfully initiated an execution of the system's Disk Defragmenter program.  (July 22, 2009 Spruill Report 4.)  Over 200 files were deleted on February 17, 2007, and as of that date, Pappas had permanently deleted over 1,000 files from the Recycle Bin.  (*Id.* at 3-4.)  On July 1, 2009, Spruill provided Defense counsel and Defense ESI litigation consultant Turner with a list of the files that Pappas had deleted from his work computer and proof that the Disk Defragmenter program had been executed.  (*Id.*)  The relevance of at least some of the deleted files is evident from the file names, which included victor.zip, victordoor.zip, victordoorall.zip, victorhinge.jpg, victorlatch.jpg, and similar file names.  (Ninth Slaughenhoupt Aff. ¶ 55.)

This was the first and only user-executed defragmentation on Pappas's work computer.  (July 22, 2009 Spruill Report 4.)   Importantly, the defragmentation was done just ahead of the scheduled imaging of Pappas's work computer during the week of February 21, 2007.  (Oct. 29,

2009 Hr'g Tr. 153:12-17, 161:8-11 (Pappas Test.).)  Following the defragmentation, Plaintiff's ESI experts at Guidance Software were unable to recover any of the deleted files from Pappas's work computer "in any intelligible form." (July 22, 2009 Spruill Report 4.)  Also, because the files were purged through the use of the Disk Cleanup and Disk Defragmenter programs, they were not preserved on the server, despite Defendants' contentions to the contrary.

DeRouen, CPI's computer consultant, testified that he probably ran the programs and deleted the files as part of the system "maintenance" he ran while working on Defendants' computers from a remote location. (Apr. 26, 2010 Hr'g Tr. 31:13-25.)  Yet, when questioned, DeRouen agreed with Plaintiff's counsel that he would not have selectively opened, examined, and deleted files as part of routine maintenance, as Plaintiff's evidence demonstrates happened in this case.  (*Id.* at 32:1-5.)  Nonetheless, DeRouen claimed that any files that were deleted "were backed up on the server in two places."  (*Id.*)

Not so, according to Spruill, whose testimony was far more credible than DeRouen's. Spruill testified that the person who ran the Disk Defragmenter program was not working remotely (Dec. 1, 2009 Hr'g Tr. 166:8-25), and Pappas admitted he was the only person present at CPI's offices at the time the Disk Defragmenter program was run.  (Oct. 29, 2009 Hr'g Tr. 167:1 – 168:21 (Pappas Test.); *see* Ninth Slaughenhoupt Aff. ¶ 39.)   The evidence of record convinces me that Pappas was the person who deleted the files and executed the Disk Defragmenter program, but if he did not, then it was DeRouen, the computer consultant Pappas retained and whose wife is a longstanding CPI office manager.

As the above factual summary amply demonstrates, much of what was deleted took place after I admonished Defense counsel of the duty to preserve relevant evidence and after I had

issued a written Preservation Order.  Further, the occurrence of these deletions immediately before the scheduled imaging of Pappas's computer evidences purposeful violation of this Court's preservation orders, and a knowing violation of the duty to preserve potentially relevant evidence.  These circumstances, combined with the purposeful destruction by Pappas of ESI that included files with names that make their relevance manifest, convince me that, as with other deletions already discussed, this was prejudicial to Plaintiff.

8.  *Pappas Failed to Preserve ESI When CPI Switched from the Old Server to the New Server*

Defendants ordered a new server on October 30, 2006, two weeks after this action began, and installed it in April, 2007. (Apr. 26, 2010 Hr'g Tr. 92:22 – 93:2 (DeRouen Test.).)  DeRouen transferred the data on the "Old Server" to the "New Server" on April 21, 2007.  (*Id.* at 96:24 – 97:9.)   It is unclear why Defendants replaced the Old Server.   According to Pappas, the Old Server "got corrupted."   (Oct. 29, 2009 Hr'g Tr. 178:10-14, 181:11-15.)     According to DeRouen's June 2007 testimony, the Old Server was nearing its capacity when it was replaced. (DeRouen Dep. 16:15-16.)  Spruill stated in a sworn affidavit, based on his examination of the Old Server, that that there was no apparent operational reason for exchanging servers in the middle of the ESI collection process that was taking place as part of the discovery in this case. (Third Spruill Aff. ¶ 9.)

More fundamentally, Spruill stated that exchanging servers and failing to preserve the data on the Old Server would "cause the irretrievable loss of some content and records of user activities that would otherwise be available for recovery and analysis."  (*Id.* ¶¶ 4-5.)  Spruill specified that if a user moved deleted emails from the deleted items folder to the "'Trash Bin,'"

as "Mr. Pappas testified that he repeatedly did," those items would not be moved to the New Server. (*Id*. ¶ 5.)  Spruill stated that, to preserve ESI that would be lost in the transfer, the Old Server should have been—but was not—backed up before the data transfer.  (*Id*. ¶ 6.)

DeRouen acknowledged that he had not transferred any deleted ESI.  (Apr. 26, 2010 Hr'g Tr. 101:5-20 (DeRouen Test.).)   Nonetheless, he testified that the deleted ESI was preserved because it still existed on the Old Server, which was sent to Plaintiff.   (*Id*. at 101:5-20.) However, VSI did not receive the Old Server immediately; VSI and the ESI litigation consultants, Turner and Spruill, did not even learn that there had been a server exchange until June 29, 2007, when DeRouen was deposed.   (Def.'s Resp. to Pl.'s Second Set of Interrog. #11, Pl.'s Mot. Ex. 92, ECF No. 341-92; Dec. 2, 2009 Hr'g Tr. 29:21-25, 83:10-25, 142:18-24 (Turner Test.).)  By the time VSI received the Old Server, it had become corrupted and could not be searched, and Spruill had to rely instead on an image that Turner made of the Old Server on July 13, 2007.  (Apr. 26, 2010 Hr'g Tr. 153:16-20, 155:11-16 (Spruill Test.); Dec. 2, 2009 Hr'g Tr. 85:3 – 86:4, 105:15 – 107:22 (Turner Test.).)

The completeness of Turner's image of the Old Server, like the completeness of her image of the New Server, is questionable.  In her February 9, 2009 report, Turner stated that the Old Server "was not responsive to the imaging process," so she created a targeted collection instead of imaging it in its entirety, and the targeted collection did not include the unallocated spaces where deleted files would be stored.  (Feb. 9, 2009 Turner Report 3.)  Notably, Pappas testified that he stored files in a deleted state; all files in a deleted state when Turner imaged the Older Server would have been excluded.  And, according to Spruill, the Old Server had been purged before Turner had the opportunity to image it, such that she could not have captured the deleted files if she had tried.  (Apr. 26, 2010 Hr'g Tr. 153:24 – 154:20.)   Although, as noted, a

folder containing some—but not all—of the files deleted on January 31, 2007, inexplicably "reappeared" on the New Server, and ESI deleted on January 17, 2007 was recovered from a backup tape and produced for Plaintiff, that backup tape was the most recent backup tape produced for the Old Server. Therefore, other than those files in the folder that "reappeared," Defendants failed to preserve any ESI deleted between January 18, 2007 and April 21, 2007, when the Old Server was replaced. The relevance of some of the files—those that were deleted permanently on January 31, 2007—is evident from their names, which include "bollardcad8.doc," "China-6.zip," "nancadsamples.zip," "UBBENCHCAD.doc," and "victor.zip," as discussed above. (Ninth Slaughenhoupt Aff. ¶ 33.) Although the contents, quantity, and relevance of the other lost files are unknown, Defendants have failed to demonstrate that what was not preserved was irrelevant, or its loss benign. The events surrounding the switch from the Old to New Server, viewed in the context of everything else that occurred, convince me that what was lost included relevant evidence, the absence of which prejudices Plaintiff.

9. *The Court Repeatedly Ordered the Production of ESI, and Pappas Used Programs Called Easy Cleaner and CCleaner to Delete It*

On August 1, 2007, August 30, 2007, September 21, 2007, and October 3, 2007, I ordered Defendants to "produce all relevant, non-privileged ESI" to Plaintiff's counsel. (ECF Nos. 131, 145, 149, and 164.) Nonetheless, at the December 1, 2009 hearing, Plaintiff offered evidence that someone at CPI used a program called Easy Cleaner to "scrub" or delete data from Defendants' computers and another called CCleaner "to clear up file content in specific areas, and . . . to go through the registry . . and clear out . . . dead registry entries" from the New Server in July 2008 and August 2009, months after my series of orders, and over a year after my two

initial preservation orders.  (Dec. 1, 2009 Hr'g Tr. 118:6 – 119:14, 120:18-22 (Spruill Test.); Dec. 2, 2009 Hr'g Tr. 63:13-20 (Turner Test.).)   DeRouen, Defendants' computer consultant over the past six years, admitted that he used the programs "for maintenance with all [of his] clients," and he acknowledged that he had "installed CCleaner and Easy Cleaner on the New CPI server," even though he knew that litigation was ongoing and that both programs would eliminate files like internet history files and temporary internet files.  (DeRouen Aff. ¶ 14; April 26, 2010 Hr'g Tr. 112:2-25 (DeRouen Test.).)

Spruill testified that the only purpose for using the Easy Cleaner was "to permanently destroy data," and that "[t]here's absolutely no reason whatsoever" for a business under a preservation order to run a "scrubbing program" such as Easy Cleaner.  (April 26, 2010 Hr'g Tr. 119:1 – 121:14.)   Spruill added that it was extremely difficult to perform a forensic examination of any computer system after Easy Cleaner had been used on it.  (*Id.* at 120:5-6.)   DeRouen testified that CCleaner may have run "automatically" in July and that he did not "know why" it was run in August.  (Apr. 26, 2010 Hr'g Tr. 107:20 – 110:6, 111:20-23.)   Pappas stated that CCleaner was run in August "without any instruction from [him] and without [his] knowledge." (Feb. 16, 2010 Pappas Aff. ¶ 13.)   However, neither Pappas nor DeRouen provided credible testimony.  Instead, I accept as credible Spruill's version of the events.  Regardless of the "spin" Defendants attempt to put on it, following a series of ESI preservation and production orders by the Court, Defendants allowed their computer consultant to run programs that eliminated temporary internet files.  (Apr. 26, 2010 Hr'g Tr. 113:1-24 (DeRouen Test.).)   It cannot be ignored that this occurred in a case the essence of which involves surreptitious entry to Plaintiff's website for the purposes of downloading design drawings that Defendants then pirated and misrepresented to be their own in order to compete with Plaintiff.  It is no coincidence that the

deleted files included those showing the internet site that Defendants had accessed.  I am persuaded that these files were relevant, and that their loss caused prejudice to Plaintiff.

*10. Plaintiff Moves for Spoliation Sanctions*

Plaintiff filed its fourth motion for sanctions, the subject of this Memorandum, Order and Recommendation, alleging "CPI and Pappas' destruction of the key evidence and other forms of misconduct" and seeking a default judgment as "the only effective method to punish such egregious conduct, deter others, and fully mitigate the prejudice to VSI and the judicial process." (Pl.'s Mot. 45.)  Plaintiff also seeks a civil fine and a "referral for criminal prosecution against Pappas"; and attorney's fees and costs, including costs related to all of Plaintiff's ESI motions and efforts to "uncover[] Defendants' discovery abuses."  (*Id.* at 97-98.)  Alternatively, Plaintiff seeks leave to amend its Rule 26 disclosures and reports, and asks the court to reopen discovery and "to enter a permanent injunction against Pappas and CPI as requested in the Verified Complaint."  (*Id.* at 98.)

In their Opposition, Defendants admit that "certain CPI ESI was deleted by Pappas and CPI's Computer Engineer Evan DeRouen and/or others after CPI was served with the lawsuit and after a preservation order was issued," although they "deny that the deletions were done for the purpose of withholding ESI from VSI."  (Defs.' Opp'n 2.)  Defendants also admit that fifteen CPI products were based on VSI designs.  (Defs.' Surreply 5.)  Defendants state that they "are willing to accept as a sanction . . . a consent judgment on liability for copyright infringement and a consent injunction on Plaintiff's copyright claim."  (Defs.' Opp'n 29.)   In their view, "[c]opyright infringement has always been the heart of [VSI's] case."  (Defs.' Surreply 1.)

As will be discussed in greater detail below, assessing appropriate sanctions for proven failure to preserve evidence, whether ESI or not, is a complex task, made so in large part by the need to evaluate the relevance of the evidence lost and the prejudice to the party claiming injury because of the spoliation.  In the sections above I have described eight ways in which Defendants willfully and permanently destroyed evidence related to this lawsuit, as well as their failed attempts to destroy evidence that later was recovered.  In each section I have explained the relevance of the evidence lost and why the loss caused prejudice to Plaintiff in prosecuting its case.   Taken individually, each section demonstrates intentional misconduct done with the purpose of concealing or destroying evidence.  Collectively, they constitute the single most egregious example of spoliation that I have encountered in any case that I have handled or in any case described in the legion of spoliation cases I have read in nearly fourteen years on the bench. When reading other spoliation cases, it appears that frequently the Court finds culpable conduct, often gross negligence or intentional wrongdoing, but there is really no convincing showing that what was lost was harmful or that, despite the obvious frustration and considerable expense of chasing down the facts to prove the spoliation, the party that proved the spoliation was actually handicapped in proving its case in any significant way.  In *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 607-08 (S.D. Tex. 2010), for example, the defendants were found to have committed intentional destruction of ESI, but what was lost included evidence helpful to the spoliators, as well as harmful.  Faced with bad conduct but minimal prejudice, courts are understandably reluctant to impose the most severe sanctions, especially case-dispositive ones.

But this case is in an entirely different posture.  Plaintiff has proved grave misconduct that was undertaken for the purpose of thwarting Plaintiff's ability to prove its case and for the

express purpose of hamstringing this Court's ability to effect a just, speedy, and inexpensive resolution of a serious commercial tort.  The prejudice to Plaintiff is clear and has been described in each of the sections above.  It is helpful, but of little comfort, that Defendants themselves agree with my assessment that the lost or destroyed ESI was relevant, and its absence as evidence prejudicial to Plaintiff.  At the hearing held on June 25, 2010, counsel for Defendants stated:

> [W]e've given up on prejudice . . . . [with regard to Plaintiff's copyright claim] which I think was the appropriate thing to do. We gave up on the issue of relevance, and so I would think that the Court would decide what the profits should be from those 15 products, and then the Court . . . would determine what would be the appropriate attorneys' fees . . . .

