IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VICTOR STANLEY, INC.            *

           Plaintiff            *

           vs.                  *    CIVIL ACTION NO. MJG-06-2662

CREATIVE PIPE, INC., et al.     *

           Defendants            *

\*     \*     \*     \*     \*     \*     \*     \*     \*

<u>MEMORANDUM OF DECISION</u>

The Court has conducted a bench trial in the instant case. The Court has heard the evidence presented, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure. The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

I.    <u>INTRODUCTION</u>

A.    <u>VICTOR STANLEY INC. ("VSI")</u>

VSI is a Maryland company that has, since 1962, been manufacturing site furnishings such as litter receptacles,

benches, tables, chairs, ash urns, planters, tree guards, seats, bike racks, and bollards made from steel, cast ductile iron, wood, and recycled plastic.

VSI has two manufacturing facilities in Maryland and has invested millions of dollars in the design and development of new site furnishing products.  VSI has invested in advanced technology such as computerized welding robots, the development and installation of state-of-the-art powder coating systems, and the purchase of advanced automated metalworking and woodworking equipment. In the 1990s, VSI developed a break-through powder-coating process that provides a superior weather-resistant, durable finish, which is highly desirable for outdoor site furniture. The innovative process was named and trademarked Publicote$^{TM}$.

VSI has also invested millions of dollars in the creation, maintenance, upgrading, and dissemination of technical drawings and product graphics. It has a dedicated department employing about half a dozen people who create informative and detailed computer assisted design ("CAD") drawings of VSI products. These drawings are used in the manufacturing process as well as in the sales process, and they have substantial economic value.  VSI created an on-line product library that contains these CAD drawings, specifications, and product images, accessible by

customers, architects, and designers, for specific use in project design and purchasing activities such as presentations and bid documents.

In its 49 years of operations, VSI has developed a highly competitive American-made site furnishings business with a reputation for high quality.

B.   MARK PAPPAS ("PAPPAS") AND CREATIVE PIPE, INC. ("CPI")[1]

In 2004, Pappas[2] and his controlled and solely-owned company, CPI, both based in California,[3] sought to enter the site furnishings business.  Pappas initially tried to design site furnishings for sale in the United States but was unsuccessful, selling only about two dozen furnishings.  Pappas attempted to get a foothold in the site furnishings market by claiming falsely to represent VSI.  Pappas and CPI also directly competed with VSI by copying VSI's products and selling the copies under the trade name, "FUVISTA," a name selected by Pappas as a targeted insult to VSI.  As Pappas puts it, the name "Fuvista" stands for "F--- You Victor Stanley."[4]

---

[1] Collectively referred to herein as "Defendants."
[2] A citizen of California.
[3] A California corporation.
[4] Pl.'s Ex. 42; Hendry Dep. 36:12-14, June 28, 2007.

As discussed herein, Pappas and CPI unfairly competed with VSI, infringed VSI's rights in copyright protected design drawings, and infringed a VSI design patent.

C.    PROCEDURAL SETTING

VSI filed the instant lawsuit against Pappas,[5] CPI, and Mrs. Pappas (who has been dismissed as a Defendant).  The Complaint contained twelve Counts that have been "pruned" to four Counts asserted against Pappas and CPI that have proceeded to trial:

    1. Count I - Copyright Infringement

    2. Count II – Unfair Competition

    3. Count VII – False Advertising; and

    4. Count VIII – Patent Infringement.

In the course of the instant litigation, the Defendants engaged in a massive degree of spoliation of evidence detailed in Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 506 (D. Md. 2010). See the Memorandum, Order and Recommendation of Magistrate Judge Grimm [Document 377].  By the Order Re: Sanctions Motion [Document 381], the Court adopted the decision of Magistrate Judge Grimm, awarded VSI attorneys' fees and costs and a default judgment as to liability on Count I (Copyright Infringement).

---

[5] Plaintiffs sued a John Doe Defendant identified as "Fred Bass," an alias used by Pappas.

The case has proceeded to trial on the damages to be awarded on VSI's claims for copyright infringement, and on VSI's claims for unfair competition, false advertising, and patent infringement.

## II.   DISCUSSION

### A.   COPYRIGHT INFRINGEMENT[6]

#### 1.   Acts of Infringement

VSI maintained a library of detailed design drawings of its products that were original pictorial or graphic works protected by copyright.  17 U.S.C. § 102(a)(5).  VSI provided access to the library through its website for the convenience of bidders on projects that would include VSI products.  A person seeking to bid on a project using a VSI product could obtain access to the library and permission to download VSI designs by providing identification, representing that access was sought for a permitted purpose, and accepting the terms of a licensing agreement.  The bidder could then include the downloaded

---

[6] The Court accepts all factual allegations related to the Copyright claim contained in the Complaint and Supplement as true.  See Partington v. Am. Int'l Specialty Lines Ins. Co., 443 F.3d 334, 341 (4th Cir. 2006)("a default judgment has the effect of deeming all factual allegations in the complaint admitted"); see also Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987)("The effect of a default judgment is that the defendant admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established.").

drawings on bids and would, if the bids were accepted, purchase the VSI products shown in the drawings for the project.

Pappas (acting for CPI) obtained access to the VSI library by falsely identifying himself – using the alias "Fred Bass" and other pseudonyms – and falsely representing his purpose.  Pappas downloaded VSI's copyright protected drawings, copied them, had the identity of CPI substituted for that of VSI, and left the remainder of the drawings unchanged from the original copyright protected drawings.  Pappas then proceeded to make additional copies of the infringing altered drawings, without authority from VSI (the copyright owner), and used the altered drawings in the course of CPI's business.  Thus, infringing drawings derived from unauthorized copies of VSI drawings were included with bids submitted by CPI for the sale of CPI (Fuvista) products.  Also, unauthorized copies were sent to contractors – largely in China – that produced products bearing the CPI (Fuvista) label based on the drawings.

VSI seeks monetary damages based on the profits of the infringer[7] with interest and injunctive relief.

---

[7] VSI is not entitled to statutory damages because the technical drawings were not registered prior to Defendants' infringement. See 17 U.S.C. § 412.

2.   Damages

VSI is seeking damages for Defendants' acts of copyright infringement, consisting of the unauthorized copying of VSI's copyright protected technical drawings, the production of infringing altered drawings (i.e., with false identification as CPI drawings) and copying of the infringing altered drawings.[8]

a.   Drawings and Physical Items Distinguished

VSI's technical drawings are original pictorial or graphic works protected by 17 U.S.C. § 102(a)(5).  As a copyright owner, VSI has the exclusive right to reproduce, prepare derivative works, distribute copies, and display the copyrighted work.  17 U.S.C. § 106.  VSI does not, however, have the right to exclude others from using the copyrighted work, since "use" rights are governed by the Patent Act, 35 U.S.C. § 271.

Copyright protection does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such a work." 17 U.S.C. § 102(b). Further, the Copyright Act "does not afford, to the owner of copyright in a work that portrays a useful article as such, any greater or lesser rights with respect to

_____

[8] VSI is not seeking, as Defendants repeatedly assert, "patent type" damages.

the making, distribution, or display of the useful article so portrayed than those afforded to such works under the law."  17 U.S.C. § 113(b).

VSI's copyright in a technical drawing of a useful article does not preclude the Defendants from manufacturing and marketing the article itself.  Gusler v. Fischer, 580 F. Supp. 2d 309, 315 (S.D.N.Y. 2008)("Ownership of a copyright in a pictorial representation of a useful article does not vest the owner of the picture with a derivative copyright in the useful article itself.")(citations omitted).  Indeed, to allow the act of manufacturing a non-architectural useful item by using a copyright protected drawing of that item to constitute copyright infringement would be to elevate the copyright to a patent. Forest River, Inc. v. Heartland Recreational Vehicles, LLC, 753 F. Supp. 2d 753, 759 (N.D. Ind. 2010).

Thus, anyone - including Defendants – would not be committing copyright infringement by reverse engineering a VSI product.  Of course, there could be debatable issues presented if the Defendants had merely used without copying a copyright protected drawing to manufacture products.[9]  However, this is not such a case.

---

[9] The article itself – albeit derived from the contents of the copyright protected drawing - would not itself be an infringing item.  In the instant case, though, there were extensive acts of

VSI's technical drawings are works that are eligible for copyright protection.  17 U.S.C. § 102(a)(5).  When a protected drawing is copied, there is copyright infringement.  See Forest River, 753 F. Supp. 2d at 760 (finding that the complaint alleging that the defendant created derivative technical drawings stated a claim for copyright infringement as to the copies, distinct from the useful articles).

