IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VICTOR STANLEY, INC., | * | |
| Plaintiff, | * | |
| v. | * | Case No. MJG-06-2662 |
| CREATIVE PIPE, INC., *et al.* | * | |
| Defendants. | * | |

\* \* \* \* \* \*

**MEMORANDUM OPINION**

On September 18, 2015, the Court issued an Order that granted in part and denied in part Plaintiff-Judgment Creditor Victor Stanley, Inc.'s ("VSI") "Motion for Sanctions and Finding of Contempt for Failure to Comply with the Court's Orders of February 8, 2012 and November 20, 2014" ("Motion") (ECF No. 687).[1] (ECF No. 714.) This Order directed VSI "to file with the Court a memorandum outlining (a) the monetary damages it has sustained as a result of the contempt of [the Defendant-Judgment Debtors Creative Pipe, Inc. ("CPI") and Mark Pappas ("Pappas") (collectively, "Defendants")] and (b) the attorney's fees and costs it has incurred in connection with its Motion." (*Id.* ¶ 5.) Now pending before the Court is VSI's memorandum concerning its damages (ECF No. 715), Defendants' response (ECF No. 718), and VSI's reply (ECF No. 719). Although the Court held a hearing on VSI's Motion on the issue of sanctions and civil contempt, having reviewed the submissions of the parties in connection with VSI's damages, I find that a hearing on the issue of damages is unnecessary. *See* Loc. R. 105.6. For the

---

[1] On March 22, 2013, this case was referred to me for ordering and conducting supplementary proceedings in accordance with Md. R. Proc. 2-633. (ECF No. 612.)

reasons set forth below, and as laid out in a separate Order, VSI's request for monetary damages and attorney's fees will be granted in part and denied in part.

## I. INTRODUCTION

### A. The Relevant Judgments

The labyrinthine procedural history of this case need not be set forth in this opinion. It is sufficient to state that on November 4, 2011, the Court entered an Amended and Final Judgment Order that, in pertinent part, entered judgment against Defendants and in favor of VSI in the amount of $2,454,931.10. (ECF No. 488; *see also* ECF No. 715 at 9 n.3.) A Supplemental Judgment Order was entered on December 30, 2013 that awarded VSI "legal fees and expenses in the amount of $748,334.72, to be paid by Defendants." (ECF No. 666; *see also* ECF No. 715 at 9 n.3.) The Court will refer to the Amended and Final Judgment Order (ECF No. 488) and the Supplemental Judgment Order (ECF No. 666) collectively as the "judgment." VSI states that only $16,507.60 has been paid toward the judgment, leaving a balance owed on the judgment in excess of three million dollars. (ECF No. 715 at 9.)

### B. History of Discovery in Aid of Enforcement

VSI has attempted to collect the judgment by propounding discovery on Defendants pursuant to Rule 69(b) of the Federal Rules of Civil Procedure. On two occasions relevant to this opinion, the Court ordered Defendants to produce discovery responses to VSI's requests. (ECF Nos. 538 & 686.)

First, on February 8, 2012 the Court ordered Defendants to "produce all responsive documents in their possession, custody, or control" in connection with VSI's First Request for Production of Documents to CPI (ECF No. 515-4). (ECF No. 538.) The Court stated that Defendants would not be required to produce those responsive documents that had been

previously produced, but would be required to identify the previously produced document, the time of its production, and the discovery request to which it was responsive. (*Id.* at 2.) Defendants' discovery responses were due by February 22, 2012. (*Id.*) In its Motion and in its memorandum regarding damages, VSI contends that CPI's response to document production request 27[2] (*see* ECF No. 515-4 at 10) did not comply with the Court's Order.

Second, on November 20, 2014 the Court ordered Defendants to produce "full and complete answers to all of the interrogatories propounded in [VSI's] Third Set of Interrogatories" to Defendants and "all of the documents sought in [VSI's] Third Request for Production of Documents" to Defendants. (ECF No. 686 ¶¶ 2-3.) This Order specifically cautioned Defendants that "any violation" of the Order might "subject the Defendants to the sanctions set forth in Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii), including the issuance of an order for the Defendants to appear before this Court to show cause as to why they should not be held in contempt of Court." (*Id.* ¶ 5.) VSI contends that Defendants' responses to a number of discovery requests violated this Order.[3]

On August 14, 2015, the Court issued an Order directing Defendants to appear before the Court to show cause why they "should not be held in civil contempt and subject to possible fine and/or incarceration for failure to fully comply with the Court's Orders of February 8, 2012 (ECF No. 538) and November 20, 2014 (ECF No. 686)." (ECF No. 701.) A hearing was held on September 18, 2015. (ECF No. 717.) At the conclusion of the hearing, the Court entered an

---

[2] This request sought "[a]ll documents since January 1, 2009 to the present that refer or relate to any transfer of funds to or from Salton Sea Builders, Inc. (or any partner of Salton Sea Builders, Inc.)." (ECF No. 515-4 at 10.)

[3] The full text of the relevant discovery requests and the Defendants' responses are included later in this opinion.

Order granting in part and denying in part VSI's Motion. (ECF No. 714.) The Order stated, in

pertinent part:

> 2. CPI is held in contempt of the Court's Order dated November 20, 2014 for its failure to fully and completely respond to Interrogatory No. 7 and Document Production Request Nos. 4 and 6.
> 3. Pappas is held in contempt of the Court's Order dated November 20, 2014 for his failure to fully and completely respond to Interrogatory Nos. 11 and 12, and Document Production Request Nos. 10 and 12.
> 4. CPI is held in contempt of the Court's Order dated February 8, 2012 for its failure to produce a full and complete response to Document Request No. 27.

(*Id.*)

Among other things, the Court must now determine the appropriate sanction for

Defendants' violation of the Court's orders compelling the production of discovery.