(June 25, 2010 Hr'g Tr. 3:16-22.)  Having chronicled what happened and the effect that it had on Plaintiff's ability to prosecute its claims and the Court's ability to ensure a fair trial, I will turn now to a discussion of the law governing where we go from here, given what we know.

## II.    DISCUSSION

Plaintiff asks the Court to sanction Defendants for their[23] spoliation of evidence, which is "the destruction or material alteration of evidence or . . . the failure to preserve property for

---

[23] VSI alleges that "Defendants' misconduct and their three year evasion of their [prior] discovery obligations have been further aided and abetted by questionable conduct by their [former] counsel at various times and by DeRouen." Pl.'s Mot. 73. Insofar as Plaintiff alleges spoliation by the attorneys who represented Defendants earlier in this litigation, Defendants' previous attorneys acted as Defendants' agents. *See Link v. Wabash R.R.*, 370 U.S. 626, 633-34 (1962) (stating that attorney is a "freely selected agent" such that there was "no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client"); *Rouse v. Lee*, 339 F.3d 238, 249 (4th Cir. 2003) ("Former counsel's errors are attributable to [plaintiff] not because he participated in, ratified, or condoned their decisions, but because they were his agents, and their actions were attributable to him under standard principles of agency."). Therefore, any such spoliation is attributable to Defendants. *See Goodman v. Praxair Servs., LLC*, 632 F. Supp. 2d 494, 522 n.16 (D. Md. 2009) ("A party may be held responsible for the spoliation of relevant evidence done by its agents. *See N.J. Mfrs. Ins. Co. v. Hearth & Home Techs., Inc.*, No. 3:06-CV-2234, 2008 WL 2571227, at *7

another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 505 (D. Md. 2009); *Sampson v. City of Cambridge*, 251 F.R.D. 172, 179 (D. Md. 2008); *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 510 (D. Md. 2005); *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003); THE SEDONA CONFERENCE, THE SEDONA CONFERENCE GLOSSARY: E-DISCOVERY & DIGITAL INFORMATION MANAGEMENT 48 (2d ed. 2007), *available at* http://www.thesedonaconference.org/content/ miscFiles/TSCGlossary_12_07.pdf ("SEDONA CONFERENCE GLOSSARY") ("Spoliation is the destruction of records or properties, such as metadata, that may be relevant to ongoing or anticipated litigation, government investigation or audit.").

Motions seeking sanctions for spoliation stem from alleged destruction of or failure to preserve potentially relevant evidence. When the spoliation involves ESI, the related issues of whether a party properly preserved relevant ESI and, if not, what spoliation sanctions are appropriate, have proven to be one of the most challenging tasks for judges, lawyers, and clients. Recent decisions, discussed below, have generated concern throughout the country among lawyers and institutional clients regarding the lack of a uniform national standard governing

---

(M.D. Pa. June 25, 2008) ('A party to a law suit, and its agents, have an affirmative responsibility to preserve relevant evidence. A [party] ... is not relieved of this responsibility merely because the [party] did not itself act in bad faith and a third party to whom [the party] entrusted the evidence was the one who discarded or lost it.') (citations omitted). Thus, agency law is directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master. *See, e.g.*, *Nucor Corp. v. Bell*, 251 F.R.D. 191, 198-99 (D.S.C. 2008) (agent's willful 'alteration or destruction of relevant data' on laptop was directly attributable to defendant; *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360 (N.D. Ga. 2008) (agent's bad faith destruction of email was attributable to defendant)."); *accord Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 592 (4th Cir. 2001) (concluding that later-discharged attorney's actions could be imputed to plaintiff). Because Defendants' previous attorneys and DeRouen, Defendants' computer consultant, are not parties to this action, any claims against them as individuals, rather than as agents of Defendants, would have to be brought as a separate action.

when the duty to preserve potentially relevant evidence commences, the level of culpability required to justify sanctions, the nature and severity of appropriate sanctions, and the scope of the duty to preserve evidence and whether it is tempered by the same principles of proportionality that Fed. R. Civ. P. 26(b)(2)(C) applies to all discovery in civil cases.[24] Moreover, concern has been expressed by some commentators that court decisions finding spoliation and imposing sanctions have, in some instances, imposed standards approaching strict liability for loss of evidence, without adequately taking into account the difficulty—if not impossibility—of preserving all ESI that may be relevant to a lawsuit, the reasonableness of the measures that were taken to try to preserve relevant ESI, or whether the costs that would be incurred by more complete preservation would be disproportionately great when compared to what is at issue in the case.[25]  The lack of a national standard, or even a consensus among courts in different jurisdictions about what standards should govern preservation/spoliation issues, appears to have exacerbated this problem.  It is not an exaggeration to say that many lawyers, as well as institutional, organizational, or governmental litigants, view preservation obligations as

---

[24] *See* Lawyers for Civil Justice, et al., *Reshaping the Rules of Civil Procedure for the 21st Century: The Need for Clear, Concise, and Meaningful Amendments to Key Rules of Civil Procedure* (2010 Conf. on Civil Litig., May 2, 2010); Dan H. Willoughby, Jr. & Rose Hunter Jones, *Sanctions for E-Discovery Violations: By the Numbers* (2010 Conf. on Civil Litig., May 2010); Thomas Y. Allman, *Amending the Federal Rules:  The Path to an Effective Duty To Preserve* 5 (2010 Conf. on Civil Litig., June 15, 2010); Paul W. Grimm, Michael D. Berman, Conor R. Crowley, Leslie Wharton, *Proportionality in the Post-Hoc Analysis of Pre-Litigation Preservation Decisions*, 37 U. Balt. L. Rev. 381, 388 (2008).  The 2010 Conference on Civil Litigation papers are available on the Conference's website at http://civilconference.uscourts.gov/LotusQuickr/dcc/Main.nsf/h_RoomHome/4df38292d748069 d0525670800167212/?OpenDocument, under the links for Papers and Empirical Research.

[25] *See* Robert E. Shapiro, *Conclusion Assumed*, 36 LITIG. 59 (ABA Spring 2010).

one of the greatest contributors to the cost of litigation being disproportionately expensive in cases where ESI will play an evidentiary role.[26]

Nothing in this memorandum should add to this collective anxiety.  Defendants do not dispute that spoliation took place, relevant evidence was lost, and Plaintiff was prejudiced accordingly; that Defendants' misconduct was sufficiently egregious to warrant sanctions; and that the sanctions warranted are serious.  Nor is this a case where Defendants have claimed or demonstrated that what they did was reasonable and involved effort and expense that were proportionate to what is at stake in the litigation.  In such an instance, the Court could be excused for simply acknowledging Defendants' concessions and applying the applicable law of the Fourth Circuit without considering the broader legal context in which preservation/spoliation issues are playing out in litigation across the country.  While justified, such a narrow analysis would be of little use to lawyers and their clients who are forced, on a daily basis, to make important decisions in their cases regarding preservation/spoliation issues, and for whom a more expansive examination of the broader issue might be of some assistance.  Accordingly, I will attempt to synthesize not only the law of this District and Circuit, but also to put it within the context of the state of the law in other circuits as well. I hope that this analysis will provide counsel with an analytical framework that may enable them to resolve preservation/spoliation issues with a greater level of comfort that their actions will not expose them to disproportionate costs or unpredictable outcomes of spoliation motions.[27]

---

[26] *See* articles cited at note 24, *supra*.

[27]  In this regard, I have attached as an appendix to this memorandum a chart that contains citations to cases discussing preservation and spoliation in each of the circuits and attempts to break them down into discrete sub-issues to facilitate comparison of the positions taken by the circuits, and where applicable, districts within a particular circuit.

## A.  The Court's Authority to Impose Spoliation Sanctions

To resolve the issue of appropriate sanctions for spoliation, the court must consider the source and nature of its authority to impose such sanctions.  Two "main" sources supply the court with authority to impose sanctions against a party for spoliation of evidence.  *Goodman*, 632 F. Supp. 2d at 505.

> First, there is the "court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct 'which abuses the judicial process.'" *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 263-64 (2007) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)); *accord Thompson*, 219 F.R.D. at 100 (quoting *Silvestri*, 271 F.3d at 590); *see also Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005); *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 191 (S.D.N.Y. 2007). Second, if the spoliation violates a specific court order or disrupts the court's discovery plan, sanctions also may be imposed under Fed. R. Civ. P. 37. *United Med. Supply Co.*, 77 Fed. Cl. at 264, *cited in Sampson*, 251 F.R.D. at 178.

*Id.* at 505-06 (some citations omitted).

The court's inherent authority arises "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). For almost two centuries, it has been established that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution. . . . because they are necessary to the exercise of all others" and they enable courts "to preserve [their] own existence and promote the end and object of [their] creation." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 33-34 (1812); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Hudson*, 7 Cranch at 34); *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) (same), *superseded on other grounds by statute as stated in Morris v. Adams-Millis Corp.*, 758 F.2d 1352, 1357 n.7 (10th Cir. 1985); *Shaffer Equip. Co.*, 11 F.3d at 462 ("This power is organic, without need of a statute or

rule for its definition, and it is necessary to the exercise of all other powers."). Thus, undergirding this authority "is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010).

Pursuant to their inherent authority, courts may impose fines or prison sentences for contempt and enforce "the observance of order." *Hudson*, 7 Cranch at 34. Additionally, they may "prevent undue delays in the disposition of pending cases and . . . avoid congestion in the calendars of the District Courts," such as by dismissing a case. *Roadway Exp.*, 447 U.S. at 765 (discussing inherent authority of court to dismiss case for failure to prosecute); *see Link v. Wabash R.R.*, 370 U.S. 626, 629-30 (1962) (same); *see also Shaffer Equip. Co.*, 11 F.3d at 462 (noting court's authority to dismiss for abuse of judicial process). And, the courts may "impose order, respect, decorum, silence, and compliance with lawful mandates." *Shaffer Equip. Co.*, 11 F.3d at 461.

However, the court's inherent authority only may be exercised to sanction "bad-faith conduct," *Chambers*, 501 U.S. at 50, and "must be exercised with restraint and discretion," *id.* at 44; *see Shaffer Equip. Co.*, 11 F.3d at 461-62 (the court's inherent power "must be exercised with the greatest restraint and caution, and then only to the extent necessary"). "'[I]ts reach is limited by its ultimate source—the court's need to orderly and expeditiously perform its duties.'" *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010) (quoting *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002). Thus, the court relies instead on statutory authority or rules when applicable. *Id.* at 611-12.

Rule 37(b)(2), pertaining to sanctions for failure to comply with a court order, provides:

(A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

. . . .

(C) *Payment of Expenses.* Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

In this case, I issued a series of orders to preserve evidence, including ESI, and another series of orders to produce ESI evidence, all of which were violated.  As discussed above, after each of them, Pappas and CPI destroyed ESI evidence:

1.   On December 22, 2006, I issued an order staying discovery until after a discovery hearing scheduled for January 18, 2007, and included in it an admonition that the parties had a duty to preserve evidence, including ESI.   ECF No. 41.   Pappas had actual knowledge of the order and understood its import.  Between the issuance of my order and

the hearing, Pappas deleted 9,282 files from his work computer, most of them on the eve of the discovery hearing. [28]

2.  On February 1, 2007, I orally admonished counsel of their clients' duty to preserve relevant ESI, and ordered counsel to explain this duty to their clients. I followed this up the same day with a written preservation order, ECF No. 56, which Pappas knew had been issued.  Between February 2 and 23, 2007, Pappas ran or caused to be run a Disk Cleanup program on his work computer, deleted files, entered his computer's Registry Editor, and ran the system's Disk Defragmenter program on the computer.  This occurred shortly before the scheduled imaging of Pappas's work computer.[29]

3.  I issued orders on the following dates to produce or permit discovery: August 1 and 30, September 21, and October 3, 2007.  ECF Nos. 131, 145, 149, and 164.  After those orders were issued, between July 2008 and August 2009, Pappas or DeRouen ran the CCleaner and Easy Cleaner programs on CPI's New Server and scrubbed (deleted) ESI.[30]

While it is clear that I have authority pursuant to Rule 37(b)(2)(A) to impose sanctions for the violation of my four orders to produce discovery, it must be determined whether I have authority to do so for violation of my three preservation orders, in which I ordered that ESI be preserved, but did not at that time order its actual production.  For the reasons that follow, I conclude that I do.

On its face, Rule 37(b)(2) permits sanctions for disobedience of "an order to *provide or permit discovery*, including an order under Rule 26(f), 35, or 37(a)."  (Emphasis added.)  The

---

[28] *See* discussion, *supra*, in Section I.6, at pages 21-24.

[29] *See* discussion, *supra*, in Section I.7, at pages 24-28.