VSI has proven that Defendants, without authority, did at least the following acts of copyright infringement: downloaded (infringement) copyright protected technical drawings, transmitted by e-mail (infringement) the drawings to a contractor for alteration, caused the contractor to create a derivative work (infringement), emailed the infringing derivative work (infringement) to Defendants, made copies of the infringing derivative work (infringement) and sent these with bids, emailed the infringing works (infringement) to contractors (largely in China) who, themselves copied the infringing works to use in the course of manufacturing VSI-like products, etc.[10]

---

infringement including unauthorized copying and production of infringing derivative works.

[10] The evidence establishes that it is more likely than not that Defendants caused the contractors to make copies of the derivative work and that Defendants made copies of VSI's copyright protected drawings and/or infringing derivative works for their archives and/or business use.

b.  Profits of the Infringer

The Copyright Act permits a copyright owner to recover actual damages suffered, and also

> any profits of the infringer that are
> attributable to the infringement and are not
> taken into account in computing the actual
> damages. In establishing the infringer's profits,
> the copyright owner is required to present proof
> only of the infringer's gross revenue, and the
> infringer is required to prove his or her
> deductible expenses and the elements of profit
> attributable to factors other than the
> copyrighted work.

17 U.S.C. § 504(b).

The term "gross revenue" in § 504(b) refers only to revenue that is reasonably related to the infringement. Bonner v. Dawson, 404 F.3d 290, 294 (4th Cir. 2005)(citing Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003).

Profits attributable to the infringement can include profits derived from the sale of products if those sales are attributable to the copyright infringement.  In Demetriades v. Kaufmann, 680 F. Supp. 658, 665 (S.D.N.Y. 1988), decided prior to the addition of augmented rights for architectural drawings,[11] the court recognized "that the unauthorized reproduction of copyrighted architectural plans constitutes infringement," and

---

[11] A 1990 amendment to the Copyright Act added a form of copyright protection for architectural plans in the physical architectural work.  17 U.S.C. § 102(a)(8).

all copyright remedies were available.  In <u>Robert R. Jones</u>
<u>Assoc., Inc. v. Nino Homes</u>, 858 F.2d 274, 279-81 (6th Cir.
1988), the Sixth Circuit awarded damages equal to the profits of
an infringer who used infringing copies of copyrighted plans to
construct buildings, stating that "the infringing act was the
making of infringing plans, and the construction of the houses
according to those infringing copies merely multiplied the
damages attributable to the infringing act."  <u>See also</u> <u>Intown</u>
<u>Enters., Inc. v. Barnes</u>, 721 F. Supp. 1263, 1266-67 (N.D. Ga.
1989)(awarding profits of the infringer attributable to the
infringement that were not taken into account in computing the
actual damages).

     The Court finds that VSI is entitled to recover, pursuant
to § 504(b), the profits of Defendants that are attributable to
their acts of infringement.


### c. Gross Revenue

     VSI must prove the amount of revenue that is reasonably
related to the infringement. <u>Bonner</u>, 404 F.3d at 294.  In this
regard, the United States Court of Appeals for the Fourth
Circuit has stated that "in requiring proof of a causal link
between the infringement and a particular profit stream or
streams, we did not purport to saddle plaintiffs with an onerous

evidentiary burden." <u>Phoenix Renovation Corp. v. Rodriguez</u>, 258 F. Appx. 526, 534-35 (4th Cir. 2007).

In the instant case, VSI has, most assuredly, proven that there was a causal link between Defendants' copyright infringements as detailed herein and Defendants' sales of what have been referred to as "VSI-like products." The Defendants bear the burden to establish that these sales are attributable to something other than the copyright infringement. <u>Bouchat</u>, 346 F.3d at 520. Defendants have not done so.

The Court finds that Defendants' copyright infringements were causally connected to gross revenues of not less[12] than $2,361,967.97[13] derived from sales of VSI-like products during the years 2005 through 2010. Thus, the Court finds, for § 504(b)

---

[12] The Court finds it far more likely than not that the amount was substantially more but unascertainable by virtue of Defendants' spoliation of evidence.

[13] Pl.'s Ex. 145 provides the detailed breakdown of revenue by year. Defendants' expert agreed that VSI's expert had correctly calculated gross revenues of $2,075,237.37 of VSI-like products based on the Defendants' records. Trial Tr. 4, 48:18-23, 93:7-14, Jan. 26, 2011. However, Defendants' records were unreliable and, in fact, Plaintiff's expert found CPI purchase invoices totaling $143,365.30 for such products without any record of corresponding sales. The Court finds, and Defendants' expert agreed, that it was reasonable to consider that there were additional off record sales attributable to these purchases. <u>Id.</u> at 94:18-97:20. The Court finds it reasonable, as testified by Plaintiff's expert, to conclude that the gross revenue derived from these missing sales was $286,730.60 (based upon a 100% markup). Thus, the total gross revenue derived from the sale of VSI-like products is found to be $2,075,237.37 (from CPI records) plus $286,730.60 (off record sales) for a total of $2,361,967.97.

purposes, that VSI has proven that Defendants had $2,361,967.97 of revenue reasonably related to their infringement.

In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue.  The infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.  As stated by the United States Court of Appeals for the Fourth Circuit, "all gross revenue is presumed to be profit 'attributable to the infringement,' unless the infringer is able to demonstrate otherwise."  Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 512 (4th Cir. 2002).

"If the infringer wishes to establish that its operating expenses are deductible expenses, it has the 'burden of proving that each item of general expense contributed to the production of the infringing items, and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.'"  Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC, 377 Fed. Appx. 303, 310 (4th Cir. 2010)(quoting In Design v. K-Mart Apparel Corp., 13 F.3d 559, 565-66 (2d Cir. 1994)).  "Any doubts resulting from an infringer's failure to present adequate proof of its costs are resolved in favor of the copyright holder."

Universal Furniture Int'l v. Collezione Europa, USA, Inc., 599
F. Supp. 2d 648, 660 (M.D.N.C. 2009), aff'd, 618 F.3d 417 (4th
Cir. 2010).

Courts should also closely scrutinize an infringer's
evidence of alleged deductible expenses when infringement is
found to be willful.  Id. at 659.  The Fourth Circuit has held
that infringement is willful if the defendant either (1) has
actual or constructive knowledge that its actions constitute an
infringement, or (2) recklessly disregards a copyright owner's
rights.  Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d
789, 799 (4th Cir. 2001).  The Court finds that Defendants
willfully and intentionally infringed VSI's copyrighted
drawings.  Pappas knew that the VSI product library contained
original works that were owned by VSI, but he deliberately
copied them using a false identity, removed the VSI identifiers
and replaced them with CPI identifiers.[14]  Then he caused the
evidence of these actions to be destroyed.  Therefore,
Defendants' claimed deductions will be given appropriate
scrutiny.

---

[14] See, e.g., Pl.'s Ex. 13-22, 53, 65, 67, 142, 252. Trial Tr. 1,
168:16-22, 172:14-22, Jan. 18, 2011.  See also Pl.'s Ex. 71
(email from Pappas signed "A.K.A. Fred Bass").

d.  Gross Profit

While the Court finds Defendants' records and testimony
unreliable, the Court finds reliable, and accepts, the opinion
of Plaintiff's expert witness[15] that gross profit should be
determined by reducing the gross revenue by 51.28% to take into
account cost of goods sold and net freight.[16]  Thus, the Court
finds that the gross profit attributable to Defendants' sales of
VSI-like products totals $1,150,750.79.[17]


e.  Deductions

Defendants seek deductions for operating expenses comprised
of employee expenses (salaries, health insurance, workmen's
compensation) and overhead (including rent).

---

[15] As Defendants' expert testified:
    [Plaintiffs' expert] and I agree on the calculation of
gross profit earned by Creative Pipe for the VSI-like products.
The revenue and gross profit, where gross profit is calculated
by taking the revenue and subtracting cost of goods sold as well
as net freight expense, those calculations we agree on." Trial
Tr. 4, 48:16-23, Jan. 26, 2011.
[16] Plaintiff's expert matched purchase orders and sales invoices
and found that the cost of manufacture was, on average, 47.39%
and that average net freight was on average 3.89%, for a total
of 51.28%, yielding a gross profit percentage of 48.28%.  Thus,
gross profits were 48.72% of $2,361,967.97 or $1,150,750.79.
[17] Pl.'s Ex. 145. Trial Tr. 3, 196:24-197:4, Jan. 20, 2011. See
also App. I.

Employee Expenses:

There are several reasons for the denial of an employee expense deduction as claimed by Defendants.

First, those on CPI's payroll as employees performed services for CPI and others.  Defendants have not established a reliable basis to allocate those expenses between CPI and the others who received the benefit of the services.

Second, the Court finds CPI's records unreliable.  Indeed, because of the admitted unreliability of CPI's records, including QuickBooks data, the Defendants' expert determined the amount of salaries by reference to W-2 forms.