## II.    LEGAL STANDARD

Rule 69(b) permits a judgment creditor to obtain discovery in aid of the judgment or

execution "as provided in [the Federal Rules] or by the procedure of the state where the court is

located." The two discovery devices employed by VSI, interrogatories and document production

requests, are permitted by Rules 33 and 34 and were appropriately used in this case. When a

party propounds discovery requests that go unanswered, or when incomplete, evasive, or

untruthful responses are produced, Rule 37 allows a court to compel a party to properly respond

to discovery requests. Rule 37 also permits a court to issue sanctions against a party for its failure

to comply with an order compelling a discovery response. *See Victor Stanley v. Creative Pipe,*

*Inc.*, 269 F.R.D. 497, 537 (D. Md. 2010).

In general, Rule 37 states that a court may "issue further just orders" when a party "fails

to provide or permit discovery" as directed by a court's order. Fed. R. Civ. P. 37(b)(2)(A). The

rule specifically lists seven types of sanctions that a court may impose against a party that

disobeys a discovery order:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
(iii) striking pleadings in whole or in part;
(iv) staying further proceedings until the order is obeyed;
(v) dismissing the action or proceeding in whole or in part;
(vi) rendering a default judgment against the disobedient party; or
(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

*Id.*

Because judgment has already been entered in this case, the sanctions set forth in Rule 37(b)(2)(A)(i)-(vi) are not relevant and would not be effective here. These sanctions are all geared toward the ultimate determination of liability in a case, and not the issue of how any judgment might be collected. The sanction of treating a party's disobedience as contempt, however, remains an effective sanction even after judgment has been entered. This is because a court's contempt power can coerce a party into compliance through imprisonment and the imposition of financial sanctions.

"Civil contempt is an appropriate sanction if we can point to an order of this Court which 'set[s] forth in specific detail an unequivocal command' which a party has violated." *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995) (quoting *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir. 1986)). Notably, "[w]illfulness is not an element of civil contempt." *Id.*; *see also S.E.C. v. SBM Inv. Certificates, Inc.*, No. DKC-06-0866, 2012 WL 706999, at *10 (D. Md. Mar. 2, 2012) (summarizing the Fourth Circuit's rejection of "the absence of willfulness" and "good faith alone" as defenses to civil contempt). Where civil contempt has been established, courts "may impose sanctions . . . 'to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy.'" *In re Gen. Motors Corp.*, 61 F.3d at 258 (quoting *Connolly v. J.T. Ventures*, 851 F.2d 930, 932 (7th Cir. 1988)).

In August 2015, the undersigned was of the opinion that treating the Defendants' disobedience to the Court's orders as civil contempt, as had been done in this case in 2010, would be the most efficient and effective mechanism to address Defendants' misconduct. For this reason, the Court issued the Order dated September 14, 2015 that found Defendants to be in civil contempt. Upon further review of relevant legal authority, however, the undersigned has determined that paragraphs 2-4 of the Order dated September 14, 2015 (ECF No. 714) must be vacated *nunc pro tunc*. The undersigned believes that he lacks the authority under 28 U.S.C. § 636(e) to hold Defendants in civil contempt given the procedural posture of this case.

Section 636(e) of Title 28 of the United States Code sets forth the civil contempt authority that a United States magistrate judge may exercise. In civil cases in which a magistrate judge presides with the consent of the parties pursuant to 28 U.S.C. § 636(c), the magistrate judge "may exercise the civil contempt authority of the district court." *Id.* § 636(e)(4). In civil cases in which a magistrate judge presides other than by the consent of the parties, pursuant to 28 U.S.C. § 636(a), (b), or "any other statute," magistrate judges are not authorized to exercise the civil contempt authority of the district court. *Id.* § 636(e)(6)(B). Instead, magistrate judges must certify the facts believed to constitute civil contempt to a district judge, so that the district judge may make a determination as to whether civil contempt occurred and how it ought to be "punish[ed]." *Id.*

Here, the parties are not proceeding before a magistrate judge by their consent. As a result, Section 636(e)(6)(B) prevents the undersigned from making any finding of civil contempt and imposing any "punishment" in connection with such contempt. In short, I possess no

authority to hold Defendants in civil contempt. For this reason, paragraphs 2-4 of the Court's Order dated September 14, 2015 (ECF No. 714) will be vacated *nunc pro tunc*.[4]

Fortunately, "Rule 37 is flexible," and courts are permitted to "use as many and as varied sanctions as are necessary to hold the scales of justice even." 8B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2284 (3d ed. 2015). Here, the interests of justice plainly require the imposition of a sanction that will (1) deter Defendants from continuing to evade their obligation to properly respond to discovery requests, (2) deter Defendants from violating future orders of the Court, and (3) compensate VSI for the lost judgment collection opportunities and expenses incurred as a result of the Defendants' defiance of the Court's orders. As it happens, these interests are the same interests that civil contempt sanctions are meant to advance. *See In re Gen. Motors Corp.*, 61 F.3d at 258.

In determining the extent of sanctions to be imposed, the Court will be guided by the standard of civil contempt, even though this standard is more rigorous than the general standard for the imposition of sanctions under Rule 37. Considering Defendants' misconduct under the civil contempt standard provides the parties and the district judge additional assurance that the sanctions imposed are sufficient to meet the interests of justice under the circumstances of this case, yet not greater than necessary to satisfy those interests. Moreover, the civil contempt standard provides useful guidance in determining the extent to which sanctions are appropriate, especially considering the unique circumstances at issue. In addition, in the event that

---

[4] As discussed more fully below, the sanctions that will be imposed against the Defendants pursuant to Rule 37 are the same sanctions that the Court would have imposed had it possessed civil contempt authority in this case. Nonetheless, if VSI believes that the undersigned is nonetheless compelled to certify the facts constituting the Defendants' civil contempt to the district judge, VSI should make such a request within fourteen (14) days of the date of the accompanying Order. Given the resources that the parties and the Court have already expended on this matter, and in consideration of the sanctions to be imposed, it is not clear that certification of civil contempt to the district judge is necessary.

Defendants fail to comply with the sanctions imposed, the analysis contained herein will assist the district judge in determining whether the Order implementing this opinion is a "valid decree," which will be a finding required in any future civil contempt analysis. *See Ashcraft v. Conoco, Inc.*, 218 F.3d at 301.