[30] *See* discussion, *supra*, in Section I.9, at pages 31-32.

rule does not define what is meant by "provide or permit" discovery, but the advisory committee's notes to Rule 37 reflect that subsection (b) was amended in 1970 to broaden the ability of a court to sanction for a violation of discovery.   Fed. R. Civ. P. 37 advisory committee's note to the 1970 amendment to subdiv. (b).   The Advisory Committee observed that "[v]arious rules authorize orders for discovery—*e.g.,* Rule 35(b)(1), Rule 26(c) as revised, Rule 37(d). Rule 37(b)(2) should provide comprehensively for enforcement of all these orders."   *Id.* The advisory committee's note following the 1980 amendment to Rule 37 refers to newly-enacted Rule 26(f), which governs discovery conferences, and states that Rule 26(f) requires "an order respecting the subsequent conduct of discovery" following such a meeting.   Fed. R. Civ. P. 37 advisory committee's note to the 1980 amendment to subdiv. (b)(2).   This reference is particularly important because, as amended in 2006, Rule 26(f) specifically contemplates that when the parties meet and confer to discuss discovery, they *must*, *inter alia*, "discuss any issues about preserving discoverable information."   Thus, it cannot seriously be questioned that a court order to preserve information, including ESI, has as its core purpose the objective of ensuring that the ESI can be "provided" during discovery, and is intended to "permit" that discovery.   It would clearly violate the purpose of Rule 37(b) if a court were unable to sanction a party for violating the court's order to *preserve* evidence simply because that order did not also order the production of the evidence.   As will be discussed below, the duty to preserve relevant evidence is a common law duty, not a rule-based duty.   It therefore is no surprise that Rule 37(b)(2) does not specifically refer to court orders to "preserve" evidence.   The reference to Rule 26(f), however, which does specifically refer to preservation obligations, makes it clear that court orders issued to enforce discovery plans agreed to by the parties, which include preservation obligations, would be enforceable by Rule 37(b)(2) sanctions.   If so, then it is equally compelling that a

preservation order issued by the court *sua sponte*, and designed to govern the discovery process by ensuring that the evidence to be preserved, if within the scope of discoverable information, may be provided in response to an appropriate discovery request, also is an order to "permit discovery."  To reach a contrary conclusion would be to exalt form over substance.

Moreover, it is clear that courts have broadly interpreted the authority granted by Rule 37(b)(2) to permit sanctions for failures to obey a wide variety of orders intended to "permit discovery."  *See, e.g.*, *Hathcock v. Navistar Int'l Transp. Co.*, 53 F.3d 36, 40 (4th Cir. 1995) (holding that a trial court had the authority to impose a default judgment as a sanction for violating a Rule 16 scheduling order, pursuant to Rule 37(b)(2); stating "we agree with the basic premise that a default sanction can, under certain circumstances, be an appropriate response to a violation of a Rule 16 order.  After all, the express terms of Rule 37 permit a trial court to impose sanctions when a party fails to obey an order to provide or permit discovery"); *Quela v. Payco-Gen. Am. Creditas, Inc.*, No. 99-C-1904, 2000 WL 656681, at *6 (N.D. Ill. May 18, 2000) ("Although the language of Rule 37 requires violation of a judicial order in order to impose sanctions, a formal, written order to comply with discovery is not required. Courts can broadly interpret what constitutes an order for purposes of imposing sanctions.") (citing *Brandt v. Vulcan, Inc*., 30 F.3d 752, 756 n.7 (7th Cir. 1994) ("While courts have only applied Rule 37(b)(2) where parties have violated a court order, courts have broadly interpreted what constitutes an "order" for purposes of imposing sanctions.")); *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005) (quoting *Quela*, 2000 WL 656681, at *6), *aff'd*, 200 Fed. App'x 592 (7th Cir. 2006).  Indeed, courts have stated summarily that Rule 37(b)(2) sanctions may stem from failure to comply with a preservation order, or operated under that assumption. *See Pitney Bowes Gov't Solutions, Inc. v. United States*, 93 Fed. Cl. 327, 336 (2010)

("Spoliation may result in sanctions . . . grounded in contravention of specific discovery *or document-preservation* orders.") (emphasis added); *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 271 (2007) (ordering sanctions for spoliation pursuant to court's inherent authority, for spoliation predating court's first preservation order, and Rule 37(b), for spoliation following the date on which "the court ordered defendant to be prepared to specify the steps that would be taken to prevent further spoliation, or, at the latest, December 5, 2005, when, as described in greater detail below, the court warned defendant that any further document destruction would lead to sanctions"); *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 119-20 (S.D.N.Y. 2008) ("'Where a party violates an order to preserve evidence or fails to comply with an order compelling discovery because it has destroyed the evidence in question, it is subject to sanctions under Rule 37(b) of the Federal Rules of Civil Procedure for failure to comply with a court order.'") (quoting *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 194 (S.D.N.Y. 2007); *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 104 F.R.D. 119, 121 (C.D. Cal. 1985) (concluding that "oral document preservation order" that later "was reduced to writing and filed" was an order "to provide or permit discovery . . . upon which monetary sanctions may be awarded under Rule 37(b)").  For these reasons, I conclude that this Court has the authority to impose Rule 37(b)(2) sanctions, if otherwise appropriate, for violations of a Court-issued preservation order, even if that order does not actually order the actual production of the evidence to be preserved. Additionally, of course, the Court's authority to impose Rule 37(b)(2) sanctions for violation of its serial orders to actually produce ESI, is equally clear.

### B.  Proof of Sanction-Worthy Spoliation

In the Fourth Circuit, to prove spoliation that warrants a sanction, a party must show:

"(1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."

*Goodman*, 632 F. Supp. 2d at 509 (quoting *Thompson*, 219 F.R.D. at 101).  District courts in the Second, Fifth, Sixth, Seventh, and Ninth Circuits have identified the same factors for sanction-worthy spoliation.[31]  *See Jones v. Bremen High Sch. Dist. 228*, No. 08-C-3548, 2010 WL 2106640, at *5 (N.D. Ill. May 25, 2010); *In re Global Technovations, Inc.*, 431 B.R. 739, 778 (Bankr. E.D. Mich. 2010); *Pension Comm.*, 685 F. Supp. 2d at 467; *Rimkus*, 688 F. Supp. 2d at 615-16; *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2010 WL 582189, at *4 (D. Ariz. Feb. 12, 2010).  The first element involves both the duty to preserve and the breach of that duty through the destruction or alteration of the evidence.  *See Jones*, 2010 WL 2106640, at *5 ("To

---

[31] The same factors can be culled from the case law in most other circuits. *See, e.g.*, *D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-687 (JDB/JMF), 2010 WL 3324964, at *5 (D.D.C. Aug. 24, 2010) (stating the same factors in the context of an adverse inference specifically); *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, No. 09-60351-CIV, 2010 WL 3368654, at *4 (S.D. Fla. Aug. 23, 2010) (also requiring that lost evidence have been "crucial to the movant being able to prove its prima facie case or defense").  However, some courts address the factors in the context of two separate issues: was there spoliation, and if so, what sanctions are appropriate, with state of mind only figuring into the second issue.  *See, e.g.*, *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009); *Wright v. City of Salisbury*, No. 2:07CV0056 AGF, 2010 WL 126011, at *2 (E.D. Mo. Jan. 7, 2010); *Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150, 152 (D.N.J. 2009); *Velez v. Marriott PR Mgmt., Inc.*, 590 F. Supp. 2d 235, 258 (D.P.R. 2008); *Hofer v. Gap, Inc.*, 516, F. Supp. 2d 161, 170 (D. Mass. 2007).  The Federal Circuit "applies the law of the regional circuit from which the case arose" when reviewing sanction orders. *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1380 (Fed. Cir. 2004).

find that sanctions for spoliation are appropriate, the Court must find the following: *1) that there was a duty to preserve the specific documents and/or evidence, 2) that the duty was breached*, 3) that the other party was harmed by the breach, and 4) that the breach was caused by the breaching party's wilfulness, bad faith, or fault.") (emphasis added).

### 1.  *Duty to Preserve Evidence and Breach of that Duty*

The first consideration is whether the alleged spoliator had a duty to preserve the lost evidence and breached that duty.  "Absent some countervailing factor, there is no general duty to preserve documents, things, or information, whether electronically stored or otherwise."  Paul W. Grimm, Michael D. Berman, Conor R. Crowley, Leslie Wharton, *Proportionality in the Post-Hoc Analysis of Pre-Litigation Preservation Decisions*, 37 U. BALT. L. REV. 381, 388 (2008). Yet, it is well established that "[a] formal discovery request is not necessary to trigger the duty to preserve evidence."  *Krumwiede v. Brighton Assocs., L.L.C.*, No. 05-C-3003, 2006 WL 1308629, at *8 (N.D. Ill. May 8, 2006). Rather, the duty "may arise from statutes, regulations, ethical rules, court orders, or the common law. . . . , a contract, or another special circumstance." Grimm, 37 U. BALT. L. REV. at 390.  Thus, any preservation order that the Court may issue obligates the parties to preserve evidence, and the Court has the authority to enforce that obligation under Rule 37, as discussed *supra*.  But, the obligation existed prior to the order; only its mechanism of enforcement changes with the Court order.

The common law imposes the obligation to preserve evidence from the moment that litigation is reasonably anticipated.  *See Silvestri*, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."); *Goodman*, 632 F. Supp. 2d at 509 (same); *Pension Comm.*, 685 F. Supp. 2d at 466

(same); Grimm, U. BALT. L. REV. at 390 n.38 ("'All circuits recognize the duty to preserve information relevant to anticipated or existing litigation.'") (citation omitted); *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (duty to preserve exists when party had "'some notice that the documents were potentially relevant to the litigation before they were destroyed'") (citation omitted).   Moreover, "this duty arises at the point in time when litigation is reasonably anticipated whether the organization is the initiator or the target of litigation." THE SEDONA CONFERENCE, THE SEDONA CONFERENCE COMMENTARY ON LEGAL HOLDS: THE TRIGGER AND THE PROCESS 3 (public cmt. ed. Aug. 2007), *available at* http://www.thesedonaconference.org/content/miscFiles/Legal_holds.pdf ("Legal Holds").   For example, in *Sampson*, 251 F.R.D. at 181, the defendant's duty arose no later than the date when plaintiff's counsel, prior to filing the complaint, asked the defendant by letter to preserve relevant evidence.   However, a future litigant is not required to make such a request, "and a failure to do so does not vitiate the independent obligation of an adverse party to preserve such information" if the adverse party knows or should know of impending litigation.  *Thompson*, 219 F.R.D. at 100.   Thus, the duty exists, for a defendant, at the latest, when the defendant is served with the complaint.  *See Nucor Corp. v. Bell*, 251 F.R.D. 191, 197 (D.S.C. 2009) (stating that "defendants each had a duty to preserve the data beginning no later than those dates" on which plaintiff served the complaint on each defendant); *see also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007) ("In most cases, the duty to preserve evidence is triggered by the filing of a lawsuit."); *Krumwiede*, 2006 WL 1308629, at *8 ("The filing of a complaint may alert a party that certain information is relevant and likely to be sought in discovery.").

The duty to preserve evidence "includes an obligation to identify, locate, and maintain, information that is relevant to specific, predictable, and identifiable litigation." Legal Holds, *supra*, at 3.  It is well established that the duty pertains only to relevant documents.  *See Pension Comm.*, 685 F. Supp. 2d at 464.  Relevant documents include:

> [A]ny documents or tangible things (as defined by [Fed. R. Civ. P. 34(a))] made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." The duty also includes documents prepared for those individuals, to the extent those documents can be readily identified (e.g., from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of any party, or which is "relevant to the subject matter involved in the action." Thus, the duty to preserve extends to those employees likely to have relevant information-the "key players" in the case.

*Zubulake v. UBS Warburg LLC* (*Zubulake IV*), 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003) (footnotes omitted); *see Broccoli*, 229 F.R.D. at 510 ("The duty to preserve encompasses any documents or tangible items authored or made by individuals likely to have discoverable information that the disclosing party may use to support its claim or defenses.").

Beyond these basics, the duty to preserve evidence should not be analyzed in absolute terms; it requires nuance, because the duty "'cannot be defined with precision.'"  Grimm, 37 U. BALT. L. REV. at 393 (quoting SHIRA A. SCHEINDLIN, MOORE'S FEDERAL PRACTICE E-DISCOVERY: THE NEWLY AMENDED FEDERAL RULES OF CIVIL PROCEDURE 7 n.28 (2006)). Proper analysis requires the Court to determine reasonableness under the circumstances—"reasonable and good faith efforts to retain information that may be relevant to pending or threatened litigation."  THE SEDONA CONFERENCE, THE SEDONA PRINCIPLES: BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION ii (2d ed. 2007), *available at* http://www.thesedonaconference.org/content/miscFiles/ (follow link); *see Jones*, 2010 WL 2106640, at *5.  It "is neither absolute, nor intended to cripple organizations."

Grimm, 37 U. BALT. L. REV. at 385. Thus, "[w]hether preservation or discovery conduct is acceptable in a case depends on what is *reasonable*, and that in turn depends on whether what was done—or not done—was *proportional* to that case and consistent with clearly established applicable standards." *Rimkus*, 688 F. Supp. 2d at 613 (emphasis in *Rimkus*); *see* Legal Holds, *supra*, at 3 ("In determining the scope of information that should be preserved, the nature of the issues raised in the matter, experience in similar circumstances and the amount in controversy are factors that may be considered."). Put another way, "the scope of preservation should somehow be proportional to the amount in controversy and the costs and burdens of preservation." Grimm, 37 U. BALT. L. REV. at 405. Although, with few exceptions, such as the recent and highly instructive *Rimkus* decision,[32] courts have tended to overlook the importance of proportionality in determining whether a party has complied with its duty to preserve evidence in a particular case, this should not be the case because Fed. R. Civ. P. 26(b)(2)(C) cautions that all permissible discovery must be measured against the yardstick of proportionality. *See Procter & Gamble Co. v. Haugen*, 427 F.3d 727, 739 n.8 (10th Cir. 2005) (requiring district court to consider Rule 26(b)(2)(C)(iii) before ordering spoliation sanctions to ensure against "'the burden or expense of the proposed discovery outweigh[ing] its likely benefit'") (quoting Rule). Moreover, the permissible scope of discovery as set forth in Rule 26(b) includes a proportionality component of sorts with respect to discovery of ESI, because Rule 26(b)(2)(B) permits a party to refuse to produce ESI if it is not reasonably accessible without undue burden and expense. Similarly, Rule 26(g)(1)(B)(iii) requires all parties seeking discovery to certify that

---

[32] *See also Canton v. Kmart Corp.*, No. 1:05-cv-143, 2009 WL 2058908, at *3 (D.V.I. July 13, 2009) (Conduct is culpable if a "'party [with] notice that evidence is relevant to an action . . . either proceeds to destroy that evidence or allows it to be destroyed by failing to take *reasonable* precautions'" (quoting *Mosaid Techs., Inc. v. Samsung Elecs. Co.,* 348 F. Supp. 2d 332, 338 (D.N.J. 2004)) (emphasis added).

the request is "neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, the amount in controversy, and the importance of the issues at stake in the action." Thus, assessment of reasonableness and proportionality should be at the forefront of all inquiries into whether a party has fulfilled its duty to preserve relevant evidence. *Jones*, 2010 WL 2106640, at *6-7 ("[R]easonableness is the key to determining whether or not a party breached its duty to preserve evidence.").