Third, and more significantly, Defendants have not proven the extent to which any CPI employee, other than Pappas himself, rendered substantial services directly related to sales of VSI-like products.  Nor have Defendants proven that any of the claimed employee expenses would have been any less without the sale of VSI-like products.

Fourth, and most significantly, even though Pappas did provide services directly relating to the sale of VSI-like products, these services constituted the very tortious acts that created Defendants' liability.  Hence, to the extent that Pappas related employee expenses would be attributable to the sales of VSI-like products, these payments would – if deductible by CPI

to reduce its profits – constitute additional profits of infringement to Pappas.  Thus there would be no net deduction available to Defendants by virtue of those expenses.

     The Court finds that Defendants have not carried their burden to prove entitlement to any deduction for employee expenses.


     Overhead expenses:

     Defendants seek a deduction for overhead expenses including rent paid by CPI.

     The rent[18] included in overhead was paid by CPI to Pappas for the use of part of a home owned by Pappas.  As with compensation paid by CPI to Pappas, if the Court were to find that CPI was entitled to a deduction for rent paid co-defendant allocable to profits which CPI must disgorge, then the amount received by Pappas would constitute – for him – profit attributable to the infringement that the Defendants would have to disgorge.

     Defendants have suggested an allocation of overhead to revenues derived from VSI-like products based upon the proportion of sales of such products to sales of all products.  The Court does not accept the suggestion.  Rather the Court

---

[18] Defendants' expert sought to establish the rental deduction by what she found to be comparable rents for similar properties.

would allow a deduction for overhead only to the extent that Defendants would establish that the overhead was increased by virtue of the sales of VSI-like products.  That is, that there was an excess of overhead borne over what the overhead would have been without the sales of VSI-like products.  See Alexander v. Chesapeake, Potomac, & Tidewater Books, Inc., 60 F. Supp. 2d 544, 550 (E.D. Va. 1999)(finding that before a defendant may deduct overhead, he has the burden of proving that the expense contributed to the production of the infringing items).

Accordingly, the Court finds that Defendants have not proven entitlement to any deduction with regard to overhead.

### f.   Recovery

As discussed herein, the Court finds VSI entitled to recover compensatory damages for the profits of the infringer, pursuant to § 504(b) in the amount of $1,150,750.79.[19]

### g.   Prejudgment Interest

VSI seeks prejudgment interest. Under Maryland law, the matter of prejudgment interest normally is left to the discretion of the jury, or the trial court when sitting without a jury. See I.W. Berman Props. v. Porter Bros., Inc., 344 A.2d

---

[19] See App. I.

65, 75 (Md. 1975).   However, prejudgment interest is recoverable as a matter of right where the money claimed has actually been used by the other party. Travel Comm., Inc. v. Pan American World Airways, Inc., 603 A.2d 1301, 1333 (Md. Ct. Spec. App. 1992).   The Court finds VSI entitled to prejudgment interest as a matter of law and states that even if the matter were one of discretion it would award prejudgment interest in the instant case.

The Court therefore, awards prejudgment interest to be based upon the profits of the infringer in each calendar year, to commence at the end of each calendar year.

The rate of prejudgment interest is beyond debate. As stated in First Va. Bank v. Settles, 588 A.2d 803, 808 (Md. 1991), "prejudgment interest which is awarded should be at the rate of 6% per annum."

Accordingly, the Court awards prejudgment interest computed on the basis of profits earned in each year 2006 through 2010, with interest running from the last day of each year through September 30, 2011 in the amount of $228,804.91.[20]

---

[20] See App. I.

3.   <u>Injunctive Relief</u>

The Court has granted Plaintiff's motion for injunctive relief as to Count I (copyright infringement), as a sanction for Defendants' willful spoliation. <u>See</u> Order Re: Sanctions Motion, 2, [Document 381].  Even if there were no such sanction, the Court would enjoin Defendants from any further copyright infringement.

B.   <u>UNFAIR COMPETITION</u>

VSI asserts a Maryland state law unfair competition claim against Defendants.

1.   <u>Nature of the Claim</u>

The doctrine of unfair competition is described in <u>Baltimore Bedding Corp. v. Moses</u>, 34 A.2d 338 (Md. 1943).  It established that the purpose of the doctrine was to prevent dealings based on deceit and dishonesty, and it sets out the doctrine as follows:

> [W]hile [unfair competition law] encourages fair trade in every way and aims to foster, and not to hamper, competition, no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.... What constitutes unfair competition in a given case is governed by its own particular facts and circumstances.  Each case is a law unto itself, subject, only, to the general principle that all

dealings must be done on the basis of common honesty
and fairness, without taint of fraud or deception.

Baltimore Bedding, 34 A.2d at 342.

An unlawful act is not an essential element of an unfair

competition claim.  Trimed, Inc. v. Sherwood Med. Co., 977 F.2d

885, 891 (4th Cir. 1992)(applying Maryland law).  The essential

element of unfair competition is deception – either actual or

probable deception.  GAI Audio of N.Y., Inc. v. Columbia Broad.

Sys., Inc., 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975)(citing

Edmondson Village Theatre v. Einbinder, 116 A.2d 377, 380

(1955)). In effect, the defendant is unfairly competing by

taking advantage of the goodwill and business reputation that

the plaintiff has lawfully developed, and gaining a profit it

would not have received except for that deception. Id.

In Elec. Store, Inc. v. Cellco P'ship, 732 A.2d 980, 991

(Md. 1999) the Maryland Court of Appeals stated:

> The rules relating to liability for harm caused by
> unfair trade practices developed from the established
> principles in the law of torts. These rules developed
> largely from the rule which imposes liability upon one
> who diverts custom from another to himself by
> fraudulent misrepresentation . . . . (citations
> omitted).

And in Translucent Commc'ns, LLC v. Americas Premiere

Corp., No. WGC-08-3235, 2010 WL 723937, at *22 (D. Md. Feb. 24,

2010), a judge of this district noted that although the doctrine

of unfair competition was originally applicable only to

trademark cases, it is no longer limited to a particular kind of business activity, but each case is a law unto itself subject only to the general principle of old-fashioned honesty.

### 2.  Preemption

Defendants contend that VSI's unfair competition claim under Maryland law is preempted by the Copyright Act Section 301, which preempts state law claims if (1) "the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. §§ 102, 103" and (2) "the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106."  Rosciszewski v. Arete Assocs., 1 F.3d 225, 229 (4th Cir. 1993).

Defendants argue that the unfair competition claim does not have the "extra element" required to make it qualitatively different from a claim for copyright infringement.  See id. at 229-30 (stating that the extra element requirement does not include awareness or intent, which alters the action's scope but not its nature); see also Costar Group, Inc. v. Loopnet, Inc., 164 F. Supp. 2d 688, 713 (D. Md. 2001)("The critical question, then, is whether [the Plaintiff's] unfair competition claim contains an additional element or whether it is based solely on the alleged copying.").

However, "[t]he essential element of unfair competition is deception, by means of which the goods of one dealer are passed off as the goods of another, and the seller receives the profit which he would not have received except for such deception." GAI Audio, 340 A.2d at 748.  Deception is not an element of copyright infringement.  Accordingly, the unfair competition claim is not preempted by the Copyright Act.

### 3.   Liability

VSI has proven that Defendants have misappropriated VSI's intellectual property and goodwill through deception.  The deception included, but by no means was limited to, illegally obtaining VSI's drawings under false pretenses, copying and using the drawings to solicit business and manufacture competing products, falsely representing VSI's drawings as CPI's, falsely representing CPI as an equal to VSI in the marketplace, and mimicking VSI's advertising, style, and marketing themes.

Defendants contend that, even though VSI may have proven that they engaged in unfair competition, VSI has not proven that it was damaged as a competitor or harmed in any way.  Trimed, 977 F.2d at 891.

However, VSI has proven harm directly resulting from at least one of Defendants' acts of unfair competition.  In regard

to a project for Portsmouth, Virginia, VSI and CPI were the only
two bidders in direct competition. Trial Tr. 6, 23:22-24:7,
25:5-17, Feb. 24, 2011. CPI won the bid using an altered drawing
derived from a copyright protected original drawing that was
downloaded without authority from VSI's product library.

In addition, the bids submitted by CPI for VSI-like
products based upon the deceptive claim that the products were
made "in house" in the United States effectively caused VSI (and
others) to reduce their prices.  Moreover, in Translucent, when
the plaintiff was not able to quantify damages directly
attributable to the defendant's trickery, the Court still
required the defendants to provide an accounting of the profits
derived from its dishonest actions.  2010 WL 723937, at *22.