The Fourth Circuit has stated that four elements "must be shown by clear and convincing evidence" to establish civil contempt:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that [the] movant suffered harm as a result.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (internal ellipses omitted).

Like sanctions under Rule 37, courts have broad discretion to fashion remedies for civil contempt. *In re Gen. Motors Corp.*, 61 F.3d at 259. While such remedies are necessarily coercive and compensatory, they must not be punitive.[5] *Id.* (stating that a "compensatory sanction may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature") (internal quotation marks omitted).

The Court must now determine the monetary damages and attorney's fees and costs that are appropriate in light of Defendants' noncompliance with the Court's orders. As stated above, the sanctions that will be imposed for Defendants' disobedience to the Court's orders are imposed pursuant to Rule 37(b).

---

[5] Here, there is little risk that any sanctions imposed will be punitive, at least with respect to the amount of damages. VSI "agrees that any monetary damages awarded [in connection with its Motion] are subject to being credited against the [judgment]." (ECF No. 715 at 9.) Thus, any monetary damages assessed against Defendants will not "exceed the actual loss to the complainant caused by the actions of the respondent" as they will not exceed the amount of the judgment.

## III.   DEFENDANTS' DISCOVERY RESPONSES

The Court's reasoning for imposing sanctions for Defendants' disobedience to the Court's orders is set forth below in connection with each relevant discovery request, but two findings apply to all of the requests. First, the Court's orders of February 8, 2012 (ECF No. 538) and November 20, 2014 (ECF No. 686) are "valid decrees" of which Defendants had actual knowledge. *See generally Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000). Second, the Court's orders of February 8, 2012 and November 20, 2014 were both in VSI's favor in that they required Defendants to provide the discovery responses that VSI was seeking. Having made these findings,[6] the only remaining elements in the Court's sanctions inquiry are (1) whether Defendants were aware of their violation of the orders; and (2) whether VSI was harmed by Defendants' violation of the orders. The Court will address these elements separately as to each category of discovery responses.

In its memorandum regarding damages, VSI organized Defendants' inadequate discovery responses into four categories according to subject matter. The Court adopts this approach in its discussion below.[7] The first category relates to the production of information about CPI's accounts receivable, and concerns CPI Interrogatory No. 7 and Document Request No. 6. The second category relates to a "loan" that CPI made to "Salton Sea Builders" and its owner, Michael Brabo, and concerns Pappas Interrogatory No. 11 and CPI Document Request No. 27. The third category relates to information about transfers of money by CPI in excess of $1,000, and concerns CPI Document Request No. 4 and Pappas Interrogatory No. 12. The fourth

---

[6] Defendants do not dispute the validity of the Court's orders or that the orders were in VSI's favor.

[7] With the exception of Document Request No. 27 to CPI, all of the discovery requests at issue are dated July 18, 2014. Document Request No. 27 was propounded on November 18, 2011.

category relates to information about Pappas's acquisition and ownership of real estate in Belize, and concerns Pappas Document Request Nos. 10 and 12.

## A.    Accounts Receivable

The first category of discovery requests at issue concerns information about CPI's accounts receivable. Interrogatory No. 7 to CPI states:

> As of the date of your response to this Interrogatory, as to each customer that has accounts receivable to you totaling over $3,000: (a) identify the customer; (b) state the amounts owed by that customer to you; and (c) identify and fully describe the order(s) or contract(s) that relate to that receivable.

(ECF No. 687-14 at 8.)

Initially, CPI answered this request by stating that it possessed no information besides what it produced on a disc containing its QuickBooks data. (ECF No. 687-3 at 3.) In response to VSI's deficiency letter (ECF No. 687-2), on February 27, 2015, CPI amended its answer as follows:

> The accounts receivable data for Creative Pipe, Inc. was not moved out of QuickBooks and was on the QuickBooks disc produced. There are two ways one can access the accounts receivable file as follows: 1. On the QuickBooks "Home" page there is a window in the upper right-hand corner called "Account Balances" containing several inks including a link for "Accounts Receivable" that can be clicked on to open the accounts receivable file; 2. One can also access this file by clicking on the "Reports" link on the top tool bar, then the "Customers & Receivables" link and finally the "A/R Aging Summary" link to open the accounts receivable file. The balance at the time of the QuickBooks production was $63,933.66.

(ECF No. 688-6 at 3-4.)

Document Request No. 6 to CPI requests:

> All documents related to your open order files and your accounts receivables, including, but not limited to aged listings, for you and for any other business entity in which you have had an ownership interest at any times since January 1, 2013, to the date of your response to this Request. This should include, but not be limited to, the documents and files referenced at ¶1(b) of Attachment A. This

> shall also include the open order files referenced by Christi DeRouen in her June
> 2, 2014 Affidavit at ¶8.

(ECF No. 687-7 at 7.)

Initially, CPI responded to this document request: "We no longer keep the open order report as described in Christi DeRouen's affidavit previously produced. See QuickBooks included herein for accounts receivable." (ECF No. 687-13 at 4.) Subsequently, CPI amended its response and stated:

> The accounts receivable information can be found in QuickBooks produced by
> disc as explained in supplemental answer 7 to the Third Set of Interrogatories
> propounded by the Plaintiff-Judgment Creditor Victor Stanley. CPI possesses no
> open order documents. The "open order" document was created by a former
> employee on her own for her own personal reference. It was abandoned when she
> left since CPI knew by the purchase orders and invoices what orders were open at
> any given time and found the open order document superfluous. Neither Concept
> Development nor Robert Greer performs any billing services for CPI. Concept
> Development pays some of CPI's bills as directed.

(ECF No. 689 at 3-4.)