Case law has developed guidelines for what the preservation duty entails. Unfortunately, in terms of what a party must do to preserve potentially relevant evidence, case law is not consistent across the circuits, or even within individual districts. This is what causes such concern and anxiety, particularly to institutional clients such as corporations, businesses or governments, because their activities—and vulnerability to being sued—often extend to multiple jurisdictions, yet they cannot look to any single standard to measure the appropriateness of their preservation activities, or their exposure or potential liability for failure to fulfill their preservation duties. A national corporation cannot have a different preservation policy for each federal circuit and state in which it operates. How then do such corporations develop preservation policies? The only "safe" way to do so is to design one that complies with the most demanding requirements of the toughest court to have spoken on the issue, despite the fact that the highest standard may impose burdens and expenses that are far greater than what is required in most other jurisdictions in which they do business or conduct activities.

For example, as noted, parties must preserve potentially relevant evidence under their "control," and in the Fourth Circuit and the Second Circuit, "'documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.'" *Goodman*, 632 F. Supp. 2d at 515 (quoting *In re*

*NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007)).   And, in this circuit, as well as the First and Sixth Circuits, the preservation duty applies not only when the evidence is in the party's control; there is also a duty to notify the opposing party of evidence in the hands of third parties.   *See Silvestri*, 271 F.3d at 590; *Velez v. Marriott PR Mgmt., Inc.*, 590 F. Supp. 2d 235, 258 (D.P.R. 2008); *Jain v. Memphis Shelby Airport Auth.*, No. 08-2119-STA-dkv, 2010 WL 711328, at *2 (W.D. Tenn. Feb. 25, 2010).   In contrast, district courts in the Third, Fifth, and Ninth Circuits have held that the preservation duty exists only when the party controls the evidence, without extending that duty to evidence controlled by third parties.   *Bensel v. Allied Pilots Ass'n*, 263 F.R.D. 150, 152 (D.N.J. 2009); *Rimkus*, 688 F. Supp. 2d at 615-16; *Melendres*, 2010 WL 582189, at *4.   So, what should a company that conducts business in the First, Second, Third, Fourth, Fifth, Sixth, and Ninth Circuits do to develop a preservation policy that complies with the inconsistent obligations imposed by these circuits?   This is the question for which a suitable answer has proven elusive.

It generally is recognized that when a company or organization has a document retention or destruction policy, it "is obligated to suspend" that policy and "implement a 'litigation hold' to ensure the preservation of relevant documents" once the preservation duty has been triggered. *Goodman*, 632 F. Supp. 2d at 511 (quoting *Thompson*, 219 F.R.D. at 100 (quoting *Zubulake IV*, 220 F.R.D. at 218)); *see Pension Comm.*, 685 F. Supp. 2d at 466 (same); *School-Link Tech., Inc. v. Applied Res., Inc.*, No. 05-2088-JWL, 2007 WL 677647, at *3 (D. Kan. Feb. 28, 2007) (same). But, a litigation hold might not be necessary under certain circumstances, and reasonableness is still a consideration.   *Jones*, 2010 WL 2106640, at *7; *see* Thomas Y. Allman, *Amending the Federal Rules:  The Path to an Effective Duty To Preserve* 5 (2010 Conf. on Civil Litig., June 15, 2010), http://civilconference.uscourts.gov/LotusQuickr/dcc/Main.nsf/h_Toc/47B91A2AC603

E0340525670800167201/?OpenDocument ("Allman, *Amending the Rules*") (suggesting that "if a litigation hold process *is* employed, that fact should be treated as prima facie evidence that reasonable steps were undertaken to notify relevant custodians of preservation obligations" and that "intervention in routine operations [should be] unnecessary unless the failure to do so [was] intended to deprive another of the use of relevant evidence") (emphasis added); Legal Holds, *supra*, Guidelines 2-3 (stating that conduct that "demonstrates reasonableness and good faith in meeting preservation obligations" includes "adoption and consistent implementation of a policy defining a document retention decision-making process" and the "use of established procedures for the reporting of information relating to a potential threat of litigation to a responsible decision maker").  However, as discussed in detail below, courts differ in the fault they assign when a party fails to implement a litigation hold.  *Compare Pension Comm.*, 685 F. Supp. 2d at 466 (stating that failure to implement a written litigation hold is gross negligence *per se*) *with Haynes v. Dart*, No. 08 C 4834, 2010 WL 140387, at \*4 (N.D. Ill. Jan. 11, 2010) ("The failure to institute a document retention policy, in the form of a litigation hold, is relevant to the court's consideration, but it is not *per se* evidence of sanctionable conduct.") (citation omitted).

Although it is well established that there is no obligation to "'preserve every shred of paper, every e-mail or electronic document, and every backup tape,'" *Consol. Edison Co. of N.Y., Inc. v. United States*, 90 Fed. Cl. 228, 256 (Fed. Cl. 2009) (quoting *Zubulake IV*, 220 F.R.D. at 217), in some circumstances, "[t]he general duty to preserve *may* also include deleted data, data in slack spaces, backup tapes, legacy systems, and metadata."  Grimm, 37 U. BALT. L. REV. at 410 (emphasis added).  Unlike most courts, which have not addressed directly retention requirements for multiple copies or backup tapes specifically, the United States District Court for the Southern District of New York has provided an in-depth discussion of the topic.  *See*

*Zubulake IV*, 220 F.R.D. 220.  In *Zubulake IV*, the court explained that the duty is to preserve "unique, relevant evidence that might be useful to an adversary."  *Id.* at 217.  It stated that although "[a] party or anticipated party must retain all relevant documents," it need not "preserve all backup tapes even when it reasonably anticipates litigation" or retain "multiple identical copies."  *Id.* at 217-18.  The parties may decide how to select among multiple identical copies, *id.* at 218:

> [A] litigant could choose to retain all then-existing backup tapes for the relevant personnel (if such tapes store data by individual or the contents can be identified in good faith and through reasonable effort), and to catalog any later-created documents in a separate electronic file. That, along with a mirror-image of the computer system taken at the time the duty to preserve attaches (to preserve documents in the state they existed at that time), creates a complete set of relevant documents.

District courts in the Fifth and Sixth Circuits have relied on *Zubulake IV*'s discussion of backup tape preservation.  *See Maggette v. BL Devel. Corp.*, Nos. 2:07CV181-M-A, 2:07CV182-M-A, 2009 WL 4346062, at *2 (N.D. Miss. Nov. 24, 2009); *Forest Labs., Inc. v. Caraco Pharm.*, No. 06-CV-13143, 2009 WL 998402, at *4-5 (E.D. Mich. April 14, 2009); *Toth v. Calcasieu Parish*, No. 06-998, 2009 WL 528245, at *2 (W.D. La. Mar. 2, 2009).  However, because such discrepancies exist among circuits on other topics, it is not clear for litigants how uniformly the *Zubulake IV* opinion will be applied.

Breach of the preservation duty, also, is premised on reasonableness:  A party breaches its duty to preserve relevant evidence if it fails to act reasonably by taking "positive action to preserve material evidence."  *See Jones*, 2010 WL 2106640, at *6.  The action must be "'reasonably calculated to ensure that relevant materials will be preserved,' such as giving out specific criteria on what should or should not be saved for litigation."  *Id.* (quoting *Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *38 (N.D. Ill. 2000)).

54

Before turning to the remaining elements of a spoliation claim, it is helpful in analyzing the existence of the duty to preserve evidence and its breach to keep in mind the entity to whom that duty is owed, because this is important in determining an appropriate sanction when spoliation is found.  What heretofore usually has been implicit—but seldom stated—in opinions concerning spoliation is that, with the exception of a few jurisdictions that consider spoliation to be an actionable tort,[33] the duty to preserve evidence relevant to litigation of a claim is a duty owed to the *court*, not to a party's adversary.   *E.g.*, *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556 (N.D. Cal. 1987) (ordering, in addition to costs and fees, defendant's payment of "$15,000.00 to the clerk of this court for the unnecessary consumption of the court's time and resources," after noting that "the defendant employed an unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for its *obligations as a litigant*" and that defendant had a "profound disrespect for its *responsibilities in this litigation*") (emphasis added); *see also, e.g.*, *Metro. Opera Ass'n v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 228 (S.D.N.Y. 2003) (quoting *Turnage*, 115 F.R.D. at 556); *Krumwiede*, 2006 WL 1308629, at *11 (concluding that default judgment on

---

[33] *See Foster v. Lawrence Mem'l Hosp.*, 809 F. Supp. 831, 836 (D. Kan. 1992) (stating the Kansas recognizes torts of negligent and intentional spoliation); *Hazen v. Municipality of Anchorage*, 718 P.2d 456, 463 (Alaska 1986) (In Alaska, there exists "a common-law cause of action in tort for intentional interference with prospective civil action by spoilation [sic] of evidence."); *Rodgers v. St. Mary's Hosp. of Decatur*, 597 N.E.2d 616, 620 (Ill. 1992) (concluding that private cause of action existed in Illinois for spoliation under statute requiring preservation of x-rays when hospital was notified of relevant pending litigation); *Thompson ex rel. Thompson v. Owensby*, 704 N.E.2d 134, 139 (Ind. Ct. App. 1998) (stating that cause of action existed in Indiana for "negligent failure to maintain evidence"); *Hirsch v. Gen. Motors Corp.*, 628 A.2d 1108, 1115 (N.J. Law Div. 1993) (stating that "New Jersey recognizes a tort analogous to intentional spoliation of evidence" called "fraudulent concealment of evidence") (modified on other grounds by *Rosenblit v. Zimmerman*, 766 A.2d 749 (N.J. 2001)); *Henry v. Deen*, 310 S.E.2d 326, 334-35 (N.C. 1984) (stating that there is a cause of action for spoliation of evidence in North Carolina); *Smith v. Howard Johnson Co.*, Inc., 615 N.E.2d 1037, 1038 (Ohio 1993) (In Ohio, "[a] cause of action exists in tort for interference with or destruction of evidence.").

defendant's counterclaims was the only remedy for plaintiff's spoliation and perjury, which showed "blatant contempt for th[e] Court and a fundamental disregard for the judicial process"). *See generally Quela*, 2000 WL 656681, at *7 ("'[P]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities.'") (quoting *Rodriguez v. M & M/Mars*, No. 96 C 1231, 1997 WL 349989, at *2 (N.D. Ill. June 23, 1997)).  For the judicial process to function properly, the court must rely "in large part on the good faith and diligence of counsel *and the parties* in abiding by these rules [of discovery] and conducting themselves and their judicial business honestly."  *Metro. Opera Ass'n*, 212 F.R.D. at 181 (emphasis added).  The court's inherent authority to impose sanctions for spoliation of evidence is a means of preserving "the integrity of the judicial process" so that litigants do not lose "confidence that the process works to uncover the truth." *Silvestri*, 271 F.3d at 590.

The civil justice system is designed for courts to decide cases on their merits, and to do so, the fact-finder must review the facts to discern the truth.  *See Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) ("In the normal course of events, justice is dispensed by the hearing of cases on their merits."); *Metro. Opera Ass'n*, 212 F.R.D. at 181 ("'A lawsuit is supposed to be a search for the truth.'") (quoting *Miller v. Time-Warner Commc'ns, Inc.*, No. 97 Civ. 7286, 1999 WL 739528, at *1 (S.D.N.Y. Sept. 22, 1999)).  While the fact-finder can review only the documents that the parties produce, and production and preservation are not synonymous, production is possible only if documents are preserved.  *See generally* Richard Marcus, *Only Yesterday: Reflections on Rulemaking Responses to E-discovery*, 73 FORDHAM L. REV. 1, 14 (2004) (noting that the duty to preserve does not mean that all preserved information must be produced, but it "ensure[s] that a judge will be able to make that determination" about what should be produced).  Thus, the truth cannot be uncovered if information is not preserved.

That the duty is owed to the court, and not to the party's adversary is a subtle, but consequential, distinction.  A proper appreciation of the distinction informs the Court's decision regarding appropriate spoliation sanctions.  Where intentionally egregious conduct leads to spoliation of evidence but causes no prejudice because the evidence destroyed was not relevant, or was merely cumulative to readily available evidence, or because the same evidence could be obtained from other sources, then the integrity of the judicial system has been injured far less than if simple negligence results in the total loss of evidence essential for an adversary to prosecute or defend against a claim.  In the former instance, the appropriateness of a case-dispositive sanction is questionable despite the magnitude of the culpability, because the harm to the truth-finding process is slight, and lesser sanctions such as monetary ones will suffice.  In contrast, a sympathetic though negligent party whose want of diligence eliminates the ability of an adversary to prove its case may warrant case-dispositive sanctions, because the damage to the truth-seeking process is absolute.  Similarly, certain sanctions make no logical sense when applied to particular breaches of the duty to preserve.  For example, an adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence because it believed that the evidence was harmful to its case does not flow from mere negligence—particularly if the destruction was of ESI and was caused by the automatic deletion function of a program that the party negligently failed to disable once the duty to preserve was triggered.  The more logical inference is that the party was disorganized, or distracted, or technically challenged, or overextended, not that it failed to preserve evidence because of an awareness that it was harmful. In short, matching the appropriate sanction to the spoliating conduct is aided by remembering to whom the duty to preserve is owed.