VSI has proven that Defendants engaged in a massive degree
of unfair competition directly aimed at VSI.[21]  In addition to
deceitfully obtaining copies of VSI's copyright protected
drawings, Defendants misrepresented the drawings as their own,
created the false impression on CPI's website that it was
comparable to VSI as an American manufacturer of quality site

---

[21] Pappas went so far as to name the product line that included
VSI-like products as the "Fuvista" line and had a sales
representative spread the word in the marketplace that it meant
"F--- you Victor Stanley."  Pl.'s Ex. 42; Hendry Dep. 36:12-14,
June 28, 2007. VSI also presented evidence of Pappas's ranting
and raving about his hatred of VSI. Hendry Dep. 36:6-37:20, June
28, 2007.

furnishings, with 50 employees, a unique powder coating process and facilities, and made all its goods "in house." In fact, CPI had four employees, no manufacturing facility, had products manufactured in China,[22] and removed the country of origin labels.  Moreover, the Court finds that CPI's profits increased as a result of its unfair competition.

The Court finds that Defendants practiced deceit, trickery, and other unfair and dishonest methods of business practice against VSI and are liable for unfair competition under Maryland law.


4.   Compensatory Damages

A plaintiff who has established unfair competition may obtain injunctive relief, and compensatory and punitive damages. GAI Audio, 340 A.2d at 750.  Remedies include the ordering of an accounting for profits arising out of the acts of unfair competition.  Id.; see also Car-Freshner Corp. v. Marlenn Prods. Co., 183 F. Supp. 20, 46 (D. Md. 1960)(requiring defendant to account and pay over all gains or profits derived from its unfair competition); Coca-Cola Co. v. Dixi-Cola Labs., Inc., 155 F.2d 59 (4th Cir. 1946)(applying Maryland law)(finding that

---

[22] And elsewhere outside the United States.

plaintiff in an unfair competition case may recover the
defendant's profits).

The Court finds it appropriate to award VSI the profits of
the Defendants that are attributable to their unfair
competition. The Court finds that the objective of the unfair
competition engaged in by Defendants vis-à-vis VSI, and the
result achieved, was the sale of VSI-like products.
Accordingly, the Court awards, as compensatory damages for
unfair competition, Defendants' profits attributable to its
sales of VSI-like products, that is $1,150,750.79 with
prejudgment interest of $228,804.91.[23] The Court will also
exercise its discretion to award prejudgment interest at the
rate of 6%.

### 5.   Punitive Damages

The "purpose of punitive damages is ... to punish the
defendant for egregiously bad conduct toward the plaintiff,
[and] also to deter the defendant and others contemplating
similar behavior." Owens-Corning Fiberglas Corp. v. Garrett, 682
A.2d 1143, 1161 (1996).

---

[23] These amounts are determined as was the amount of the profits
of the infringer award for copyright infringement.

Under Maryland law, punitive damages may only be awarded in addition to compensatory damages[24] on the basis of "actual malice." <u>French v. Hines</u>, 957 A.2d 1000, 1027 (Md. Ct. Spec. App. 2008)(citing <u>Scott v. Jenkins</u>, 690 A.2d 1000, 1003-04 (Md. 1997)). "Actual malice," as the basis for punitive damages, is defined as a sense of conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud. <u>Spengler v. Sears, Roebuck & Co.</u>, 878 A.2d 628, 644 (Md. Ct. Spec. App. 2005).  Actual malice is more than merely gross negligence or wanton or reckless conduct. <u>Shoemaker v. Smith</u>, 725 A.2d 549, 559 (Md. 1999)(citations omitted); <u>see also</u> <u>Ellerin v. Fairfax Sav., F.S.B.</u>, 652 A.2d 1117, 1123 (Md. 1995)("Maryland law has limited the availability of punitive damages to situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing."). Actual malice must be proven by clear and convincing evidence.  <u>Scott</u>, 690 A.2d at 1004.

The Court finds that VSI has established Defendants' actual malice by clear and convincing evidence.  Defendants engaged in deliberate wrongdoing with wrongful motives and ill will specifically directed at VSI.  Defendants, with malice, chose

---

[24] Punitive damages must be supported by an award of compensatory damages, even if only in a nominal amount.  <u>Shabazz v. Bob Evans Farms, Inc.</u>, 881 A.2d 1212, 1236 (Md. 2005).

the product name Fuvista specifically mocking VSI and making public its meaning as "F--- you Victor Stanley."  Pappas also expressed his hatred of VSI.  Therefore, the Court will award punitive damages.

It is important that the amount of a punitive damage award be reasonable.  See BMW of North America, Inc. v. Gore, 517 U.S. 559, 568 (1996)(requiring that "the damages awarded be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence"); see also Ellerin, 652 A.2d at 1129-30 ("punitive damage awards must not be disproportionate to the gravity of the defendant's wrong").

In addition, under Maryland law, the amount of punitive damages "should not be disproportionate to . . . the defendant's ability to pay." Ellerin, 652 A.2d at 1130.  The plaintiff's costs and expenses resulting from the wrongful conduct, including uncompensated expenses of litigation, may also be considered.  Bowden v. Caldor, Inc., 710 A.2d 267, 282-83 (Md. 1998).

The Court finds that, in the circumstances of the instant case, an award of punitive damages against both Defendants[25] in the amount of $500,000.00[26] is appropriate.  The amount is less

---

[25] I.e., imposing joint and several liability on CPI and Pappas.
[26] The amount is determined taking into account that the Court is awarding enhanced damages of $575,375.40 on Plaintiff's Lanham

than the compensatory damages awarded herewith, yet substantial enough to serve the purposes of punitive damages.  The Court, having imposed liability for substantial fees and costs on Defendants, is not including in the punitive damages award any element of these.  The Court finds that, on the evidence of record, particularly relating to Pappas, there is no reason to believe that the award is disproportionate to the Defendants' ability to pay.[27]

### 6.   Legal Fees

The Court finds no legal authority under Maryland law to award attorneys' fees for the unfair competition claim. Maryland generally adheres to the "American rule," in which each party is responsible for its own legal fees, regardless of who wins in the litigation, although exceptions may be accomplished by an express agreement or by statute.  Henriquez v. Henriquez, 992 A.2d 446, 451 (Md. 2010); see also Bausch & Lomb Inc. v. Utica Mut. Ins. Co., 735 A.2d 1081, 1095 (Md. 1999)("Maryland law has never recognized fee shifting ... absent contractual provision, statute, or rule.").

---

Act claim.  Were the Lanham Act enhanced damages to be reversed on appeal, the Court would increase the punitive damage award herein to $1,075,375.40.
[27] The only evidence of Defendants' size and financial condition was that Pappas had a net worth of $3,126,000.00 as of October 4, 2010.  Pl.'s Ex. 149.

C.    LANHAM ACT § 43 – FALSE DESIGNATION OF ORIGIN

VSI asserts a "reverse passing off" claim under the Lanham Act with regard to Defendants passing off VSI's drawings as those originating with CPI.

1.    Nature of the Claim

To establish a reverse passing off claim a plaintiff must prove: "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." Universal Furniture, 618 F.3d at 438 (citations omitted).

2.    Preemption

Defendants contend that VSI's reverse passing off claim is preempted by the Copyright Act pursuant to the rationale of Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003). In Dastar, the United States Supreme Court considered whether Dastar had violated the Lanham Act when it released a video set that it compiled, with minor edits, from tapes of an original version of a Fox-produced series without giving credit

to Fox.  The Court held that the Lanham Act did not prevent the
unaccredited copying of the series, which was in the public
domain since its copyright had already expired.  Id. at 28-38.

The Dastar Court clarified that the phrase "origin of
goods" as used in § 43(a) of the Lanham Act "refers to the
producer of the tangible goods that are offered for sale, and
not to the author of any idea, concept, or communication
embodied in those goods."  Id. at 37. Defendants assert that CPI
is the origin of the tangible goods at issue, just as Dastar was
the origin of the videotapes that it sold, and that VSI is
claiming authorship of the original copyrighted drawings for the
products, and thus there is no proper claim for reverse passing
off.[28]

With any type of passing off claim, it is critical to
properly identify the product at issue, and the source, or
origin, of that product.  Here, VSI is not claiming that the
products at issue are the VSI-like physical items created and
sold by CPI.  Rather, VSI claims that the products at issue are
the technical drawings, and VSI is the source of the technical

---

[28] The Lanham Act false designation of origin claim is often
referred to as "passing off" or "reverse passing off."  Passing
off (or palming off, as it is also sometimes called) occurs when
a person misrepresents his or her own goods as someone else's.
Reverse passing off occurs when a person misrepresents someone
else's goods as his or her own.  Implied reverse passing off
occurs when a person removes the source's name from the product
and sells it in an unbranded state.

drawings.  The evidence showed, in numerous instances, that
Defendants downloaded the drawings from the VSI product library,
removed the VSI source information and product name from the
drawings, replaced the source information with representations
that CPI had created the drawings, and replaced the VSI product
name with a CPI product name.[29]

The Fourth Circuit has found liability for both copyright
infringement and reverse passing off under similar
circumstances.  See Universal Furniture, 618 F.3d at 439-40
(finding reverse passing off where the defendant removed the
competitor's indicia of ownership from the products and
displayed them as defendant's own, even though it did not
actually sell the displayed products but fulfilled sales with
its own manufactured products).