The essence of CPI's initial and supplemental responses to these discovery requests is that all of CPI's accounts receivable are contained in the QuickBooks data produced and are identified as "Accounts Receivable." If this were true, while VSI might have a legitimate quibble with the form of CPI's responses, the content of the responses might not support the imposition of sanctions under Rule 37(b). After all, a representative from VSI, Gerald P. Skalka, testified that VSI had previously made use of CPI's QuickBooks data to attempt to attach its accounts receivable. (*See also* ECF No. 715-3.) If accessing CPI's accounts receivables was as straightforward as its discovery responses indicated, it would be difficult for VSI to show that it suffered any harm. *See SBM Inv. Certificates, Inc.*, 2012 WL 706999, at *10 (generally discussing the defense of "substantial compliance" to civil contempt).

At the September 18, 2015 hearing, however, an exchange occurred[8] between the Court and counsel for Defendants that highlights the problem with CPI's responses:

> THE COURT: What if I find out that SCH has been processing orders for Creative Pipe and was holding accounts receivables for Creative Pipe, despite your representations today that that's not happening?
>
> DEFENSE COUNSEL: I would agree, your honor, it's a big issue and I wouldn't make that representation on my own accord, and I think my client would be in very deep trouble with the Court. . . .

(*See* ECF No. 717.)

In fact, the Court's question was prescient because CPI has used a company called SCH Enterprises ("SCH") to process orders and collect payments from customers, all without reporting the payments it expected to receive from SCH as accounts receivable. Mr. Pappas was deposed on September 18, 2015 and provided information about CPI's scheme to use SCH as a way to hide CPI's accounts receivable.

Mr. Pappas stated that his wife, Jeaneatte Pappas, created SCH sometime around the beginning of 2015.[9] (ECF No. 715-1 at 9.) Mr. Pappas stated that CPI presently "merely consists of [himself] and Jeanette." (*Id.* at 10.) CPI "provide[s] leads to SCH," but SCH makes the actual sale to the customer and handles all of the "logistics, the ordering of product, the shipping of product, and the delivery of product to the customer as well as the collection of monies and the payment of monies to the vendors," which are all functions that used to be performed by CPI. (*Id.* at 10-11.) The relationship between SCH and CPI is close: SCH "lease[s] the same office

---

[8] The Court does not have access to a transcript of this hearing, but the proceedings were electronically recorded. The unofficial "transcript" of the hearing included herein is based on the electronic recording.

[9] The SCH entity created by Mr. Pappas's wife is distinct from the SCH entity created and run by the late Stephen C. Hair and his wife. It appears that the SCH entity owned by Mr. Hair and his wife performed services for CPI while Mr. Hair was living, but ceased to operate after his death.

space" that is used by CPI; SCH and CPI share a telephone number; and, SCH's employees are former employees of CPI. (*Id.* at 11-14.) SCH does not perform "any activity that wasn't [previously] performed by Creative Pipe." (*Id.* at 15.) In essence, CPI restructured its business so that SCH would take over "everything that goes along with the sale of a product from beginning to end." (*Id.* at 20.) Unlike CPI, Jeaneatte Pappas is the sole shareholder of SCH. (*Id.* at 15.) Nonetheless, Mr. Pappas works as a consultant to SCH and has full access to SCH's business data. (*Id.* at 21.)

In summary, SCH was created to handle the business functions that had previously been handled by CPI. SCH made sales that generated accounts receivable for SCH. CPI issued invoices to SCH for services rendered in connection with the sales that SCH made, which have been referred to by Mr. Pappas as "commissions." These invoices for "commissions" amount to accounts receivable for CPI. These accounts receivable were not included in CPI's QuickBooks data as accounts receivable in the manner stated in CPI's discovery responses. Defendants did not produce documents to VSI that included invoices generated by CPI and sent to SCH until September 18, 2015. These invoices, which date from the period of October 15, 2014 to September 1, 2015 seek payment for "commissions" in the amount of $509,493.97. Defendants' failure to disclose these "commissions" as accounts receivable (or any kind of asset for that matter) to Defendants is a violation of the Court's November 20, 2014 Order. Given the relationship of CPI and Mr. Pappas to SCH, the Court finds that Defendants knew that their responses were in violation of the Court's Order.

Defendants argue that VSI misstates the relationship between CPI and SCH, and that the "commissions" due to CPI from SCH were not "net sales receipts," but were only commissions based on a percentage of SCH's sales. (ECF No. 718 at 4-6.) This argument entirely misses the

point, however, because these "commissions" were accounts receivable within the ordinary meaning of the term. Furthermore, whether SCH was created for a legitimate business purpose (as Defendants argue) or to confuse and obstruct VSI's judgment execution efforts (as VSI claims) is not relevant to the Court's inquiry. CPI stood to be paid by SCH for the sales leads and services it rendered, but it failed to disclose this to VSI. CPI's alteration (and convolution) of its business practices to outsource all of its logistics to SCH is a circumstantial indication that Defendants' conduct was designed to mislead VSI. While the Court agrees that Defendants are "not obligated to voluntarily pay the judgment," they are obligated to comply with this Court's orders.[10] As defense counsel said at the September 18, 2015 hearing in response to the Court's hypothetical question, Defendants are now in "very deep trouble."

Having found that Defendants failed to disclose the payments to CPI that were expected from SCH as accounts receivables, it is now necessary to determine the extent to which VSI has been harmed. In his declaration dated October 1, 2015, Mr. Skalka states that he reviewed the invoices from CPI to SCH from October 15, 2014 to September 1, 2015, and found that the invoices totaled $509,493.97 in "commissions." (ECF No. 715-3 ¶ 3.) Notably absent from these invoices are any invoices between July 18, 2014, the time that the discovery request was served, and October 15, 2014. (*Id.* ¶ 5.) I find that VSI has been harmed by Defendants' violation of the Court's Order. I further find that if Defendants had properly disclosed its $509,493.97 in accounts receivable, VSI could have acted to attach this amount in execution of its judgment. Accordingly, although it is likely an under-estimate of VSI's actual damages, I find that VSI's damages in connection with Defendants' inadequate responses as to these discovery requests is $509,493.97. (*See* ECF No. 715-3 ¶¶ 5-6.)