Failures to preserve evidence also cause another, less widely discussed, injury to the civil justice system. "When spoliation issues are litigated, 'more attention is focused on e-discovery than on the merits, with a motion for sanctions an increasingly common filing.'" Allman, *Amending the Rules* 1) (quoting Dan H. Willoughby, Jr. & Rose Hunter Jones, *Sanctions for E-Discovery Violations: By the Numbers* (2010 Conf. on Civil Litig., May 2010), available at http://civilconference.uscourts.gov/LotusQuickr/dcc/Main.nsf/h_RoomHome/4df38292d748069 d0525670800167212/?OpenDocument, under the links for Papers and Empirical Research); *see Rimkus*, 688 F. Supp. 2d at 607 ("Spoliation allegations and sanctions motions distract from the merits of a case, add costs to discovery, and delay resolution."). Allegations of spoliation and the motions practice that ensues interfere with the court's administration of justice in general by crowding its docket and delaying the resolution of cases. *See, e.g.*, *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 n.5 (9th Cir. 2006) (noting that plaintiff's "destruction of 2,200 files on his employer-issued computer 'greatly impeded resolution of the case' by obscuring the factual predicate of the case and consuming months of sanction-related litigation" and concluding that "there was ample evidence of the time and resources spent in investigating and resolving the spoliation issues," which supported dismissal of the case); *Pension Comm.*, 685 F. Supp. 2d at 471 n.56 ("I, together with two of my law clerks, have spent an inordinate amount of time on this motion. We estimate that collectively we have spent close to three hundred hours resolving this motion. I note, in passing, that our blended hourly rate is approximately thirty dollars per hour (!) well below that of the most inexperienced paralegal, let alone lawyer, appearing in this case. My point is only that sanctions motions, and the behavior that caused them to be made, divert court time from other important duties—namely deciding cases on the merits."); *State Farm Fire & Cas. Co. v. Broan Mfg. Co.*, 523 F. Supp. 2d 992, 997 (D. Ariz. 2007) (noting that the fact that

"the Court has spent significant resources investigating and resolving the spoliation issues" supported dismissal); *Gutman v. Klein*, No. 03 Civ. 1570 (BMC), 2009 WL 3296072, at *8 (E.D.N.Y. Oct. 13, 2009) (noting that, with regard to spoliation sanctions, "defendants have raised pettifogging objections at nearly every stage of the litigation, trying the court's patience . . ."); *Zubulake v. UBS Warburg LLC* (*Zubulake V*), 229 F.R.D. 422, 440 (S.D.N.Y. 2004) (stating that "[t]he tedious and difficult fact finding encompassed in this opinion [regarding the duty to reserve ESI] and others like it is a great burden on a court's limited resources"). Interestingly, this burden is the same regardless of whether the culpability underlying the spoliation was negligent, grossly negligent, or intentional.

What frustrates courts is the inability to fashion an effective sanction to address the drain on their resources caused by having to wade through voluminous filings, hold lengthy hearings, and then spend dozens, if not hundreds, of hours painstakingly setting forth the underlying facts before turning to a legal analysis that is multi-factored and involved. Adverse inference instructions do not compensate for the expenditure of court resources to resolve a spoliation dispute, nor do awards of attorney's fees and costs to the prevailing party in the dispute. Further, dispositive sanctions, the appellate courts tell us, are only appropriate where lesser sanctions will not suffice. *Silvestri*, 271 F.3d at 590 (4th Cir. 2001); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Indeed, it is questionable whether the interests of justice truly are served if a court imposes case-dispositive sanctions for clearly culpable conduct resulting in spoliation of evidence absent a finding that the failure to preserve evidence resulted in the loss of evidence that was relevant, or caused prejudice to the spoliating party's adversary, notwithstanding the amount of time it took the court to resolve the spoliation issue, or the

concomitant "opportunity cost" to the court occasioned by its inability to work on other pressing matters because of the need to resolve the spoliation motion.

While some trial courts have ordered the payment of money to the clerk of the court as a sanction for unnecessarily prolonging and increasing litigation expense, or as a fine for unnecessarily consuming court resources, *e.g.*, *Pinstripe, Inc. v. Manpower, Inc.*, No. 07-cv-620-GKF-PJC, 2009 WL 2252131, at *4 (N.D. Okla. July 29, 2009); *Claredi v. Seebeyond Tech. Corp.*, No. 4:04CV1304 RWS, 2007 WL 735018, at *4 (E.D. Mo. Mar. 8, 2007); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 111 (D.N.J. 2006); *Turnage*, 115 F.R.D. at 559, those rulings were from trial courts and were not appealed.  It is far from clear that, had they been appealed, they would have been affirmed.  *See Bradley v. Am. Household, Inc.*, 378 F.3d 373, 377-79 (4th Cir. 2004) (vacating and remanding district court order that imposed substantial monetary fine against defendant ($200,000) and attorney ($100,000) for discovery violations including failure to preserve and produce evidence; concluding that the fines were criminal because (a) they were payable to the court rather than to the complaining party; (b) they were not conditioned on compliance with a court order; (c) they were not tailored to compensate the complaining party; and (d) they were imposed for punitive purposes); *Buffington v. Baltimore Cnty., Md.*, 913 F.2d 113, 133 (4th Cir. 1990) (vacating sanctions imposed by trial court as "civil contempt" for violation of discovery obligations; observing that fines were ordered payable to the court, rather than to the complaining party; concluding that the fines were a form of criminal contempt, which could not be imposed without compliance with due process procedures required for criminal contempt proceedings); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442-44 (10th Cir. 1998) (holding that 25% surcharge added to fees that otherwise would be compensatory was a criminal contempt sanction, even though it was payable to the adverse party and not to the

court; reversing order for sanctions because court did not follow procedural requirements for criminal contempt).

The bottom line is that resolution of spoliation motions takes a toll on the court, separate from that extracted from the litigants, for which there is no satisfactory remedy short of criminal contempt proceedings, which are unlikely to be initiated absent extraordinary circumstances. In fact, research has revealed only one instance to date in which a court has initiated criminal contempt proceedings against a party for spoliation of ESI in a civil case. *See SonoMedica, Inc. v. Mohler*, No. 1:08-cv-230 (GBL), 2009 WL 2371507, at *1 (E.D. Va. July 28, 2009) ("The Court further holds that this case will be referred to the United States Attorney to investigate criminal contempt proceedings because the Court finds that the [third party witnesses] willfully violated a court order by failing to produce documents in accordance with the court order, [one of the third party witnesses] failed to tell the truth during [a] deposition and for spoliation of certain files on their computer which were subject to production under the [court's] Order to Compel."). Courts should not shy away from their authority to initiate criminal contempt proceedings when the circumstances warrant such measures. However, in reaching this decision, they cannot ignore the fact that doing so involves compliance with Fed. R. Crim. P. 42, which requires various procedural safeguards, such as referral to the United States Attorney, notice, and a hearing, as discussed below. It seems clear that courts, even those faced with cases involving serious spoliation of evidence, will be reluctant to proceed with criminal contempt proceedings in most instances.

In this case, as the discussions above on pages 7 and 46-48 shows, Defendants clearly were under a duty to preserve ESI relevant to Plaintiff's claims on October 14, 2006, if not earlier, and that, in an unabated destruction continuing for years, failed to comply with that duty.

While I have acknowledged that courts must consider issues of proportionality and reasonableness of the alleged spoliator's conduct in determining whether there has been a breach of the preservation duty, neither is at issue in this case.

Proportionality and reasonableness are not at issue because Defendants have never alleged that it would have been an undue burden for them to preserve the ESI they destroyed. Neither is this a case where a hapless party took objectively reasonable steps to preserve ESI, but it nonetheless was destroyed or lost.  Defendants candidly admit that "certain CPI ESI was deleted by Pappas and CPI's Computer Engineer Evan DeRouen and/or others after CPI was served with the lawsuit and after a preservation order was issued," and they "take responsibility" for those deletions.  Defs.' Opp'n 2.  Defendants admit that "between October 14, 2006 and February 17, 2007 thousands of files were deleted from Pappas' laptop computer," *id.* at 5; that "Pappas made deletions on his laptop" on February 16 and 17, 2007, *id.* at 2, 7; and that, consistent with  Pappas's testimony, "he would put e-mails into a 'Deleted Items' folder on his laptop" for what Defendants characterized as "storage purposes," *id.* at 8 (citation omitted). Acknowledging that the EHD "should not have been disposed of since it was in existence after the lawsuit had been filed," *id.* at 5, they "take responsibility for . . . the failure to preserve files on the SimpleDrive [EHD]," *id*. at 2.  Defendants also "recognize[] that there has been . . . contradictory testimony about its computer stores, and contradictory testimony about the use of the name Fred Bass."  Defs.' Surreply 19.  Thus, in this case, the issue is not whether the preservation duty was triggered, or whether Defendants took reasonable and proportional steps to preserve it, or whether the duty was breached.  The issue is what sanctions are appropriate, given the nature of Defendants' conduct, the relevance of the ESI that was lost or destroyed, and the prejudice suffered by Plaintiff.  *See Goodman*, 632 F. Supp. 2d at 509.

2.  *Culpable State of Mind*

The second consideration for resolving a spoliation motion is to determine whether the alleged spoliator acted culpably.  "Each case will turn on its own facts and the varieties of efforts and failures is infinite."  *Pension Comm.*, 685 F. Supp. 2d at 465.  The information may have been lost or destroyed inadvertently, "for reasons unrelated to the litigation," or the loss may result from intentional acts, calculated to prevent the other party from accessing the evidence. *Rimkus*, 688 F. Supp. 2d at 613.  Therefore, it has been suggested that the court must rely on its "gut reaction based on years of experience as to whether a litigant has complied with its discovery obligations and how hard it worked to comply."  *Pension Comm.*, 685 F. Supp. 2d at 471.  As with the elements of duty and breach, the variety of standards employed by courts throughout the United States and the lack of a uniform or consistent approach have caused considerable concern among lawyers and clients regarding what is required, and the risks and consequences of noncompliance.

"Courts differ in their interpretation of the level of intent required before sanctions may be warranted."  SEDONA CONFERENCE GLOSSARY, *supra*, at 48.  In *United Medical Supply Co. v. United States*, 77 Fed. Cl. 257, 266 (Fed. Cl. 2007), the court noted that a "distinct minority" of courts "require a showing of bad faith before any form of sanction is applied"; some courts require a showing of bad faith, but only "for the imposition of certain more serious sanctions"; some do not require bad faith for sanctions, but require more than negligence; and others "require merely that there be a showing of fault."  In the Fourth Circuit, for a court to impose some form of sanctions for spoliation, any fault—be it bad faith, willfulness, gross negligence, or ordinary negligence—is a sufficiently culpable mindset.  *Goodman*, 632 F. Supp. 2d at 518, 520; *Thompson*, F.R.D. at 101; *see Pandora Jewelry, LLC v. Chamilia, LLC*, No. CCB-06-3041, 2008

WL 4533902, at *9 (D. Md. Sept. 30, 2008).  Under existing case law, the nuanced, fact-specific differences among these states of mind become significant in determining what sanctions are appropriate, as discussed *infra*.  *See Sampson*, 251 F.R.D. at 179 ("Although, some courts require a showing of bad faith before imposing sanctions, the Fourth Circuit requires only a showing of fault, with the degree of fault impacting the severity of sanctions.") (citing *Silvestri*, 271 F.3d at 590).

Negligence, or "culpable carelessness," is "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]"*Black's Law Dictionary* 846 (Bryan A. Garner ed., abridged 7th ed., West 2000).  Negligence is contrasted with "conduct that is intentionally, wantonly, or willfully disregardful of others' rights."  *Id.* With regard to preservation of evidence, if either the failure to collect or preserve evidence or the sloppiness of the review of evidence causes the loss or destruction of relevant information, the spoliator's actions may amount to negligence, gross negligence, or even intentional misconduct. *See Pension Comm.*, 685 F. Supp. 2d at 464 (stating that such acts are "surely" negligence, if not more); *Jones*, 2010 WL 2106640, at *6 (stating that failure to implement a litigation hold is not negligence *per se*; reasonableness must be considered).  Failure "to assess the accuracy and validity of selected search terms" also could be negligence.  *See Pension Comm.*, 685 F. Supp. 2d at 465 (citing *Victor Stanley, Inc. v. Creative Pipe, Inc*., 250 F.R.D. 251, 259-62 (D. Md. 2008), in which the Court discussed reasonableness of a search to identify and withhold privileged documents).

Gross negligence, which is something more than carelessness, "'differs from ordinary negligence only in degree, and not in kind.'" *Pension Comm.*, 685 F. Supp. 2d at 464 (quoting *Prosser & Keeton on Torts* § 34 at 212 (citations omitted)).  In *Jones*, 2010 WL 2106640, at *9,

64

the defendant "did not reasonably prevent employees from destroying [relevant] documents" and "failed to adequately supervise those employees who were asked to preserve documents, such that documents were "probably" lost. The United States District Court for the Northern District of Illinois, emphasizing reasonableness in its analysis in *Jones*, concluded that the defendant was grossly negligent.  *Id.*  The court said that its conclusion did not rise above gross negligence because there was no evidence of "deliberate attempts to 'wipe' hard drives or to destroy relevant evidence by other technological or manual means."  *Id.*  In *Pandora Jewelry*, 2008 WL 4533902, at *8-9, this Court concluded that it was grossly negligent of the defendants to exchange servers during litigation and to fail to institute a litigation hold even though their emails were automatically archived or deleted after ninety days.  This Court in *Sampson*, 251 F.R.D. at 181-82, concluded that the defendant was negligent, but not grossly negligent, when it failed to implement a litigation hold, because it instructed the employees most involved in the litigation to retain documents.   In marked contrast, the United States District Court for the Southern District of New York has concluded that conduct such as the failure to issue a written litigation hold amounts to gross negligence *per se*.  *Pension Comm.*, 685 F. Supp. 2d at 471 (stating that "the following failures support a finding of gross negligence, when the duty to preserve has attached: to issue a written litigation hold; to identify all of the key players and to ensure that their electronic and paper records are preserved; to cease the deletion of email or to preserve the records of former employees that are in a party's possession, custody, or control; and to preserve backup tapes when they are the sole source of relevant information or when they relate to key players, if the relevant information maintained by those players is not obtainable from readily accessible sources").