Here, VSI's technical drawings were presented to consumers
as CPI drawings for CPI products, and consumers were likely to
be misled into believing that CPI was the source of the
drawings.  This is the essence of a false designation of origin
claim – Defendants have misrepresented VSI's drawings as their

---

[29] See, e.g., Pl.'s Ex. 53, 85, 252 and Trial Tr. 1, 174:17-
176:24, Jan. 18, 2011 (describing the download by "Fred Bass",
the email from Pappas requesting the modification to CPI
identifiers, and the transmission of the modified drawing in
response to a bid).

own.[30]  This is a violation of trademark law that is independent
of the copying that violated copyright law.  The Court finds
that the claim presented by VSI is not precluded by the
rationale of Dastar.


        3.   Liability

      The Court finds that the drawings at issue originated with
VSI and that Defendants falsely designated the origin of the
drawings as CPI's rather than VSI's, and that the false
designation of origin was likely to confuse the relevant
consumers – primarily the recipients of bids made by CPI for the
sale of VSI-like products.  For example, a bid evaluator would
be misled into believing that CPI was, as it falsely presented,
a "genuine" designer and producer of VSI-like products in an
"in-house" American production facility.  A truthful
presentation of the drawing submitted with a CPI bid as a

---

[30] Section 43(a) of the Lanham Act provides, in pertinent part,
that it is unlawful for

        [a]ny person ... on or in connection with any goods or
        services ... [to] use[ ] in commerce ... any false
        designation of origin ... which ... is likely to cause
        confusion, or to cause mistake, or to deceive ... as
        to the origin . . . of his or her goods, services, or
        commercial activities . . . .

15 U.S.C. § 1125(a)(1).

drawing that originated with VSI would have been less effective, if it would have been accepted at all.

Defendants argue that VSI has not proven a causal connection between the reverse passing off and harm to VSI. However, as the court in Universal Furniture found, this Court finds that Defendants obtained customers that could otherwise have purchased from the Plaintiff and thus deprived VSI of the benefit of the attendant goodwill and enhanced reputation as the creator of the drawings. See 618 F.3d at 439-40. Moreover, as discussed above in regard to the unfair competition claim, Defendants were able to deprive VSI of the Portsmouth, Virginia sale by use of the drawings at issue.

Accordingly, the Court finds that VSI has established its claim that Defendants violated the Lanham Act by passing off drawings that originated with VSI as having originated with CPI.


4.   Damages

When assessing disgorgement of profits under the Lanham Act, the Court must consider:  (1) whether the defendant had the intent to confuse or deceive; (2) whether sales were diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting its rights; (5) the public interest in making the misconduct unprofitable; and (6) whether

34

it is a case of passing off.  Synergistic Int'l, LLC v. Korman,
470 F.3d 162, 174-75 (4th Cir. 2006).

There is no doubt that VSI has established that Defendants
had the intent to confuse or deceive, that there was no
unreasonable delay, that the public interest is served by making
the conduct unprofitable and that there was a case of passing
off.

There is direct proof that one sale, the Portsmouth,
Virginia sale, was diverted from VSI to CPI by virtue of the
reverse passing off together with other wrongful acts.
Certainly, Defendants were unjustly enriched as a result of the
scheme that included, as a substantial element, the reverse
passing off violations.

The Court finds that a remedy other than disgorgement of
profits would be inadequate and inappropriate in the instant
case.  Defendants' spoliation of evidence has rendered it
impossible to ascertain the full extent of the harm to VSI
and/or the profits to Defendants from the course of wrongful
conduct that included the reverse passing off at issue.
Moreover, the reverse passing off was not done in isolation but
was a substantial element of a comprehensive, deliberately
undertaken, tortious plan of action to profit from the goodwill
and efforts of VSI.

In the context of the instant case, the Court finds it appropriate to award VSI as "actual" damages on its reverse passing off claim an amount equal to Defendants' profits from the sale of VSI-like products, which is $1,150,750.79 with prejudgment interest thereon of $228,804.91.[31]

The Lanham Act allows the Court, at its discretion, to award as damages an amount up to three times the amount found as actual damages.  See 15 U.S.C. § 1117(a)("In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. . . . Such sum . . . shall constitute compensation and not a penalty.").  An enhancement of damages may be based on a finding of willful infringement, but although deterrence is an acceptable reason for enhancement, it must not be so large as to constitute a penalty.  Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F. Supp. 350, 380 (W.D.N.C. 1997)(citations omitted).  Such an enhancement of damages can also be used to provide redress to a plaintiff where imprecise damage calculations fail to do justice, especially where the imprecision results from the defendants' conduct.  Id.

---

[31] These amounts are determined as was the amount of the profits of the infringer award for copyright infringement.

The Court finds that Defendants' infringement was willful and that Defendants' deliberate acts of spoliation make it impossible for VSI to accurately assess total damages.  In light of these findings, the Court finds it appropriate to exercise its discretion to award enhanced damages of one-half of $1,150,750.79, or $575,375.40.[32]


### 5.   Attorneys' Fees

Under the Lanham Act, a plaintiff may be awarded attorney's fees in "exceptional cases."  15 U.S.C. § 1117(a).  The Fourth Circuit defines an "exceptional case" as "one in which the 'defendant's conduct was malicious, fraudulent, willful or deliberate in nature.'"  Emp'rs Council on Flexible Comp. v. Feltman, 384 Fed. Appx. 201, 207 (4th Cir. 2010)(quoting People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001)).  To succeed on a request for attorney fees, VSI must show that Defendants acted in bad faith.  Id.

The Court finds that VSI has proven Defendants' malice, deliberate and willful reverse passing off, and manifest bad faith.

---

[32] The amount is determined taking into account that the Court is awarding punitive damages of $500,000.00 on Plaintiff's unfair competition claim.  Were the unfair competition punitive damages to be reversed on appeal, the Court would award enhanced damages of $1,075,375.40.

Accordingly, the Court shall award VSI its fees and costs related to bringing the reverse passing off claim, excluding any such fees and costs awarded to VSI on other grounds.

D.    LANHAM ACT – FALSE ADVERTISING

    1.    Nature of the Claim

The Lanham Act prohibits the "false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). A plaintiff asserting a false advertising claim under the Lanham Act must establish that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 120

(4th Cir. 2011)(citing Scotts Co. v. United Indus., 315 F.3d

264, 272 (4th Cir. 2002)).


      2.  Liability

        a.  Misrepresentation of Fact

VSI contends that the Defendants made the following

misrepresentations of fact:

1. CPI advertised in its catalog a safety bollard capable of
   stopping a 15,000 pound vehicle traveling at 50 miles per
   hour that had been independently crash-tested and found to
   achieve a Department of State "K-12" rating.

2. CPI claimed that the Nebelli and Necati benches were ADA-
   compliant, although there are no ADA requirements, either
   mandatory or voluntary, that apply to outdoor benches.

3. Defendants represented that CPI products were made in the
   United States and that CPI is an American manufacturer.

4. CPI represented that it designs and manufactures all of its
   site furnishings.

5. CPI claims that it has two manufacturing facilities in the
   United States.

6. CPI claims that all of its work is done in house, and that
   it has its own state-of-the-art in-house powder coating
   facility.

7. CPI claims it developed a method of manufacturing its site
   furnishings that results in unsurpassed strength and
   integrity.

8. CPI claims it is developing progressive and functional new
   designs.

Misrepresentations of type 1 through 6 are false or
misleading statements of fact.  Defendants contend that
misrepresentations of types 7 and 8 are "puffery"[33] and not
statements of fact.  Certainly, most, if not all, advertising
claims contain elements of puffing.  Laws against false
advertising are designed to keep the puffery within bounds, and
sellers may not misrepresent products by promoting attributes
that do not exist.

"Where the advertisement is literally false, a violation
may be established without evidence of consumer deception." PBM
Prods., 639 F.3d at 120.  A court can find on its own that a
statement is literally false, but may only find a statement is
impliedly misleading if presented with evidence of actual
consumer deception.  Id.  If a defendant's claim is untrue, it
may be deemed literally false. Castrol Inc. v. Pennzoil Co., 987
F.2d 939, 944 (3d Cir. 1993).

Misrepresentations of type 7 stating that CPI has developed
a method of manufacturing imply that CPI manufactures site
furnishings.  This is not true, but Defendants contend that

---

[33] Puffery is defined as the expression of an exaggerated opinion
— as opposed to a factual misrepresentation — with the intent to
sell a good or service. Puffing involves expressing opinions,
not asserting something as a fact. Although there is some leeway
in puffing goods, a seller may not misrepresent them or say that
they have attributes that they do not possess.  Black's Law
Dictionary, 1353 (9th ed. 2009).

claims of unsurpassed strength and integrity are subjective opinion rather than something that can be proven either true or false.  More than an exaggeration, however, "unsurpassed" is capable of measure – it is either true or false.