---

[10] This is especially true given the history of this case and the sanctions that have been imposed on Defendants for their previous violations.

###### B.        Salton Sea Builders Loan

The second category of discovery requests concerns information about a "loan" that CPI made to Salton Sea Builders, a business entity owned by Mr. Pappas's accountant, Michael Brabo. (*See* ECF No. 715 at 13-15.) In November 2011, VSI requested the production of documents related to this purported loan. (*See* ECF No. 515-4.) VSI's Document Request No. 27 to CPI sought

> [a]ll documents since January 1, 2009 to the present that refer or relate to any transfer of funds to or from Salton Sea Builders, Inc. (or any partner of Salton Sea Builders, Inc.).

(ECF No. 515-4 at 10.) This document request was included among the requests for which the Court compelled discovery responses in the Order dated February 8, 2012 (ECF No. 538).

In addition, VSI's Interrogatory No. 11 in VSI's Third Set of Interrogatories to Mr. Pappas, which was propounded on July 18, 2014, stated:

> As to any payments to you by Michael Brabo (or his spouse) or Salton Sea Builders, Inc. since January 1, 2010, identify the dates and amounts of payments, state where those funds were deposited, and then state how those funds were used by you.

(ECF No. 687-15 at 9.)

Mr. Pappas initially responded to Interrogatory No. 11 as follows:

> Information relating to payments made by Michael Brabo (or his spouse) or Salton Sea Builders has been provided in previous Answers to Interrogatories and deposition testimony. Payments made on behalf of Brabo/Salton Sea Builders have been explained in Mark Pappas' Second Supplemental Response to the First Set of Interrogatories propounded by Plaintiff Judgment Creditor, Further Supplemental Answer No. 2.

(ECF No. 687-10 at 5.) Mr. Pappas later supplemented this response to state that he had "no further information to provide in response to this interrogatory, other than the information and documents referenced in Mr. Rothschild's letters to Mr. Ogg, dated March 24, 2014 and April 3,

2014, which describe the Salton Sea Loan transaction and reference the documents relating to it." (ECF No. 688-7 at 4.)

VSI contends that Defendants failed to fully disclose information related to the payment of this loan. At a deposition in August 2012, Mr. Pappas implied that the loan had been "paid in full when it had not been paid at all." (ECF No. 715 at 14.) Thereafter, VSI argues, Defendants failed to produce responsive documents to Document Request No. 27 "relating to the actual status of the loan" that was in the process of repayment. (*Id.*) Defendants "concocted a scheme to have the $193,000 that was still owed to CPI by Brabo channeled" to Mr. Pappas. (*Id.*)

Defendants' former counsel explained how the loan was repaid in a letter dated March 14, 2014 (ECF No. 687-12).  The Court is unable to fully understand the contents of the letter, and no one—including Mr. Greer (who testified as a witness for Defendants at the September 18, 2015 hearing) and counsel for the parties—has been able to adequately explain the letter. The Court makes no finding as to whether the contents of the letter are true, but does find that the letter's explanation of the repayment of the loan is sufficiently perplexing to be non-responsive to the discovery requests.[11] Accordingly, I find that Defendants' response to these discovery

---

[11] Defendants now offer a somewhat more lucid explanation for how the loan was repaid. Michael Brabo issued two checks to Mr. Pappas totaling $75,000. (ECF No. 718 at 9.) An additional $100,000 of the loan was repaid by a series of eight checks from Concept Development and/or Robert Greer to Mr. Pappas. It is unclear why Concept Development and/or Robert Greer repaid the loan on behalf of Salton Sea Builders and Michael Brabo. While the Court appreciates the efforts of Defendants' current counsel to explain the repayment of this loan, this explanation comes far too late. Since judgment was entered in this case against them, Defendants have engaged in a course of conduct designed to obstruct VSI's efforts to collect its judgment. Defendants are free to engage in lawful business activities as they see fit, but they should be aware that when they intentionally complicate their business transactions, the explanation that will be required to explain such transactions must be clear. Put another way, while Defendants' intentional complication of their financial dealings does not necessarily violate this Court's orders, their failure to explain how and where they have hidden their assets will be a violation. One of the risks that Defendants run in engaging in these purposefully complicated transactions (presumably designed to protect their assets from the reach of VSI) is

requests violated the Court's orders. Given the Defendants' obstructive history in this case, taken together with Mr. Pappas's misstatement during his 2012 deposition that the loan had been repaid in full and the complicated scheme set forth in the March 14, 2014 letter regarding the repayment of the loan, I find that Defendants were, at a minimum, constructively aware that their responses violated the Court's orders.

I also find that VSI has been harmed by Defendants' non-responses. Specifically, at least $118,000 of the loan was due to be repaid at the August 2012 deposition of Mr. Pappas. Defendants' non-compliance with the Court's orders, by their failure to explain exactly how the loan was re-structured and how it was repaid (with specific and timely reference to the checks used for repayment instead of general reference to things like QuickBooks data, cancelled checks and bank statements), was the proximate cause of VSI's failure to attach the balance of the loan. The Court is unable to determine whether VSI might have been able to collect the initial payments totaling $75,000 on the loan, and will give Defendants the benefit of the doubt on this point. I find that VSI's damages as the result of Defendants' inadequate response as to these discovery requests is $118,000, which is the remainder of the loan after subtracting $75,000.

### C.   $1,000 Transfers by CPI

The third category of discovery requests concerns transfers by CPI of amounts in excess of $1,000. Document Request No. 4 to CPI seeks:

> All instruments, documents or records evidencing the sale, transfer or other disposition of any asset (in excess of $1,000 in value) in which you had an interest, legal or equitable, from January 1, 2009, through the date of your response.

(ECF No. 687-7 at 7.)

---

that this Court will find that they have not adequately explained the transactions. Defendants created this risk, and they now bear its consequences.

In response, CPI directed VSI to the QuickBooks data produced in connection with its responses. (ECF No. 687-13 at 3.) CPI did not supplement this response.