Willfulness is equivalent to intentional, purposeful, or deliberate conduct. *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008).  In *Goodman*, 632 F. Supp. 2d at 523, this Court held that the defendant "willfully destroyed evidence that it knew to be relevant" because its chief executive officer deleted her emails, and the defendant destroyed the officer's computer. Conduct that is in bad faith must be willful, but conduct that is willful need not rise to bad faith actions.  *See Buckley*, 538 F.3d at 323; *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Goodman*, 632 F. Supp. 2d at 520.   While bad faith requires "destruction for the purpose of depriving the adversary of the evidence," *Powell v. Town of Sharpsburg*, 591 F. Supp. 2d 814, 820 (E.D.N.C. 2008), for willfulness, it is sufficient that the actor intended to destroy the evidence. *See Goodman*, 632 F. Supp. 2d at 520; *see also United Med. Supply Co.*, 77 Fed. Cl. at 268 (distinguishing bad faith and willfulness).

Nevertheless, courts often combine their analysis of willfulness and bad faith.  *E.g.*, *Metro. Opera Ass'n*, 212 F.R.D. at 224-25; *Rimkus*, 688 F. Supp. 2d at 644; *Krumwiede*, 2006 WL 1308629, at *9-10.  Thus, the following factors supported a finding of intentionality and bad faith in the Fifth Circuit:

> [t]he evidence that the defendants knew about the litigation with Rimkus when they deleted the emails; the inconsistencies in the explanations for deleting the emails; the failure to disclose information about personal email accounts that were later revealed as having been used to obtain and disseminate information from Rimkus; and the fact that some of the emails reveal what the defendants had previously denied.

*Rimkus*, 688 F. Supp. 2d at 644.  And, in the Second Circuit, the following facts lead the district court to the same conclusion: defendants "failed to comply with several court orders"; destroyed evidence; failed to search for and produce documents; and lied about "simple but material factual matters."  *Metro. Opera Ass'n*, 212 F.R.D. at 224-25.

In *Krumwiede*, 2006 WL 1308629, at *9-10, the United States District Court for the Northern District of Illinois found "willful and bad faith spoliation of evidence."  Notably, immediately after the defendant in that case sent a preservation letter to Krumwiede's attorney, referring in particular to a laptop in Kruwiede's possession, and again after the court ordered Krumwiede to return the laptop, the laptop "experienced a spike in activity . . . that resulted in the alteration, modification, or destruction of thousands of potentially relevant files and their metadata." *Id.* at *9. Also, "Krumwiede lied to th[e] Court when he testified that he did not receive notice of the September 15, 2005 order until September 16, 2005," and "continued [to] obstruct[] discovery even after relinquishing control of [the] laptop." *Id.* at *9-10.  The court reached its conclusion based on "the volume and timing of Krumwiede's activities." *Id.*

Here, the parties disagree about Defendants' level of culpability.  Plaintiff characterizes Pappas' behavior as "egregious" and perjurous, and it insists that "Pappas has exhibited a pattern of litigation abuse and a persistent disrespect for the judicial process." Pl.'s Mot. 56, 69. According to Plaintiff, "the record is replete with multiple conscious and affirmative acts by Pappas that led to the deliberate destruction of relevant evidence. Pl.'s Reply 1.  Defendants acknowledge wrongdoing but insist that their "culpable state of mind was negligence."  Defs.' Opp'n 25.  Moreover, according to Defendants, Pappas's September 27, 2007 Rule 37 certification was not false because he was not aware that his production was incomplete.  *Id.* at 9-10.  They insist that Plaintiff's allegations that Defendants "manufactured evidence" and removed data instead of producing all ESI are "unfounded." *Id.* at 14-16.  I disagree.

I find the circumstances of this case to be indistinguishable from other cases in which the spoliating party was found to have acted in bad faith.  The discussion *supra* at Sections I.1–I.9 convincingly demonstrates that Pappas, and through him CPI, directly and with the aid of

DeRouen and "Federico," set out to delete, destroy, or hide thousands of files containing highly relevant ESI pertaining to Plaintiff's claims.  Suffice it also to say that in both *Krumwiede*, 2006 WL 1308629, at *9-10, and *Rimkus*, 688 F. Supp. 2d at 607, 629, 644, as well as in this case, the spoliating parties lied about their ESI production; obstructed the discovery process; and intentionally destroyed evidence when they were aware of the lawsuit. As in *Rimkus*, 688 F. Supp. 2d 598, Pappas disposed of an entire hard drive, despite his knowledge of the lawsuit, and provided wildly inconsistent explanations of his ESI deletions.   *Id.* at 607, 644.   As in *Krumwiede*, 2006 WL 1308629, at *9-10, "the volume and timing" of Defendants' spoliation is telling: Defendants deleted thousands of files and ran programs to ensure their permanent loss immediately following preservation requests and orders, and immediately before scheduled discovery efforts.   And, as in *Metropolitan Opera Ass'n*, 212 F.R.D. at 224-25, Defendants' destruction of evidence was compounded by their failure to comply with numerous court orders. In sum, Defendants took repeated, deliberate measures to prevent the discovery of relevant ESI, clearly acting in bad faith, and if affidavits, depositions, and in open court, Pappas nonchalantly lied about what he had done.

### 3.   *Relevance of Lost Evidence and Resulting Prejudice*

The third consideration is the relevance of the lost evidence.  In the context of spoliation, lost or destroyed evidence is "relevant" if "a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it."   *Thompson*, 219 F.R.D. at 101; *see Goodman*, 632 F. Supp. 2d at 509 (same).   It is not enough for the evidence to have been "sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence," i.e., to have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence.'" *Pension Comm.*, 685 F. Supp. 2d at 467 (quoting Fed. R. Evid. 401).  Moreover, for the court to issue sanctions, the absence of the evidence must be prejudicial to the party alleging spoliation of evidence.  *Id.*; *see Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 346 (M.D. La. 2006) (noting that, in determining whether an adverse inference is warranted, the "'relevance' factor" involves not only relevance but also "whether the non-destroying party has suffered prejudice from the destruction of the evidence"); *see also Rimkus*, 688 F. Supp. 2d at 616 (quoting *Consol. Aluminum Corp.*, 244 F.R.D. at 346).  Put another way, a finding of "relevance" for purposes of spoliation sanctions is a two-pronged finding of relevance and prejudice.

Spoliation of evidence causes prejudice when, as a result of the spoliation, the party claiming spoliation cannot present "evidence essential to its underlying claim."  *Krumwiede*, 2006 WL 1308629, at *10 (noting that even if the files were only modified and not deleted, "the changes to the file metadata call the authenticity of the files and their content into question and make it impossible for [the defendant] to rely on them").  "Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof." *Rimkus*, 688 F. Supp. 2d at 613.  Generally, courts find prejudice where a party's ability to present its case or to defend is compromised.  *E.g.*, *Silvestri*, 271 F.3d at 593-94 (significant prejudice resulted when plaintiff's failure to preserve vehicle after accident giving rise to litigation "substantially denied the defendant the ability to defend the claim").  However, at least one court has found that the delayed production of evidence causes prejudice.  *See Jones*, 2010 WL 2106640, at *8-9 (noting that the defendant's one-year delay in producing documents caused prejudice to the plaintiff).  The court considers prejudice to the party and "prejudice to the judicial system." *Krumwiede*, 2006 WL 1308629, at *11.

When the party alleging spoliation shows that the other party acted willfully in failing to preserve evidence, the relevance of that evidence is presumed in the Fourth Circuit. *Sampson*, 251 F.R.D. at 179; *Thompson*, 219 F.R.D. at 101.  Negligent or even grossly negligent conduct is not sufficient to give rise to the presumption; in the absence of intentional loss or destruction of evidence, the party "must establish that the lost documents were relevant to her case." *Sampson*, 251 F.R.D. at 179; *see Thompson*, 219 F.R.D. at 101. Similarly, in the Seventh Circuit, unintentional conduct is insufficient for a presumption of relevance.  *In re Kmart Corp.*, 371 B.R. 823, 853-54 (Bankr. N.D. Ill. 2007).  However, in the Second Circuit, in the court's discretion, "[r]elevance and prejudice may be presumed when the spoliating party acted in bad faith *or in a grossly negligent manner*."[34]  *Pension Comm.*, 685 F. Supp. 2d at 467 (emphasis added).   Also, "[t]he Fifth Circuit has not explicitly addressed whether even bad-faith destruction of evidence allows a court to presume that the destroyed evidence was relevant or its loss prejudicial."  *Rimkus*, 688 F. Supp. 2d at 617-18.   Where there is a presumption, the spoliating party may rebut this presumption by showing "that the innocent party has not been prejudiced by the absence of the missing information." *Pension Comm.*, 685 F. Supp. 2d at 468.  If the spoliating party makes such a showing, "the innocent party, of course, may offer evidence to counter that proof."  *Id*.  As with the other elements, the lack of a uniform standard regarding the level of culpability required to warrant spoliation sanctions has created uncertainty and added to the concern that institutional and organizational entities have expressed regarding how to conduct themselves in a way that will comply with multiple, inconsistent standards.

---

[34] This distinction is all the more significant because, as noted, in the Second Circuit, certain conduct is considered gross negligence *per se*.  *Pension Comm.*, 685 F. Supp. 2d at 471.  Thus, for example, if a party fails to issue a written litigation hold, the court finds that it is grossly negligent, in which case relevance and prejudice are presumed.  Point.  Game.  Match.

Here, Plaintiff alleges that "Defendants' massive and intentional destruction of emails and documents has substantially prejudiced, to various degrees, its ability to prove all of its claims, both in terms of liability and the extent of damages."  Pl.'s Reply 43.   According to Plaintiff, Defendants' actions caused prejudice because the ESI that Defendants "irretrievably deleted, destroyed and spoliated . . . contained the very information and 'fingerprints' that would establish all or most of the elements of Counts I, II, VII, and VIII."  Pl.'s Mot. 76.  Although Plaintiff concedes that "many of the <u>known</u> deletions . . . were eventually recovered in whole or in part," *id.*, significant numbers of files were permanently destroyed.  On the record before me, the evidence of prejudice to Plaintiff is manifest.

Defendants' willful, bad faith conduct allows this Court to presume relevance and prejudice.   Defendants utterly fail to rebut this presumption through their inconsistent and incredible explanations for their destruction of ESI.   Moreover, as painstakingly discussed in Sections I.2–I.9, *supra*, it is obvious that the permanent loss of thousands of relevant files that proved that Defendants improperly accessed and used Plaintiff's proprietary information is prejudicial, because, even if the files were cumulative to some extent, Plaintiff's case against Defendants is weaker when it cannot present the overwhelming quantity of evidence it otherwise would have had to support its case.   Defendants themselves cannot seriously believe that their willful misconduct did not cause prejudice, because they acquiesced to the entry of a default judgment on Count I, Plaintiff's core claim, a clear concession that the spoliated documents were relevant to that claim and their destruction caused prejudice.   And, lest there be any doubt, Defendants affirmatively stated with regard to the copyright claim: ""[W]e've given up on prejudice . . . . which I think was the appropriate thing to do. We gave up on the issue of

relevance . . . ."  June 25, 2010 Hr'g Tr. 3:16-22.  Thus, the loss of ESI deprived Plaintiff of relevant evidence, and this loss was prejudicial.

## C.  Sanctions

In determining what sanctions are appropriate, the Court must consider the extent of prejudice, if any, along with the degree of culpability, and, as with the other elements, possible sanctions vary by jurisdiction.  *See Nucor Corp. v. Bell*, 251 F.R.D. 191, 201 (D.S.C. 2009); *Rimkus*, 688 F. Supp. 2d at 613-15.  The harshest sanctions may apply not only when both severe prejudice and bad faith are present, but also when, for example, culpability is minimally present, if there is a considerable showing of prejudice, or, alternatively, the prejudice is minimal but the culpability is great, as discussed *infra*.  For example, in some, but not all, circuits, conduct that does not rise above ordinary negligence may be sanctioned by dismissal if the resulting prejudice is great.  *Silvestri*, 271 F.3d at 593 (stating that dismissal may be an appropriate sanction for negligent conduct "if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case" and dismissing case without concluding whether plaintiff's conduct rose above negligence); *see Rimkus*, 688 F. Supp. 2d at 614-15 ("The First, Fourth, and Ninth Circuits hold that bad faith is not essential to imposing severe sanctions if there is severe prejudice, although the cases often emphasize the presence of bad faith.  In the Third Circuit, the courts balance the degree of fault and prejudice.") (footnotes omitted).  Conversely, absence of either intentional conduct or significant prejudice may lessen the potential appropriate sanctions. In the Fifth and Eleventh Circuits, for example, courts may not impose severe sanctions absent evidence of bad faith.  *See Rimkus*, 688 F. Supp. 2d at 614; *Managed Care Solutions, Inc. v. Essent Healthcare, Inc*., No. 09-60351-CIV, 2010 WL 3368654, at *12-13 (S.D. Fla. Aug. 23, 2010).  The different approaches among the Circuits regarding the level of culpability that must

be shown to warrant imposition of severe sanctions for spoliation is another reason why commentators have expressed such concern about the lack of a consensus standard and the uncertainty it causes.

Sanctions that a federal court may impose for spoliation include assessing attorney's fees and costs, giving the jury an adverse inference instruction, precluding evidence, or imposing the harsh, case-dispositive sanctions of dismissal or judgment by default. *Goodman*, 632 F. Supp. 2d at 506; *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. at 191.  The court may also "treat[] as contempt of court the failure to obey" a court order to provide or permit discovery of ESI evidence.  *See* Fed. R. Civ. P. 37(b)(2)(A)(vii).  "While a district court has broad discretion in choosing an appropriate sanction for spoliation, 'the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'"  *Silvestri*, 271 F.3d at 590 (quoting *West*, 167 F.3d at 779).  Put another way, appropriate sanctions should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'"  Thus, the range of available sanctions serve both normative—designed to punish culpable conduct and deter it in others—and compensatory—designed to put the party adversely affected by the spoliation in a position that is as close to what it would have been in had the spoliation not occurred—functions.  Because, as noted above, the duty to preserve relevant evidence is owed to the court, it is also appropriate for a court to consider whether the sanctions it imposes will "prevent abuses of the judicial system" and "promote the efficient administration of justice."  *Jones*, 2010 WL 2106640, at *5.  The court must "impose the least harsh sanction that can

provide an adequate remedy." *Pension Comm.*, 685 F. Supp. 2d at 469; *see Rimkus*, 688 F. Supp. 2d at 618.