Claims of superior strength require the plaintiff to affirmatively prove that the defendant's product is equal or inferior rather than superior. See Castrol, 987 F.2d. at 943-44 (claiming that motor oil provides "longer engine life" and "better engine protection").  The Fourth Circuit has differentiated between bald assertions and those asserting that the fact is test-validated.  C.B. Fleet Co. Inc. v. SmithKline Beecham Consumer Healthcare, L.P., 131 F.3d 430, 435-36 (4th Cir. 1997).  CPI's claim is a bald assertion of unsurpassed strength and integrity and does not refer to any supporting tests, so the Fourth Circuit requires it be proven by evidence affirmatively showing its falsity.  Id.

VSI introduced testimony regarding the inferior engineering of the Defendants' products.  Gerald Skalka, a vice president with VSI primarily responsible for product design, manufacturing, production techniques, and development of VSI's physical products, described some of the physical characteristics of CPI products that would result in problems over time.  Trial Tr. 3, 52:7-54:2.  For example, he described

41

how trash receptacle doors must open thousands of times for
removal of trash, and CPI used welded hinges with pins that bend
over a fairly short period of time causing the doors to go out
of alignment.  Id. at 53:15-21.

Additionally, VSI introduced into evidence a series of
emails from Pappas to a factory providing CPI products.  Pl.'s
Ex. 109.  It describes products that were rejected by customers,
saying they "never should have passed your quality control
inspection," and that the problems identified "call into
question the quality of all the products you are making for me."
Id.  The Court notes that Defendants did not argue or present
any evidence to show superior strength.

Based on the evidence, the Court finds that
misrepresentations of type 7, CPI's claims of superior strength
and integrity, are false representations of fact and, therefore,
actionable.

Misrepresentations of type 8 state that CPI claims it is
developing progressive and functional new designs. The statement
cannot be deemed false on its face.  VSI presented evidence of
CPI's past failures to design successful products, but the Court
will not find that this boast is false based on past failures.
Reasonable potential purchasers are unlikely to rely on the
statement as one of fact rather than opinion and are capable of

42

determining whether the designs they see are progressive or functional despite what the seller boasts.  There is insufficient evidence to find this general and subjective statement anything more than non-actionable puffery.

Accordingly, the Court finds that misrepresentations of types 1 through 7, but not type 8, are false or misleading descriptions of fact or representation of fact in a commercial advertisement about CPI's products.

b.   Materiality, Deception, Commerce

The Court finds that statements 1 through 7 were material and either deceived or had a tendency to influence a purchasing decision and were placed in interstate commerce by Defendants. VSI presented evidence establishing that these claims were likely to influence purchasing decisions.  See, e.g., Trial Tr. 3, 86:11-88:14, 92:19-23, 95:5-25, 98:13-25, 103:10-104:25, Jan. 20, 2011; Trial Tr. 1, 65:13-66:13, 90:6-10, Jan. 18, 2011. Such evidence included, for example, VSI's receiving phone calls from landscape architects asking if VSI products were ADA-compliant, because they did not want to have to replace products to meet the requirement (even though there is no such standard). This is certainly an indication that such claims are material to buying decisions.  VSI also described the importance of meeting

43

a Homeland Security standard for security bollards that were
being placed outside buildings to prevent explosive-laden trucks
from crashing into buildings.  These are not claims that buyers
take lightly.

Additionally, evidence was provided that some buyers have a
requirement, not merely a preference, for products to be made in
America. See, e.g., Pl.'s Ex. 89, 90 (including "Buy America"
provisions).  Thus, the Court finds that a "Made in America"
claim is material to a purchasing decision.  Even if a buyer
merely preferred to buy products made in the United States, the
claim is likely to influence the buyer.  The very actions of
Pappas to ensure that the "Made in China" labels were removed
from CPI's products provide eloquent testimony of the
materiality of the misrepresentation as to the origin of the
goods.

c. Injury

A Lanham Act suit for false advertising may be brought "by
any person who believes that he is or is likely to be damaged by
the use of any false description or representation."  15 U.S.C.
1125(a).  Despite the use of the word "believes," something more
than a mere subjective belief of injury or likelihood of injury
is required before a plaintiff is entitled to injunctive relief,

44

which is what VSI is seeking.  PBM, 639 F.3d at 127; see also

Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 189-90

(2d Cir. 1980)("a plaintiff seeking an injunction, as opposed to

money damages, need not quantify the losses actually borne").

Certainly it is difficult to show that buyers of CPI

products would have bought a VSI product absent CPI's false

claims.  CPI is one of a number of VSI's competitors, and it is

possible that sales would have gone to another competitor rather

than VSI.  There was evidence that CPI had been awarded bids on

the basis of its false claims as an American manufacturer

although it was actually receiving the products from factories

in China and then removing the "Made in China" labels before

delivery.  See, e.g., Pl.'s Ex. 31-35, 113, 129, 249, 311, 313-

14, 322.  The Court finds it likely that some of these sales may

have gone to VSI, a genuine American manufacturer. Additionally,

there is harm to all CPI's competitors, including VSI, in having

to respond to "China prices."  Trial Tr. 3, 59:1-61:22, Jan. 20,

2011. VSI also provided testimony of likely harm to its

reputation due to the poor quality of the CPI "knock-offs" that

may be mistaken for VSI products.  Trial Tr. 3, 53:6-55:13, Jan.

20, 2011.

Accordingly, the Court finds that VSI has been and is

likely to be injured as a result of the misrepresentation,

either by direct diversion of sales or by a lessening of
goodwill associated with its products.


        3.   Injunctive Relief

    VSI seeks injunctive relief, not a damage award, on its
false advertising claims.

    "An injunction is a matter of equitable discretion; it does
not follow from success on the merits as a matter of course."
Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7,
129 S. Ct. 365, 381 (2008). In eBay Inc. v. MercExchange,
L.L.C., 547 U.S. 388, 392-93 (2006), the Supreme Court
reaffirmed the traditional showing required to obtain a
permanent injunction. To make that showing, a plaintiff must
demonstrate: (1) that he has suffered an irreparable injury; (2)
that legal remedies, such as monetary damages, are inadequate
compensation; (3) that in considering the balance of hardships
between the parties an equitable remedy is warranted, and (4)
that the public interest would not be disserved. eBay, 547 U.S.
at 391; see also Christopher Phelps & Associates, LLC v.
Galloway, 492 F.3d 532, 543 (4th Cir. 2007)(quoting eBay).

    VSI has demonstrated the likelihood of harm, including harm
to its reputation.  Damages to reputation and goodwill are not
items that are easily measured by a legal calculation of

monetary damages.  Lone Star Steakhouse & Saloon, Inc. v. Alpha
of Virginia, Inc., 43 F.3d 922, 939 (4th Cir. 1995).  The
balance of hardships also favors VSI because there is no
hardship to the Defendants by imposing a requirement upon them
to stop making false and misleading claims.  As the Fourth
Circuit has recognized, Defendants have "no equitable interest
in perpetuating the false and misleading claims."  PBM, 639 F.3d
at 127.  Finally, the public interest heavily favors injunctive
relief in such cases.  Preventing false or misleading
advertising is in the public interest in general.  Scotts, 315
F.3d at 268.  Accordingly, the Court finds that the eBay factors
each weigh in favor of granting an injunction in this case.

The Court will, therefore, issue a permanent injunction so
as to prevent further false advertising by Defendants of the
type proven in the instant case.


4.   Attorneys' Fees

VSI seeks an award of attorneys' fees and costs related to
bringing the false advertising claim.  Under the Lanham Act, a
plaintiff may be awarded attorney's fees in "exceptional cases."
15 U.S.C. § 1117(a).  The Fourth Circuit defines an "exceptional
case" as "one in which the 'defendant's conduct was malicious,
fraudulent, willful or deliberate in nature.'"  Emp'rs Council

on Flexible Comp. v. Feltman, 384 Fed. Appx. 201, 207 (4th Cir. 2010)(quoting People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001)).  To succeed in a request for attorney fees, VSI must show that Defendants acted in bad faith.  Id.

The Court finds that VSI has proven Defendants' malice, deliberate and willful violations, and manifest bad faith. Accordingly, the Court shall award VSI its fees and costs related to bringing the false advertising claim, excluding any such fees and costs awarded to VSI on other grounds.

E.   DESIGN PATENT INFRINGEMENT

1.   Nature of the Claim

VSI claims, pursuant to 35 U.S.C. § 271(a), that Defendants' Nebelli and Necati benches' end frames infringe VSI's design patent D523,263 S ("the Patent").