Interrogatory No. 12 to Mr. Pappas states:

Identify all funds held at any time since January 1, 2010, held by either Robert Greer, Promontory Partners, LLC, Concept Development, LLC, or Concept Development II, LLC, or any other entity/business managed or controlled by Robert Greer, on behalf of you, CPI, any CPI profit-sharing or pension plans, or any person or entity related to you. For each such fund, state:

  a.  how money was held;
  b.  the reason that the money was held;
  c.  the entity/person that held the money;
  d.  the title-holders of the funds; and
  e.  the disposition of those funds.

(ECF No. 687-15 at 9-10.)

Mr. Pappas initially responded to this interrogatory as follows:

None other than the following:

On behalf of CPI. periodic transfers have been made from CPI business checking accounts to Concept Development for the purpose of paying creditors and vendors and obligations of CPI as directed by CPI. Any monies transferred to Concept Development would remain in that account only until the check representing payment was presented to the Concept Development bank account for payment. Other than this bill payment service, that has been used for years, no monies have been or are presently being held for my benefit or the benefit of CPI. As of the date of these Answers to Interrogatories, I believe there is less than $1000.00 in the Concept Development account for use in payment to CPI vendors/creditors. Copies of any and all transfers to Concept Development and the recordation of Concept Development payment of CPI vendors/creditors will be reflected on the CPI QuickBooks produced herein.

On behalf of Mark Pappas and CPI, on January 21, 2014, the sum of $72,650.00 was transferred to Concept Development from the CPI Profit and Pension Plans. On January 21, 2014. Concept Development wired the sum of $72,623.67 to Victor Stanley in full payment of a sanctions order issued by the Court.

On behalf of CPI, Inc. Profit Sharing Plan and Pension Plan: on May 20, 2014, Check from Profit Sharing Plan in the amount of $17,200.00 and Check from Pension Plan in the amount of $7,125.00 both deposited in Robert W. Greer Attorney at Law account. On June 30, 2014, Robert W. Greer issued check 533 in

the amount of $24,047.00 to Christi DeRouen as an allowable loan/advance on her vested Profit and Pension Plan accrued balance.

(ECF No. 687-10 at 5-6.) Mr. Pappas later supplemented this response:

a. On behalf of CPI, periodic transfers have be [sic] made from CPI business checking accounts to Concept Development's checking account.
b. The money was transferred for the purpose of paying creditors and vendors and obligations of CPI as directed by CPI.
c. The money was held by Concept Development in its checking account and would remain in the account only until the check representing payment was presented to the Concept Development Bank account for payment.
d. Concept Development.
e. Other than this bill payment service, that has been used for years, no monies have been or are presently being held for my benefit or the benefit of CPI. As of the date of these Answers to Interrogatories, I believe there is less than $1,000.00 in the Concept Development account for use in payment to CPI vendors/creditors. Copies of any and all transfers to Concept Development and the recordation of Concept Development payment of CPI vendors/creditors will be reflected on the CPI QuickBooks produced herein.

(ECF No. 688-7 at 5-6.)

The responses produced by Defendants in response to these requests were evasive and non-responsive. The production of the QuickBooks data without reference to specific transactions was as good as no answer at all. As VSI explains, beginning sometime in 2014, CPI began wiring large sums of money to Concept Development, LLC, the company owned by CPI's "trusted friend," Robert Greer. (ECF No. 715.) Concept Development would use the money to pay CPI's bills. Mr. Pappas stated that he outsourced CPI's payment of its bills (and nearly $800,000 in CPI's money) to Concept Development because he "had a lot on [his] plate." (ECF No. 715-1 at 23.) The Court rejects Mr. Pappas's explanation as implausible, but this is of no consequence to the present inquiry. Even if CPI had not engineered this scheme to hide its money with Concept Development, Defendants still had the obligation to explain, with specificity and clarity, their arrangement with Concept Development to VSI in response to the discovery requests. CPI instructed VSI to find the information itself in the QuickBooks data

produced. Instead, Defendants provided untimely, misleading and incomplete information. I find that they did so with at least the constructive knowledge that such responses violated the Court's orders.

Quantifying the harm suffered by VSI into damages on this issue is a more difficult determination. Defendants' responses to the discovery requests are plainly in violation of the Court's orders. VSI has suffered harm as a result, as there is approximately $770,000 of money that cannot be attached because it has already been distributed by Concept Development. The Court recognizes that even if Defendants had provided timely and complete responses to these discovery requests it is not certain that VSI would have been able to attach the money. This is because Concept Development apparently took the money that it received from VSI and promptly used it to pay the bills of Defendants; the money may have already been transferred by the time that VSI obtained the information in discovery.[12]

It would be unjust, however, to find that VSI suffered harm as a result of Defendants' improper responses, but that there is no available remedy. Courts are given broad discretion in fashioning appropriate sanctions under Rule 37(b). An appropriate sanction is especially important here because the discovery at issue because it relates to the real-time financial condition of the Defendants and is constantly changing. In addition to compensating VSI for the harm it has suffered, the Court's remedy must also deter Defendants from obstructing VSI's discovery efforts in the future.[13] Here, I find that a sanction that compensates VSI for its probable lost collection opportunities is appropriate.

---

[12] Whether the invoices paid by Concept Development were legitimate business expenses of CPI or not is irrelevant to the Court's inquiry on this point.

[13] For example, if such a remedy were not made available to VSI, Defendants might also avoid sanctions in the future by a combination of obfuscation and delay. Defendants could put off disclosure of their financial information until the Court issued an order compelling such

In examining the probability of VSI's ability to collect on its judgment, the Court finds that VSI was unlikely to attach the funds that predated its discovery requests of July 18, 2014. Specifically, reference is made to CPI Checks 1003-1006, which were all issued before July 18, 2014. These checks, which total $164,500, were all issued before VSI propounded the instant discovery requests on July 18, 2014. I find that it is improbable that VSI would have been able to attach the funds represented in these checks from Concept Development and Robert Greer even if Defendants had properly responded to the discovery requests.