In this case, Plaintiff has urged this Court to impose the most severe of sanctions, including entry of a default judgment as to all remaining counts—Counts I (copyright infringment), II (unfair competition), VII (Lanham Act violations, namely false advertising and reverse palming off), and VIII (patent violations)—for both liability and damages; assessment of attorney's fees and costs for what likely will amount to most of the litigation costs that Plaintiff has incurred; assessment of a civil fine; and referral of the matter to the United States Attorney for initiation of criminal proceedings against Pappas for "criminal contempt of Court, obstruction of justice, and perjury." Pl.'s Mot. 97, 98, 99. On the record before me, Plaintiff hardly can be blamed for taking such an extreme position. Indeed, as exhaustively inventoried above, Defendants' willful misconduct has had a considerable adverse impact on the Court's pretrial schedule, imposed substantial burden on two judges of this Court and their staffs, and Pappas has essentially thumbed his nose at the Court's efforts to oversee a pretrial process that would facilitate a fair and timely resolution of this case on its merits. Nonetheless, in fashioning spoliation sanctions, Courts must strive to issue orders that generate light, rather than heat, and without ignoring the magnitude of willful misconduct and prejudice, must fashion remedies that strike the appropriate balance between those that are normative and those that are compensatory. With this in mind, I will turn to what sanctions are appropriate in this case.

### 1. Dismissal or Default Judgment[35]

Courts may order a default judgment or dismissal to "send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely sanctioned." *Krumwiede*, 2006 WL 1308629, at *11.  In the Fourth Circuit, to order these harshest sanctions, the court must "'"be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, *or* (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.'"'" *Goodman*, 632 F. Supp. 2d at 519 (quoting *Sampson*, 251 F.R.D. at 180 (quoting *Silvestri*, 271 F.3d at 593)) (emphasis in *Goodman*).  To conclude that the second prong was met, i.e., that there was sufficient prejudice to warrant dismissal or a default judgment, "the Court must examine the record that remains to determine whether it contain[ed] enough data" for the aggrieved party to build its case or defense, and "the Court must decide whether a lesser sanction than dismissal [or default judgment] would level the playing field." *Erie Ins. Exch. v. Davenport Insulation, Inc.*, 659 F. Supp. 2d 701, 707 (D. Md. 2009); *see Sampson*, 251 F.R.D. at 180 (stating that second prong requires proof that "plaintiff was highly prejudiced and denied the only means to establish her case.").

---

[35] As this Court noted in *Sampson*, 251 F.R.D. at 180 n.11:

> Most of the Fourth Circuit cases involving sanctions for spoliation of evidence arise in the context of a defendant asking for dismissal of a plaintiff's claims because of destruction of evidence by the plaintiff. As the Fifth Circuit has noted, "[b]ecause ... rendering default judgment is equally as harsh a sanction as dismissing the case of a plaintiff with prejudice, we cite cases involving these sanctions interchangeably." *Pressey* [*v. Patterson*, 898 F.2d 1018, 1021 n.2 (5th Cir. 1990)]. The court here cites cases involving requests for default judgment and for dismissal interchangeably.

Although "*Silvestri* posits an either/or test," *Erie Ins. Exch.*, 659 F. Supp. 2d at 707, indicating two distinct means of justifying severe sanctions, this Court has not terminated a case where a spoliator acted in bad faith, absent a showing of substantial prejudice.[36]   Elsewhere, dispositive or potentially dispositive sanctions are impermissible without bad faith, even if there is considerable prejudice.   *See Rimkus*, 688 F. Supp. 2d at 614 (In the Seventh, Eighth, Tenth, Eleventh, and D.C. Circuits, "the severe sanctions of granting default judgment, striking pleadings, or giving adverse inference instructions may not be imposed unless there is evidence of 'bad faith.'"); *see also* the Appendix to this Memorandum, Order and Recommendation

---

[36] VSI cites various cases in which the Fourth Circuit has affirmed default or dismissal as a sanction for spoliation, but in many cases the court found irreparable prejudice.  *See* Pl.'s Mot. 53 (citing *King v. Am. Power Conversion Corp.,* 181 Fed. App'x 373, 374 (4th Cir. 2006) (affirming dismissal as sanction when plaintiff's negligence caused irreparable prejudice); *Silvestri,* 271 F.3d 583 (same); *PVD Plast. Mould Indus., Ltd. v. Polymer Grp.*, 31 Fed. App'x 210, 211 (4th Cir. 2002) (same)).  In other cases, the issue concerned a party's failure to produce discovery (not its failure to preserve ESI) and, in any event, there was substantial prejudice.  *See* Pl.'s Mot. 53 (citing *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504-05 (4th Cir. 1998) (affirming default judgment "as a last-resort sanction" where defendant in bad faith "stonewalled on discovery from the inception of the lawsuit," failing to comply with court orders to produce documents, and the delayed production caused prejudice because plaintiff's "claim became junior to that of another claimant suing the Foundation"); *Zornes v. Specialty Indus., Inc.,* No. 97-2337, 1998 WL 886997 (4th Cir. Dec. 21, 1998) (affirming dismissal where plaintiffs in bad faith failed to comply with court orders to answer interrogatories, and the delayed production caused "substantial prejudice").  In *Zaczek v. Fauquier County*, 764 F. Supp. 1071 (E.D. Va. 1991), *aff'd,* 16 F.3d 414 (4th Cir. 1993), the district court dismissed a prisoner's case for failure to comply with rules of procedure.

In its own research, which has been considerable, the Court has identified only one case—in a different circuit—that was terminated based solely on a party's bad faith spoliation of evidence.  In *Miller v. Time-Warner Communications, Inc.*, No. 97 Civ. 7286, 1999 WL 739528, at *2 (S.D.N.Y. Sept. 22, 1999), the plaintiff tried unsuccessfully to erase handwritten notes on documents produced and then lied about it.  Reasoning that the plaintiff's spoliation of evidence was willful and in bad faith and, significantly, she committed "repeated instances of perjury," the court concluded that although there was no prejudice whatsoever, "the only appropriate sanction [was] to dismiss the complaint."  *Id*.  It noted that, had the plaintiff not committed perjury, the "lesser sanction of requiring plaintiff to pay all the defendant's attorneys fees incurred as a result of the spoliation might [have] be[en] appropriate."  *Id*.  Accordingly, lofty discussions about the truth-seeking purpose of a lawsuit and the need to deter conduct that interferes with it aside, it does not appear that courts have imposed ultimate case-ending sanctions in many cases where there has not also been a showing of extreme prejudice.

(identifying requirements by jurisdiction).  And, in the Fifth Circuit, "[a] severe sanction such as

a default judgment or an adverse inference instruction requires bad faith *and* prejudice."  *Id.* at

642 (emphasis added).  The sheer variety of formulae used by various courts to determine

whether case-dispositive sanctions are appropriate also contributes to the difficulty that lawyers

and clients experience in attempting to evaluate the risks and consequences of failing to preserve

evidence.

2. *Adverse Inference and Other Adverse Jury Instructions*

In its discretion, the court may order an adverse inference instruction, which informs a

jury that it may "draw adverse inferences from . . . the loss of evidence, or the destruction of

evidence," by assuming that failure to preserve was because the spoliator was aware that the

evidence would have been detrimental.  *Vodusek*, 71 F.3d at 156.  Because such a definitive

inference is not always warranted, courts have crafted various levels of adverse inference jury

instructions:  The court may instruct the jury that "certain facts are deemed admitted and must be

accepted as true"; impose a mandatory, yet rebuttable, presumption; or "permit[] (but . . . not

require) a jury to presume that the lost evidence is both relevant and favorable to the innocent

party."  *Pension Comm.*, 685 F. Supp. 2d at 470-71; *see* examples cited in the Appendix to this

Memorandum, Order and Recommendation.   In this Circuit, to impose an adverse jury

instruction, the court "must only find that the spoliator acted willfully in the destruction of

evidence." *Goodman*, 632 F. Supp. 2d at 519 (citing *Vodusek*, 71 F.3d 148, and noting at

footnote 15 that "in the Fourth Circuit, the *Vodusek* standard detailing the requirements for an

adverse jury instruction remains applicable," rather than the oft-cited *Zubulake IV* standard from

the Southern District of New York, because although it "remains insightful," the *Zubulake IV*

standard "could be read to limit the availability of sanctions" in this Circuit); *see Sampson*, 251

F.R.D. at 181.  *But see Pension Comm.*, 685 F. Supp. 2d at 478-79 (stating that an adverse jury instruction was warranted for the grossly negligent, but unintentional, conduct).[37]   While negligence or even gross negligence is not sufficient in this Circuit, the conduct need not rise to the level of bad faith.  *Goodman*, 632 F. Supp. 2d at 519.  *But see Rimkus*, 688 F. Supp. 2d at 617 (stating that "the severe sanctions of . . . giving adverse inference instructions may not be imposed unless there is evidence of 'bad faith.'"); *see also Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008) (same); *Johnson v. Avco Corp.*, 702 F. Supp. 2d 1093, 1110 (E.D. Mo. 2010) (same); *Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 745, 747 (8th Cir. 2004) (stating that if spoliation occurs before litigation commences, there must be evidence of bad faith for the court to impose an adverse inference instruction, but if spoliation occurs during litigation, the court may impose an adverse inference instruction "even absent an explicit bad faith finding").  The court must also consider relevance and prejudice.  *Pension Comm.*, 685 F. Supp. 2d at 467; *see Vodusek*, 71 F.3d at 156 ("To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence.").   Once again, the approaches taken by courts vary widely, making predictability difficult for parties who are trying to determine what they must preserve, and what can happen if they do not.

---

[37] Again, the significance of this departure comes to light when it is viewed in the context of the chain reaction spurred by considering certain conduct gross negligence *per se*.  If, for example, a court adopts the position of *Pension Committee*, 685 F. Supp. 2d at 471, that a failure to institute a written litigation hold is gross negligence *per se*, and therefore presumes relevance and prejudice, it is inexorably poised to give an adverse jury instruction without further analysis.  This approach is not consistent with Fourth Circuit precedent.

3.  *Attorney's Fees, Costs, and Fines*

Less severe sanctions include costs, attorney's fees, and fines, which not only compensate the prejudiced party but also "punish the offending party for its actions" and "deter the litigant's conduct, sending the message that egregious conduct will not be tolerated."  *See Pension Comm.*, 685 F. Supp. 2d at 467, 471; *Goodman*, 632 F. Supp. 2d at 506.  (citations and quotation marks omitted).   The court's "inquiry focuses more on the conduct of the spoliating party than on whether documents were lost, and, if so, whether those documents were relevant and resulted in prejudice to the innocent party." *Pension Comm.*, 685 F. Supp. 2d at 467. This Court will award costs or fees in conjunction with a spoliation motion as an alternative to a harsher sanction; if further discovery is necessary due to the spoliation; or in addition to another sanction, in which case the award may be for "reasonable expenses incurred in making the motion, including attorney's fees," or also for the cost of investigating the spoliator's conduct. *Goodman*, 632 F. Supp. 2d at 524.  Additionally, a few courts have ordered the spoliating party to pay a fine to the clerk of court or a bar association for prolonging litigation and wasting the court's time and resources.  *E.g.*, *Pinstripe, Inc. v. Manpower, Inc.*, No. 07-CV-620-GKF-PJC, 2009 WL 2252131, at *4 (N.D. Okla. July 29, 2009); *Claredi v. Seebeyond Tech. Corp.*, No. 4:04CV1304 RWS, 2007 WL 735018, at *4 (E.D. Mo. Mar. 8, 2007); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 111 (D.N.J. 2006); *Turnage*, 115 F.R.D. at 559. However, as stated *supra* at page 59, it is unclear whether these unappealed trial court holdings would withstand appellate review, because in similar cases the Fourth and Tenth Circuits have vacated discovery sanctions ordering the payment of money to the Clerk of the Court, deeming them to be criminal contempt sanctions, which are unavailable without the enhanced due process procedure requirements criminal contempt proceedings require.  *Bradley v. Am. Household, Inc.*, 378 F.3d 373, 377-79

(4th Cir. 2004); *Buffington v. Baltimore Cnty., Md.*, 913 F.2d 113, 133 (4th Cir. 1990); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442-44 (10th Cir. 1998).

4.   *Contempt of Court*

Fed. R. Civ. P. 37(b)(2)(A)(vii) provides that the court may "treat[] as contempt of court the failure to obey" a court order to provide or permit discovery of ESI evidence.  Similarly, pursuant to its inherent authority, the court may impose fines or prison sentences for contempt and enforce "the observance of order." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812).  Contempt sanctions may be civil or criminal. *Buffington*, 913 F.2d at 133-34.

> When the nature of the relief and the purpose for which the contempt sanction is imposed is remedial and intended to coerce the contemnor into compliance with court orders or to compensate the complainant for losses sustained, the contempt is civil; if, on the other hand, the relief seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal. . . .
>
>> If the relief provided is a sentence of imprisonment, it is remedial if "the defendant stands committed unless and until he performs the affirmative act required by the court's order," and is punitive if "the sentence is limited to imprisonment for a definite period." If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order.

*Id.* (quoting *Hicks v. Feiock*, 485 U.S. 624, 631-32 (1988) (citations omitted)); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828, (1994) ("The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order 'to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance.'" (quoting *Gompers v. Bucks Cnty. Stove & Range Co.*, 221 U.S. 418 (1911)); *Bradley*, 378 F.3d at 378 (discussing the

"basic difference between civil and criminal contempt sanctions" and quoting *Buffington*, 913 F.2d at 133).

"Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201 (1968), requiring the procedural protections of notice and a hearing. *Bradley*, 378 F.3d at 379. Therefore, to treat a party's failure to comply with a court order as criminal contempt, the court must refer the matter to the United States Attorney for prosecution. Fed. R. Crim. P. 42(a)(2). If that office declines to accept the case (a highly probable outcome in most instances), then the court must appoint a private prosecutor to bring the criminal contempt case. Fed. R. Crim. P. 42(a)(2); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987) (concluding that federal courts possess inherent authority to initiate "contempt proceedings for disobedience of their orders, authority which necessarily encompasses the ability to appoint a private attorney to prosecute the contempt"); *Buffington*, 913 F.2d at 132 (vacating order imposing criminal contempt sanctions without required procedural protections; noting that district court, "following the procedure outlined in *Young* [481 U.S. at 801] initially referred the matter to the United States Attorney" and "[a]fter the U.S. Attorney declined to prosecute, the court, citing *Young*, appointed a private prosecutor," but ultimately improperly imposed fines payable to the clerk of the court as civil contempt sanctions). If brought, the burden of proof is beyond a reasonable doubt. *Gompers*, 221 U.S. at 444; *Bradley*, 378 F.3d at 379. Additionally, the defendant is entitled to a jury trial if the sentence will be longer than six months. Fed. R. Crim. P. 42(a)(3); *Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) ("[S]entences exceeding six months for criminal contempt may not be imposed by federal courts absent a jury trial or waiver thereof."). Recently, another court in the Fourth Circuit referred a case to the United States Attorney for criminal contempt proceedings against a party for spoliation of ESI in a civil case.

*See SonoMedica, Inc. v. Mohler*, No. 1:08-cv-230 (GBL), 2009 WL 2371507, at *1 (E.D. Va. July 28, 2009).

To hold a party in civil contempt, the court must find that four elements have been established by clear and convincing evidence:

> "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violation; and (4) that [the] movant suffered harm as a result."

*Id.* at *3 (quoting *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)).

### 5. *Appropriate Sanctions for Defendants*

#### a. *Default judgment as to liability on copyright claim only*

Plaintiff argues that "only the severest forms of sanctions" would be "effective" against Defendants. Pl.'s Mot. 90-91. As Plaintiff sees it, "[i]f this Court finds that Defendants' misconduct was egregious enough to have justified a forfeiture of their defenses, then it need not also determine whether Defendants' misconduct denied VSI the ability to prove all its claims." Pl.'s Reply 5-6. *See Erie Ins. Exch.*, 659 F. Supp. 2d at 707. Defendants contend that here, unlike in the cases in which courts have sanctioned the spoliating party through a default judgment or dismissal, "the lost evidence is not the *sole evidence* at issue on liability," such that a default judgment on the copyright claim, the unfair competition claim, the alleged Lanham Act violations, and the alleged patent violation, i.e., all remaining counts, is not appropriate. Defs.' Opp'n 45. Moreover, as Defendants see it, a court may impose a default judgment "on only those claims that make a cause of action and not on those to which the defendant possessed a viable legal defense." Defs.' Surreply 3.

As noted, Defendants admit spoliation, relevance, and prejudice, and consent to a default judgment on liability for Count I, the copyright claim.  Further, the facts amply demonstrate the intentional, bad faith permanent destruction of a significant quantity of relevant evidence, to the Plaintiff's detriment.  Thus, it is clearly appropriate that the spoliation consequences include a judgment finding CPI and Pappas liable on Count I.[38]

It is far less certain, however, whether Plaintiff has demonstrated that a default judgment as to all the remaining counts alleged against Defendants is required, or that a default judgment as to damages for all counts, including Count I, is warranted.  The copyright claim always has been Plaintiff's primary claim, and it is easy to see how the evidence that was destroyed prejudiced Plaintiff's efforts to prove it.  The same cannot be said about the remaining counts for unfair competition (Count II), Lanham Act violations, namely false advertising and reverse palming off (Count VII), and patent violations (Count VIII)—for both liability and damages; at least not at this time and on this record.  While it may be correct that evidence that would be relevant to prove the copyright claim might also be relevant to proving the others, Plaintiff has not yet made the necessary showing of irreparable or substantial prejudice.  Therefore,

---

[38] Defendants indulge in a little verbal legerdemain in characterizing their position regarding Count I.  They acquiesce to the entry of a "consent" judgment, rather than the entry by the Court of a default judgment.  While the end result is the same under either characterization, the latter makes it unambiguous that the outcome is as a severe sanction for egregious misconduct; the former implies a form of agreement without the pejorative classification, similar to settling a claim without admitting liability.  It would be inappropriate for the Court to indulge Defendants in this face-saving effort.  Defendants cannot have their cake and eat it too.  They cannot admit to breach of the duty to preserve and acknowledge (or, more accurately, capitulate) on the issues of prejudice and relevance, but attempt to sanitize the result by labeling it something other than what it is—a sanction.  Accordingly, the appropriate sanction is the entry of a default judgment as to liability for Count I, copyright infringement, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi). Because this is a dispositive outcome, I am recommending that Judge Garbis impose it, rather than doing so myself, although there can be no doubt that this result is warranted on this record.

dispositive sanctions are inappropriate with regard to those counts.  *See Silvestri*, 271 F.3d at 593; *Goodman*, 632 F. Supp. 2d at 519; *Sampson*, 251 F.R.D. at 180.

Similarly, with the exception of the remedy of the entry of a permanent injunction as to the copyright claim, which Defendants do not oppose, Defs.' Opp'n 29 & Ex. 11, it is not clear that Plaintiff has demonstrated an inability to prove monetary damages for any of the counts alleged.  The debate all these years has focused on liability, not damages.  While Plaintiff ultimately may be able to make this showing, it has not done so yet.  Accordingly, entry of a default judgment as to monetary damages is denied, without prejudice.  Rather, it is appropriate for the court to schedule a trial on the issues of liability for Counts II (unfair competition), VII (Lanham Act violations), and VIII (Patent Act violations), and money damages for all counts. Counsel have informed the Court that they do not seek a jury trial on these issues.  (June 25, 2010 Hr'g Tr. 5:19 – 6:11.)  Accordingly, these issued will be tried to the Court.  I recommend that Plaintiff be permitted to proceed, but that if in the future of this litigation Plaintiff is able to demonstrate with greater particularity than it has to date that it cannot meet its burden of proof as to liability for Counts II (unfair competition), VII (Lanham Act violations), and VIII (Patent Act violations), or money damages as to all counts, because of Defendants' spoliation, then the Court should revisit at that time whether additional sanctions, such as the entry of an order pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii) prohibiting Defendants from supporting their defenses to liability on Counts II, VII, and VIII, or money damages; or prohibiting them from opposing Plaintiff's proof of money damages; or finding Defendants liable for the counts other than copyright.

### b.  Permanent injunction on the copyright claim

As for the permanent injunction on the copyright count, which Plaintiff requests and Defendants do not oppose, Defs.' Opp'n 29 & Ex. 11, I am recommending that Judge Garbis grant this as a sanction.

### c.  Attorney's fees, costs, and civil, but not criminal, contempt

As the prevailing party, Plaintiff is entitled to reasonable attorney's fees and costs.  See Fed. R. Civ. P. 37(b)(2)(C) (For failure to comply with a court order to provide or permit discovery, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."). Here, the failure was not substantially justified, and there are no circumstances making such an award unjust.  Indeed, Defendants conceded that a fee award would be appropriate when Defense counsel stated that "the Court . . . would determine what would be the appropriate attorneys' fees." (June 25, 2010 Hr'g Tr. 3:16-22.)  Thus, spoliation sanctions shall include costs and legal fees allocable to spoliation.  Specifically, as Plaintiff requested, the Court shall award attorney's fees and costs, including costs related to uncovering Defendants' discovery abuses; preparing, filing, and arguing all of Plaintiff's ESI motions; and retaining Guidance Software and Andreas Spruill.  To that end, Plaintiff shall submit a bill of costs within thirty (30) days of this Memorandum, Order and Recommendation, with Defendants' response, if any, to be submitted within thirty (30) days thereafter.

Plaintiff also has asked the Court to refer this case to the United States Attorney to evaluate whether perjury or other criminal charges should be brought against Pappas. Pl.'s Mot.

98.  Such action is unusual and extreme for spoliation cases, but not unheard of.  *See, e.g.*, *SonoMedica Inc.*, 2009 WL 2371507.  I have given serious thought to doing this, because I have concluded that Pappas, and through him, CPI, engaged in multiple willful acts of destruction of evidence and lied under oath in affidavits, deposition testimony, and before the Court during the hearings it held.  Knowing, however, the existing demands on the U.S. Attorney's office to prosecute very serious crimes, as well as their available resources, I do not think it probable that they would agree to initiate a criminal case arising out of a factually-complicated civil case involving an inordinately voluminous record, and concerning highly technical issues that will necessitate expert testimony.

It is true that, if the U.S. Attorney declined to initiate a criminal prosecution against Pappas for contempt of court, this court could appoint a private prosecutor to do so, pursuant to Fed. R. Crim. P. 42(a)(2). *See Young*, 481 U.S. at 793 (describing process for appointing a private attorney for contempt proceedings).  However, commencement of a new proceeding would require proof beyond a reasonable doubt, and Pappas would be entitled to a jury trial, involving considerable expenses and time.  I seriously question whether this would be the best manner of dealing with Pappas's misconduct.  This dispute has been pending for far too long, been far too expensive, and, quite frankly, consumed far too much of this Court's resources to warrant initiating a criminal proceeding that unavoidably will go over the same ground, and likely involve yet another judge.

This is not to say, however, that referral for criminal contempt proceedings is the extent of what this Court can do to address Pappas's egregious behavior.  After all, Rule 37(b)(2)(A)(vii) permits the Court to treat "as contempt of court the failure to obey any order except an order to submit to a physical or mental examination."  This sanction has the obvious

benefit of being warranted on the existing record, without need for initiating new proceedings. As noted, there must exist "'valid decrees of which the alleged contemnor [i.e., Pappas] had actual or constructive knowledge'"; those decrees must have been in Plaintiff's favor; Pappas, by his conduct, must have "'violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violation'"; and VSI must have suffered harm as a result of Pappas's conduct. *See SonoMedica, Inc.*, 2009 WL 2371507, at *3 (quoting *Ashcraft*, 218 F.3d at 301). As detailed above at Sections I.2-9, I have found that Pappas violated both preservation orders and production orders that this Court issued in Plaintiff's favor, and the above discussion manifestly establishes the factual record to show that he knew of the orders and acted willfully to thwart those orders, thereby causing harm to Plaintiff.[39] Therefore, Pappas's civil contempt is established by clear and convincing evidence.

For such clearly contemptuous behavior, a very serious sanction is required. Accordingly, I order that Pappas's acts of spoliation be treated as contempt of this court, and that as a sanction, he be imprisoned for a period not to exceed two years, unless and until he pays to

---

[39] To summarize briefly, on December 22, 2006, I stated: "[B]oth parties are reminded of their substantive duty to preserve evidence, including electronic evidence, that is relevant to the case." ECF No. 41. On February 1, 2007, I issued a written Preservation Order that stated that the parties had been admonished at the February 1, 2007 hearing of their "substantive duty to preserve evidence potentially relevant to the case, and . . . ordered to do so by the Court." (Feb. 1, 2007 Order 2, ECF No. 56.) The language of the Court's preservation orders was crystal clear. Pappas testified that he understood both orders. (Oct. 29, 2009 Hr'g Tr. 117:18 – 118:2, 139:10 – 140:19.) Even if the language of the first order and the Court's oral order on February 1, 2007 left anything to doubt, the clarity of the February 1, 2007 order is undeniable. Indeed, in Pappas's own words, the Court's February 1, 2007 preservation order "was very clear." (*Id.* 139:10 – 140:19.) Pappas deleted thousands of files following these orders. Separate and apart from these preservation orders, civil contempt sanctions are warranted for Defendants' violations of the Court's August 1 and 30, September 21, and October 3, 2007 production orders, which stated clearly that Defendants were to "produce all relevant, non-privileged ESI" to Plaintiff's counsel. (ECF Nos. 131, 145, 149, and 164.) Pappas stated in a sworn affidavit that he produced all such ESI, demonstrating that he had knowledge of the orders, yet his ESI production was not complete.

Plaintiff the attorney's fees and costs that will be awarded after Plaintiff has submitted an itemized accounting of the attorney's fees and costs associated not only with filing this motion, but also with respect to all efforts expended throughout this case to demonstrate the nature and effect of Pappas's spoliation.  These costs and fees likely will amount to a significant figure, and that will properly vindicate this Court's ability to enforce its discovery orders.   The commencement of Pappas's confinement will be determined at the conclusion of the proceedings to quantify the amount of attorney's fees and costs.

Despite the fact that, if Pappas refuses to pay the attorney's fees and costs ordered by the Court, he will be imprisoned for two years, it is quite clear that this is a civil—not a criminal— contempt sanction, because the relief is compensatory and the sanction will be imposed to coerce Pappas's compliance with this Court's order to pay attorney's fees and costs to Plaintiff; Pappas can avoid imprisonment by promptly paying the fees and costs.  *See Hicks v. Feiock*, 485 U.S. at 631-32; *Int'l Union, United Mine Workers of Am.*, 512 U.S. at 828; *Bradley*, 378 F.3d at 378 (4th Cir. 2004); *Buffington*, 913 F.2d at 133-34.   This result is absolutely essential as a civil contempt sanction because, without it, I am convinced that Pappas will do all that he can to avoid paying any money judgment or award of attorney's fees that is in the form of a civil judgment alone. Without the threat of jail time, Pappas's future conduct would be predicted by his past, and Plaintiff will receive a paper judgment that does not enable it to recover its considerable out-of-pocket losses caused by Pappas's spoliation.  To avoid jail time, all that is required of Pappas is to pay Plaintiff the attorney's fees and costs that will be awarded to Plaintiff for prevailing on this motion.   Because this sanction is not case-dispositive, I have the authority to order it directly, pursuant to Rule 37(b)(2)(A)(vii).  Should Judge Garbis disagree, I request that he treat this as a recommendation, pursuant to 28 U.S.C. § 636(b)(1).

A separate Order follows.

Dated: <u>September 9, 2010</u>                          _____/S/_____
                                                        Paul W. Grimm
                                                        Chief United States Magistrate Judge

lmy