Design patent infringement is determined using the "ordinary observer" test. See Crocs, Inc. v. Int'l Trade Comm'n, 598 F.3d 1294, 1303 (Fed. Cir. 2010)(citing Egyptian Goddess Inc. v. Swisa, Inc., 543 F.3d 665, 678 (Fed. Cir. 2008), which held that the ordinary observer test should be the sole test for determining whether a design patent has been infringed). Under this test, if an ordinary observer, familiar with prior art

designs, giving the degree of attention normally given by a purchaser,[34] would be deceived into believing that the Defendants' benches are the same as VSI's design, there is infringement. Id.

The Federal Circuit has stated that the ordinary observer test applies to the patented design in its entirety, minor differences do not prevent a finding of infringement, and the focus is on the overall design impression and not on the similarities or differences of the ornamental features in isolation. Id. (citations omitted).


        2.   Liability

Defendants contend that the infringement claim fails as a matter of law because VSI did not provide the testimony of an ordinary observer purchaser. Trial Tr. 6, 66:3-67:3, 73:20-74:8, Feb. 24, 2011.  For this proposition, Defendants rely on Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc., 501 F.3d 1314 (Fed. Cir. 2007); and Gorham Mfg. Co. v. White, 81 U.S. 511 (1871) that provide detailed clarification of the characteristics of the hypothetical ordinary observer.  Neither of these decisions, nor any other provided by counsel, establish

---

[34] The test was first articulated in Gorham Mfg. Co. v. White, 81 U.S. 511 (1871) and provides that the ordinary observer gives the attention that a purchaser usually gives.

a requirement for ordinary purchaser testimony and none preclude
a jury (or judge) from making a decision based upon the fact
finder's findings as to the opinion of a hypothetical ordinary
purchaser.

The Court applied the ordinary observer test to each of the
two accused infringing benches.  As suggested by the Federal
Circuit, the Court construed the design patent claim by
examining the illustrations in the patent and the accused
products.  Egyptian Goddess, 543 F.3d at 679.  The Court also
considered, for background purposes, testimony from Gerald
Skalka, the designer of the VSI Framer's bench, who had
experience with the site furnishings marketplace, including
bench end frames and prior art, and with purchasers of site
furnishings.

a.   The Nebelli Bench



FIG. 2



The Patent                                    The Nebelli Bench


The Court finds that the Nebelli bench end frame design is substantially the same as that depicted in the Patent.

"[W]hen the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art." Id. at 678.

The Court has, therefore, also considered the illustration in the Chipman patent, D419341.[35]



| Chipman | The Patent | Nebelli |

The Chipman front and back legs are oriented differently from those in the Patent product (and the substantially identical Nebelli Bench).  The Chipman bench has a straight back leg with a concave front leg while the Patent product has concave bench legs.  The Chipman arm rest is distinctly higher and more rounded than the Patent product, which has a leaner, sloping effect. The Chipman seat projects beyond the end of the arm rest and the Patent product does not.  The overall design impression and effect of the Chipman product is distinctly different from that illustrated and claimed in the Patent, as the patent examiner must also have found when awarding VSI with the design patent.

---

[35] The Chipman patent is a cited example of prior art for the Framer's Bench.

There are minor differences between the Nebelli bench end frame and that shown in the Patent.  But the Nebelli design so nearly resembles that of the Patent that an ordinary observer, familiar with prior art designs, would be unable to easily distinguish them in a side-by-side comparison without unusually careful effort.  Thus, the Court finds that the Defendants' Nebelli bench infringes VSI's design patent D523,263 S.

b.   The Necati Bench



FIG. 2

The Patent                    The Necati Bench

The Court finds that the Necati bench end frame design is not substantially the same as that depicted in the Patent.  Even though the design of the Necati bench is, in part, based on the Nebelli (infringing) design, there are obviously distinguishing features.  The Necati has an added second brace and an oval below the arm rest.  VSI argues the additions are trivial and

the overall appearance is deceptively similar to the end frame design of the Patent.  However, the Court finds that an ordinary purchaser of benches, using a reasonable degree of care, would distinguish between the Necati and the Patent product without much effort.

The overall effect of the design with the oval below the seat, while certainly taking advantage of the graceful curves designed into the Patent design, creates a different and distinctive look that would not confuse the ordinary observer. Each of the individual ornamental elements may be almost identical in isolation, but the overall impression is aesthetically different.

Ultimately, there is infringement only if the ordinary observer would purchase one product taking it to be another.  A site furnishings purchaser is not likely to be deceived into buying the Necati bench thinking it to be the Framer's bench. Accordingly, the Court finds that the Defendants' Necati bench does not infringe the VSI design patent D523,263 S.

The Court notes that Pappas was awarded a design patent D578,808 S for the Necati bench so that, in effect, the Patent Office Examiner essentially reached the same conclusion as the Court.  This fact is, perhaps, relevant but not dispositive. <u>See Cobra Fixations CIE Ltee-Cobra Anchors Co., Ltd. v. Newell</u>

Operating Co., No. 1:09CV436, 2011 WL 1399785, *2 (M.D.N.C. Apr. 13, 2011)("The fact that two of Defendant's accused products have patented designs is relevant to but not dispositive of the question whether the design of Defendant's products infringe upon the design of Plaintiff's products."). In the instant case, the Court made its own factual determination that the Necati bench did not infringe the Patent.


　　　3.　Damages

VSI seeks monetary damages based on profits of the infringer, injunctive relief, prejudgment interest, and attorneys' fees.

The current remedies provision pertaining to design patents, 35 U.S.C. § 289, allows for recovery of the infringer's total profit from the infringement.[36] Section 289 includes no

---

[36] A design patentee may recover damages under 35 U.S.C. § 284 or under 35 U.S.C. § 289, entitled "Additional remedy for infringement of design patent," which states:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

willfulness requirement.  <u>Catalina Lighting, Inc. v. Lamps Plus,</u>
<u>Inc.</u>, 295 F.3d 1277, 1290 (Fed. Cir. 2002).

The Court awards profits of the infringer for the patent
infringement in the amount of $35,137.00.[37] The Court will also
exercise its discretion to award prejudgment interest on this
recovery of $10,014.05.[38]


### 4. Injunctive Relief

In <u>eBay</u>, the Supreme Court reminded the Federal Circuit
that injunction grants were always a matter of equity and
directed courts to use a four-factor test to ensure that grant
of an injunction was warranted.  Therefore, VSI must show "(1)
that it has suffered an irreparable injury; (2) that remedies
available at law, such as monetary damages, are inadequate to
compensate for that injury; (3) that, considering the balance of

---

Nothing in this section shall prevent, lessen, or
impeach any other remedy which an owner of an
infringed patent has under the provisions of this
title, but he shall not twice recover the profit made
from the infringement.

[37] VSI provided evidence of $66,889.00 in revenue from the sale
of Nebelli benches, which resulted in gross profits of
$35,137.00. Pl.'s Ex. 145-IV. Defendants do not dispute these
calculations.  Gerald Skalka testified that purchasers bought
benches based exclusively on the patented features, and
Defendants did not provide evidence of an allocation of the
effect of the infringement less than 100%.
[38] This award is included within, and therefore duplicative of,
the profits of the infringer award for copyright infringement.

hardships between the plaintiff and defendant, a remedy in
equity is warranted; and (4) that the public interest would not
be disserved by a permanent injunction." eBay, 547 U.S. at 391.

     VSI has demonstrated that it suffered irreparable harm and
that monetary damages would not provide adequate compensation
for future infringement of the Patent.  VSI does not license its
patents as part of its revenue stream.  Instead, it invests
heavily in designing new products for the marketplace and relies
on its designs to distinguish VSI as a leader that sets
standards in the marketplace.  See, e.g., Trial Tr. 1, 31:25-
32:14, 39:1-9, Trial Tr. 3, 72:18-76:18. VSI sells its products,
not its designs so that others can make and sell the same
products, and an injunction is necessary to protect its brand
name, market share, reputation, and goodwill.

     The balance of hardships also favors VSI because there is
no demonstrated hardship in enjoining CPI from selling its
Nebelli benches, whereas VSI has demonstrated the potential harm
to its reputation and market share for prospective buyers to
confuse the Nebelli bench for the VSI Framer's bench.
Defendants' have no right to sell the infringing products, so an
injunction merely enjoins that which Defendants are already
prevented from doing under the federal Patent Act. As the Third
Circuit so eloquently stated, "a party can hardly claim to be

harmed where it brought any and all difficulties occasioned by the issuance of an injunction upon itself." Kos Pharma., Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir. 2004)(citations omitted).

Protecting intellectual property and combating patent infringement is in the public interest.  Innovation and competition is also in the public interest, so the Court is mindful of the potential to stifle the willingness of a competitor to compete aggressively.  In this case, however, Defendants could have competed aggressively without crossing the boundaries delineated by patent law.  The public interest thus weighs in VSI's favor.