With respect to the remainder of the funds transferred from CPI to Concept Development and Mr. Greer, I find that Defendants' improper responses substantially obstructed VSI's ability to attach these funds. I find that the harm caused by Defendants to VSI in connection with these discovery requests is $605,500, which is the difference between the total amount transferred ($770,000) and the amount I have found VSI was unlikely to attach ($164,500). Accordingly, the sanction that will be imposed against Defendants pursuant to Rule 37(b) in connection with these discovery requests is $605,500.

### D.   Belizean Real Estate

The fourth category of discovery requests relates to information about Mr. Pappas's real estate holdings in Belize. (ECF No. 715.) VSI's Document Requests Nos. 10 and 12 seek the following:

> [Request 10:] All documents, including but not limited to deeds, mortgages or liens, loan applications, settlement sheets, appraisals, tax assessment notices, property tax bills, market analyses, and leases, related to any real property owned in whole or in part during any period from January 1, 2009, to the present, not otherwise produced herein, by you and by any other business entity in which you have or had an ownership or equitable interest.

disclosure. Then, Defendants could comply with the Court's order by producing information that had by that point grown stale. VSI would thereby be deprived of any way to obtain timely information about the source of funds that it might be able to attach in execution of its judgment.

[Request 12:] All communications with any of the following regarding any investment, account or property:

      a.      Bank of Belize;
      b.      British Caribbean Bank International, Ltd.;
      c.      Grand Belizean Co.;
      d.      Sugar Caye Development, Ltd.
      e.      Christopher Coye;
      f.      Belize Bank International;
      g.      John Turley; and
      h.      Caribbean Mortgage Investment Corporation.

(ECF No. 687-6 at 8.)

With respect to Document Request No. 10, Mr. Pappas initially responded that he had no responsive documents. (*See* ECF No. 689-1 (sealed) at 6.) Thereafter, Mr. Pappas supplemented his response to state that he

> [p]ossesses no documents responsive to this request other than the documents already produced, which included (a) a receipt from British Caribbean Bank Source of Funds for the purchase dated December 5, 2011, (b) a Grand Belizean Estates Property Summary, (c) Transfer and Expenditure of Funds Summary, (d) Individual Land Certificates for 22 GBE parcels, (e) Remax/Island Real Estate Purchase Agreement dated December 19, 2011, (f) Agreement for Sale GBE properties dated December 4, 2011, (g) Agreement for Sale GBE properties dated December 19, 2011, (h) Earnest Money Deposit & Agreement for Sale GOA properties and Loan Agreement, (i) CMIC Loan Facility Agreement, 2.8 million, dated January 30, 2012, and (j) Grand Oasis Properties Summary.

(*Id.*)

With respect to Document Request No. 12, Mr. Pappas initially produced an email from Christopher Coye. (ECF No. 689-1 (sealed) at 7.) Mr. Pappas later confirmed that he was not in possession of any documents responsive to this request besides the email that had been produced.

(*Id.*)

Unfortunately, as VSI learned during the September 18, 2015 show cause hearing and the deposition of Mr. Pappas that followed, the probable reason that Mr. Pappas did not produce any

documents responsive to these requests (except for one email) is that he never looked for the documents in the first place. (*See* ECF No. 719 at 18-20.) At the deposition that occurred after the hearing, Mr. Pappas stated that he did not search any of his or CPI's email accounts for communications related to his real estate holdings in Belize. (*See* ECF No. 715-1 at 27-30.) Mr. Pappas stated that he viewed VSI's document requests as "overly general and burdensome," and decided not to conduct a thorough search of his email accounts because such a search could yield "volumes of stuff . . . [or it] could be nothing." (*Id.* at 28-29.) Notably, Mr. Pappas made no effort to determine how burdensome such a search would be. Mr. Pappas chose not to look for relevant documents regarding his real estate holdings in Belize. VSI persuasively suggests that responsive documents would likely be in his email accounts (unless he or another employee of CPI deleted them). By making the choice not to look for the documents, Mr. Pappas violated the Court's orders of which he was well aware and deprived VSI of access to the documents. As a result, VSI has been unable to attach the payments that Mr. Pappas has sent to Belize, or to repatriate the real estate that he owns there.

The calculation of the harm caused by Mr. Pappas's incomplete and purposely evasive response is more complicated. VSI proposes that the Court assume that it suffered harm in the amount of $140,000 in connection with these discovery requests. VSI calculates this figure as the product of 10 monthly payments of $14,000, which represents the money that Mr. Pappas purportedly sent to Belize since the time of the Court's September 18, 2014 Order. Presumably, if VSI had more information about Mr. Pappas's properties in Belize, it might have been able to somehow intercept these payments. VSI recognizes that the calculation of its damages in this regard is not straightforward. While I find that VSI has been harmed, I am unable to find that this harm is quantifiable as the monetary damages proposed by VSI. Accordingly, I will deny VSI's

request for monetary damages as to the Belizean properties, but will do so without prejudice to its right to renew its request for damages in the future if it uncovers additional evidence.

### E.        Summary of Damages and Attorney's Fees and Costs

#### 1.        Calculation of Total Monetary Damages

For the reasons set forth above, I find that VSI is entitled to monetary damages for Defendants' misconduct as follows: $509,493.97 with respect to the accounts receivable discovery requests; $118,000 with respect to the Salton Sea Builders loan discovery requests; and $605,500 with respect to the discovery requests related to transfers in excess of $1,000. In total, the monetary damages assessed against Defendants for their conduct amounts to $1,232,993.97. I find that the assessment of damages in this amount will serve three purposes. First, it will deter Defendants from improperly thwarting VSI's future discovery efforts. Second, it will compensate VSI for its lost opportunities to collect its judgment that occurred because of Defendants' noncompliance with the Court's orders. Third, it will deter Defendants from violating this Court's discovery orders in the future.