 In sum, the Court finds that an injunction is appropriate in this case and shall, by separate Order, enjoin Defendants from further infringement of the Patent with regard to the Nebelli bench.


        5.   Attorneys' Fees

Reasonable attorneys' fees may be awarded in exceptional cases under 35 U.S.C. § 285.  "The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous

suit or willful infringement." Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1358 (Fed. Cir. 2010)(quoting Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034 (Fed. Cir. 2002)); see also Serio-US Indus., Inc. v. Plastic Recovery Tech. Corp., 459 F.3d 1311, 1321-22 (Fed. Cir. 2006)("Exceptional cases usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions.").

An award of attorneys' fees under section 285 requires a two-part determination. First, a district court must determine that the prevailing party has proven, by clear and convincing evidence, that the case is exceptional. Digeo, Inc. v. Audible, Inc., 505 F.3d 1362, 1366-67 (Fed. Cir. 2007). Second, if the district court finds the case exceptional, it must then determine whether an award of attorneys' fees is appropriate. Id.

First, with respect to determining if this is an exceptional case that may warrant the award of attorneys' fees, the Court notes that "litigation misconduct may in itself make a case 'exceptional.'" Read Corp. v. Portec, Inc., 970 F.2d 816,

831 (Fed. Cir. 1992)(citing <u>Kloster Speedsteel AB v. Crucible Inc.</u>, 793 F.2d 1565, 1580-81 (1986)); <u>see also</u> <u>Taltech Ltd. v. Esquel Enters. Ltd.</u>, 604 F.3d 1324, 1329 (Fed. Cir. 2010)("Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice to make a case exceptional.")(citations omitted); <u>Pac. Furniture Mfg. Co. v. Preview Furniture Corp.</u>, 626 F. Supp. 667, 679 (M.D.N.C. 1985)("the bad faith exhibited by the Defendants during the course of this litigation provides a separate and distinct basis upon which attorney's fees should be awarded"); <u>Monsanto Co. v. Strickland</u>, 604 F. Supp. 2d 805, 818 (D.S.C. 2009)("An exceptional case exists when the losing party has been found to have willfully infringed the prevailing party's patent or engaged in misconduct during litigation.").

There is no doubt that Defendants exhibited bad faith during the course of litigation.  The Defendants' obstructive behavior delayed this litigation, drove up the costs for VSI, and needlessly taxed the Court's resources.  VSI has amply demonstrated, by clear and convincing evidence, Defendants' bad faith and litigation misconduct sufficient to establish the case as exceptional.

Second, with respect to determining if an award of attorneys' fees is appropriate, courts consider the infringer's

behavior in light of the totality of the circumstances.  Read,
970 F.2d at 826-27; see also Spectralytics, Inc. v. Cordis
Corp., --- F.3d ----, 2011 WL 2307402, *11 (Fed. Cir.
2011)(noting that consideration of the Read factors is relevant
to both enhanced damages and attorney fees).  In Read, the
Federal Circuit articulated a list of factors relevant to the
determination:

> (1) whether the infringer deliberately copied the
> ideas or design of another;
>
> (2) whether the infringer, when he knew of the other's
> patent protection, investigated the scope of the
> patent and formed a good-faith belief that it was
> invalid or that it was not infringed;
>
> (3) the infringer's behavior as a party to the
> litigation[;]
>
> (4) Defendant's size and financial condition[;]
>
> (5) Closeness of the case[;]
>
> (6) Duration of defendant's misconduct[;]
>
> (7) Remedial action by the defendant[;]
>
> (8) Defendant's motivation for harm[; and]
>
> (9) Whether defendant attempted to conceal its
> misconduct.

Read, 970 F.2d at 827 (citations and footnotes omitted).

Applying the Read factors in this case, the Court finds
that most of them weigh towards an award of attorneys' fees.
Here, there was evidence of deliberate use of a false identity

61

to download and then hand trace the VSI design.[39] There was no
evidence presented to indicate that Pappas was unaware the
design was patented or that he believed the patent was invalid.

Although the willfulness test adopted by the Federal
Circuit in In re Seagate Tech., LLC, 497 F.3d 1360 (Fed. Cir.
2007) abandoned an affirmative obligation to obtain an opinion
of counsel, the Court expressly declined to apply that approach
to the good-faith test suggested by Read.  See i4i Ltd. P'ship
v. Microsoft Corp., 598 F.3d 831, 858-59 (Fed. Cir. 2010);
Spectralytics, 2011 WL 2307402, at *10.  Defendants did not
submit a legal opinion indicating that CPI's Nebelli design
would not infringe on VSI's Framer's Bench.

There is overwhelming evidence of litigation misconduct and
Defendants' attempt to conceal the misconduct.  The first three
factors, which speak to whether the infringer acted in bad
faith, weigh heavily against Defendants.  See Read, 970 F.2d at
826.

The next two factors are neutral. The only evidence of
Defendants' size and financial condition was that Pappas had a
net worth of $3,126,000.00 as of October 4, 2010.  Pl.'s Ex.
149, 1.  There was no evidence of CPI's net worth.

---

[39] Trial Tr. 2, 24:22-30:7, Jan. 19, 2011.

The case was sufficiently close to require an infringement trial. Moreover, while the Court held that the Necati bench does not infringe VSI's patent, the question of whether the Nebelli bench infringed was not a close one.

The remaining factors weigh against Defendants. Defendants continued to infringe, and rather than taking remedial action, Defendants tried to conceal evidence of infringement. As already discussed, Defendants conduct indicated an intention to harm VSI.

On balance, the Court – considering all the <u>Read</u> factors – shall award VSI its fees and costs related to bringing the design patent infringement claim, excluding any such fees and costs awarded to VSI on other grounds.


III. <u>CONCLUSION</u>

For the foregoing reasons the Court decides the instant case as follows:

      1.    Count I – Copyright Infringement:

          a.    The Court finds defendant liable for copyright infringement.

          b.    The Court awards Plaintiff damages of $1,150,750.79 for the infringer's profits in accordance with Section 504(a) of the Copyright Act with prejudgment interest of $228,804.91.

          c.    A permanent injunction shall be entered by separate Order.

    2.    Count II - Unfair Competition under Maryland Law:

        a.    The Court finds Defendants liable for unfair competition under Maryland law.

        b.    The Court awards damages for unfair competition in the amount of $1,150,750.79 with prejudgment interest of $223,051.16.[40]

        c.    The Court awards Plaintiff $500,000.00 in punitive damages.

        d.    The Court denies Plaintiff's request for attorney fees and costs associated with this claim.

    3.    Count II - Unfair Competition under the Lanham Act:

        a.    The Court finds Defendants liable for reverse palming off in violation of 15 U.S.C. § 1125(a).

        b.    The Court awards damages for unfair competition in the amount of $1,150,750.79 with prejudgment interest of $228,804.91.[41]

        c.    The Court awards Plaintiff $575,375.40 in enhanced damages.

        d.    The Court shall award attorney fees and costs associated with this claim, less any fees and costs previously awarded to the Plaintiff.

    4.    Count VII – False Advertising

        a.    The Court finds Defendants liable for false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

        b.    A permanent injunction shall be entered by separate Order.

        c.    The Court shall award attorney fees and costs associated with bringing this claim, less any fees and costs previously awarded to the Plaintiff.

---

[40] The award is duplicative of the profits of the infringer award for copyright infringement.

[41] The award is duplicative of the profits of the infringer award for copyright infringement.

5.   Count VIII – Design Patent Infringement

   a.   The Court finds Defendants liable for design patent infringement in violation of 35 U.S.C. § 289.

   b.   The Court awards damages of $35,127.00 with prejudgment interest of $10,014.05.[42]

   c.   A permanent injunction shall be entered by separate Order.

   d.   The Court shall award attorney fees and costs associated with bringing this claim, less any fees and costs previously awarded to the Plaintiff.

6.   Judgment shall be entered by separate Order.

7.   Plaintiff shall file a motion seeking costs and attorneys' fees within fourteen days of the entry of Judgment.

   a. Pursuant to Rule 109.2.a. of the Rules of the United States District Court for the District of Maryland ("Local Rules"), Plaintiff may defer filing the memorandum required by Local Rule 109.2.b. until 35 days after filing the motion or, if an appeal is taken from the Judgment, within fourteen days of the issuance of the mandate of the appellate court.

   b. Defendants shall file any opposition to the said motion within fourteen days of the service of the Rule 109.2.b. memorandum.

SO DECIDED, on <u>Friday, September 30, 2011.</u>


                         <u>    /s/     ____</u>
                            Marvin J. Garbis
                         United States District Judge

---

[42] This award is included within, and therefore duplicative of, the profits of the infringer award for copyright infringement.