#### 2.        Attorney's Fees and Costs

VSI also requests that the Court order Defendants to reimburse it for the attorney's fees and legal costs associated with its Motion. (ECF No. 715 at 22-23.) Rule 37(b)(2)(C) provides that "instead of or in addition to [other sanctions], the court must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure." In support of its request, VSI has attached a declaration of its counsel, Randell C. Ogg. (ECF No. 715-4.) Mr. Ogg's declaration includes an itemization of his bills "copied directly from the bills rendered to [VSI] in this matter." (*Id.* ¶ 2.) Mr. Ogg states that these bills were generated "based on the contemporaneous records kept" by Mr. Ogg's law practice. (*Id.*) Mr. Ogg states that the only

items included in the bills attached to his declaration are for those services directly related to the issues underlying Defendants' improper responses to the discovery requests, Defendants' violation of the Court's orders regarding discovery, and the calculation of VSI's resulting damages. (*Id.*) The legal services to VSI were billed at the rate of $50.00 per hour for a paralegal, and $350.00 per hour for Mr. Ogg, who has been licensed to practice law for more than 35 years. (*Id.* ¶¶ 4-5.) In total, VSI requests that the Court award attorney's fees in the amount of $46,885.00[14] and costs in the amount of $1,436.94. (*Id.* ¶¶ 3, 8; ECF No. 719 at 24.)

Defendants challenge VSI's claim that it is entitled to all of its attorney's fees and costs. (ECF No. 718 at 15-16.) Defendants do not contest the calculation of Mr. Ogg's hours (or those of his paralegal), but instead argue that many of the items claimed do not have "a reasonable nexus to any basis for contempt." (*Id.* at 16.) Specifically, Defendants list four items for which VSI should not be reimbursed its attorney's fees and costs: (1) VSI's response to Defendants' motion for a protective order (ECF No. 676); (2) VSI's opposition to Mr. Greer's request for admission *pro hac vice* (ECF No. 708); (3) VSI's preparation for the post judgment examination of Mr. Pappas on September 18, 2015; and (4) the expenses for Mr. Pappas's post-judgment examinations. (*Id.*)

In its reply, VSI addresses each of these challenges. With respect to its opposition to Defendants' motion for a protective order, VSI states that it is entitled to its fee for having successfully opposed the motion, pursuant to Fed. R. Civ. P. 37(a)(5)(B), because the motion

---

[14] In its damages memorandum (ECF No. 715), VSI it initially claimed attorney's fees in the amount of $42,300. Because this memorandum was submitted before VSI prepared and filed its reply, VSI requests supplemental attorney's fees in the amount of $4,585.00 in connection with the preparation of its reply. (ECF No. 719.) Thus, the total amount of the attorney's fees requested by VSI is $46,885.00.

was not substantially justified. (ECF No. 719 at 22-23.) The Court agrees that VSI is entitled to attorney's fees in connection with Defendants' motion for a protective order.

With respect to VSI's opposition to Mr. Greer's application for admission *pro hac vice*, VSI argues that such response was necessary to defeat "an improper attempt by the Defendants to have a key witness become their counsel at the contempt hearing to the prejudice of VSI." (*Id.* at 23.) The Court agrees that VSI is entitled to attorney's fees in connection with its opposition to Mr. Greer's *pro hac vice* application.

With respect to Defendants' opposition to attorney's fees in connection with VSI's preparation for Mr. Pappas's post-judgment examination, VSI states that "all such time was excluded from the application." Because VSI does not claim attorney's fees in connection with this area, Defendants' argument does not provide a basis to reduce VSI's claim.

Finally, with respect to the "expenses for the post-judgment examination of Mr. Pappas of at least $848.85," VSI states that it is not clear how Defendants arrived at this amount. The transcript for Mr. Pappas's deposition cost $679.35 and was used by all of the parties in connection with the Court's contempt and damages inquiries. The Court finds that VSI is entitled to the reimbursement of the costs that it claimed, including for the transcript of Mr. Pappas's deposition in 2015.

In calculating an award of attorney's fees, the Court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008). The Fourth Circuit has stated that a court's

> discretion should be guided by the following twelve factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy

and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). In addition, Appendix B to this Court's Local Rules ("Rules and Guidelines for Determining Attorneys' Fees in Certain Cases") provides that lawyers admitted to the bar for twenty years or more may reasonably bill $300-475 per hour, and that paralegals and law clerks may reasonably bill $95-150 per hour. These hourly rates serve as guidelines in determining the reasonableness of hourly rates.

I find that the hourly rates charged to VSI by Mr. Ogg and his paralegal, both of which are within the rates recommended by the Local Rules, are reasonable. I also find that the time that Mr. Ogg and his paralegal spent working on this matter in connection with Defendants' disobedience to the Court's orders is reasonable. Finally, I do not find that Defendants' failure to comply with the Court's orders was substantially justified, or that any other circumstances would make an award of expenses unjust. *See* Fed. R. Civ. P. 37(b)(2)(C). Accordingly, I award attorney's fees and costs to VSI in the amount of $48,321.94.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that monetary sanctions in the amount of $1,232,993.97 are appropriate. Sanctions in this amount will partially compensate VSI for the losses it has sustained as a result of Defendants' disobedience to the Court's orders and should also deter Defendants from continuing to violate the Court's orders in the future. The payment of these sanctions will be credited against the judgment in this case. In addition, the Court finds that an award of attorney's fees of costs in the amount of $48,321.94 is warranted. The payment of these attorney's fees and costs will not be credited against the judgment in this case. Defendants

are ordered to pay a total of $1,281,315.91[15] to VSI by May 23, 2016. Such payment is to be made through counsel for VSI. The parties are jointly ordered to file a status report by May 31, 2016 confirming that Defendants have made the required payment. If the parties report that Defendants have failed to make the required payment in full, the Court will certify this fact to the district judge in this case for a civil contempt inquiry pursuant to 28 U.S.C. § 636(e)(6)(B)(iii).

     An Order implementing this decision will follow.


April 20, 2016                                                   /s/
Date                                              Timothy J. Sullivan
                                                  United States Magistrate Judge

---

[15] This amount is the sum of the sanctions imposed against Defendants and the award of attorney's fees and costs.